GREENBERG TRAURIG, LLP
ROBERT J. HERRINGTON (SBN 234417)
herringtonr@gtlaw.com
MATTHEW R. GERSHMAN (SBN 253031)
gershmanm@gtlaw.com
2450 Colorado Avenue, Suite 400E
Santa Monica, California 90404
Telephone: (310) 586-7700
Facsimile: (310) 586-7800
Attorneys for Defendants
GLOBAL TEL*LINK CORPORATION and
BRIAN OLIVER

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL CARLOS GARCIA,<br><br>              Plaintiff,<br><br>vs.<br><br>COUNTY OF RIVERSIDE, et al.<br><br>              Defendants. | CASE NO. EDCV11-34 VAP (OPx)<br><br>**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br>*[Motion to Dismiss, Declaration of Robert J. Herrington, and Appendix of Cases from Lexis filed concurrently herewith]*<br><br>DATE:        August 15, 2011<br>TIME:        2:00 PM<br>PLACE:      Courtroom 2<br>JUDGE:      Hon. Virginia A. Phillips<br><br>ACTION FILED:  April 15, 2011<br>TRIAL DATE:     Not Set |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Defendants Global Tel*Link Corporation and Brian Oliver (collectively, the "GTL Defendants"), by and through their attorneys of record, hereby requests the Court to take judicial notice pursuant to Federal Rule of Evidence 201, of the following:

1.    Plaintiff's criminal trial is scheduled to begin on September 6, 2011.  (*See* Ex. 1 [printout of on-line docket]).

2.    Plaintiff's original Complaint alleged that the court in Plaintiff's criminal case was holding hearings regarding Plaintiff's allegations that the jail was recording his phone calls.  (Complaint, ¶ 75).  At the court's February 3, 2011 hearing on Plaintiff's Motion to Dismiss and/or Recuse the District Attorney for alleged Prosecutorial Misconduct, the court found that the prosecution in Plaintiff's criminal case has not listened to any allegedly privileged calls, there was no prosecutorial misconduct, and Plaintiff has suffered no prejudice.  (*See* Ex. 2 [*People v. Garcia*, Superior Court of California for the County of Riverside, Case No. INF 064492, Feb. 3, 2011 Court Transcript, at 104:1-3, 18-21, 105:14-15, 110:20-22, 111:18-112:16, 116:7-10, 27-28, 120:2-7]).

Judicial notice is appropriate in this instance on a Rule 12(b)(6) motion to dismiss for failure to state a claim.  *See MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986) ("On a motion to dismiss, we may take judicial notice of matters of public record outside the pleadings."); *see also Lee v. Los Angeles Police Dep't*, CV 08-5165 JVS (FFM), 2011 WL 1691940, at *5 (C.D. Cal. Mar. 21, 2011) (false allegation of tort claim compliance is ignored when judicially noticed facts show the absence of any such tort claim); *accord Anderson v. Simon*, 217 F.3d 472, 474-75 (7th Cir. 2000) ("In ruling on a 12(b)(6) motion, a district court may take judicial notice of matters of public record without converting the 12(b)(6) motion into a motion for summary judgment.").

DATED:  June 20, 2011                GREENBERG TRAURIG, LLP

By:  */s/ Robert J. Herrington*
Robert J. Herrington

Attorneys for Defendants Global Tel*Link Corporation and Brian Oliver

2

Exhibit 1

# RIVERSIDE SUPERIOR COURT

## PUBLIC ACCESS

## Criminal Case Report

### Pay Ticket / Case Fine

[ Print This Report ]

[ Close This Window ]

### Case INF064492 - Defendants

| Seq | Defendant | Next Court Date | Status | Agency / DR Number | Arrest Date | Count 1 Charge | Violation Date |
|-----|-----------|-----------------|--------|--------------------|-------------|----------------|----------------|
| 1 | MANNING, RUSSELL HERBERT | | | PSPD 0902P4855 | 12/05/2008 | PC 182(A) (1) | 12/05/2008 |
| 2 | NIROULA, KAUSHAL | Trial Readiness Conference 06/10/2011 AT 3:00 PM DEPT. 1B | ACTIVE | PSPD 0902P4855 | 12/05/2008 | PC 187 (A) | 12/05/2008 |
| 3 | REPLOGLE, DAVID | Hearing set re: RECORD DUE BY PATRICIA 07/28/2011 AT 8:00 AM DEPT. DCA | ACTIVE | PSPD 0902P4855 | 12/05/2008 | PC 187 (A) | 12/05/2008 |
| 4 | GARCIA, DANIEL CARLOS | Trial Readiness Conference 06/10/2011 AT 3:00 PM DEPT. 1B | ACTIVE | PSPD 0902P4855 | 12/05/2008 | PC 187 (A) | 12/05/2008 |
| | ALIAS: GARCIA, DANIEL | | | | | | |
| 5 | BUSTAMANTE, MIGUEL ADOLFO | Hearing set re: RECORD DUE BY PATRICIA 07/28/2011 AT 8:00 AM DEPT. DCA | ACTIVE | PSPD 0902P4855 | 12/05/2008 | PC 187 (A) | 12/05/2008 |
| 6 | MCCARTHY, CRAIG ANTHONY | Report and Sentencing 02/24/2012 AT 8:30 AM DEPT. 1B | ACTIVE | PSPD 0902P4855 | 12/05/2008 | PC 187 (A) | 12/05/2008 |

### Case INF064492 - GARCIA, DANIEL CARLOS - Status

*Filing Type*    **Held to Answer**         *Custody*      **In Custody**
*Ordered Bail*   **$0.00**              *Filing Date*    **07/22/2009**
*D.A.*         **DDA L. DiMaria**       *Posted Bail*    **$0.00**
*Next Action:*   **Trial Readiness Conference**   *Defense*      **Pro Per**
           **06/10/2011 AT 3:00 PM DEPT. 1B**   *Deputy Report #:* **PSPD 0902P4855**

Exhibit 1, Page 3

| 8 | PC 115 | F | Forged Instrument | 12/05/2008 | NOT GUILTY | ACTIVE |
| 9 | PC 459 | F | Burglary | 12/05/2008 | NOT GUILTY | ACTIVE |
| 10 | PC F496(A) | F | Receiving Stolen Property | 12/05/2008 | NOT GUILTY | ACTIVE |
| | *Enhancement* | | *Description* | | *Plea* | *Status* |
| | PC 186.11(a)(3) | | Fraud/Embezzelment | | | ACTIVE |

## Case INF064492 - GARCIA, DANIEL CARLOS - Probation

**Probation Has Not Been Granted On This Case For This Defendant.**

## Case INF064492 - GARCIA, DANIEL CARLOS - Related Cases On Calendar

| Related Cases On Calendar |
| --- |
| *This Defendant Does Not Have Any Other Cases With Future Hearings Scheduled.* |

## Case INF064492 - GARCIA, DANIEL CARLOS - All of Defendant's Other Cases

| Case Number | Filed,Date | Charges | Next Hearing | Jurisdiction | Status |
| --- | --- | --- | --- | --- | --- |
| *This Defendant Does Not Have Any Other Reportable Cases.* | | | | | |

## Case INF064492 - GARCIA, DANIEL CARLOS - Actions & Minutes

| Action Date | Action Text | Disposition | Hearing Type |
| --- | --- | --- | --- |
| 09/06/2011 8:30 AM DEPT. 1B | JURY TRIAL | ACTIVE | |
| 06/10/2011 3:00 PM DEPT. 1B | TRIAL READINESS CONFERENCE | ACTIVE | TRC |
| 06/06/2011 8:30 AM DEPT. 1B | HEARING ON MOTION RE: RECONSIDER SUPPRESSION OF EVIDENCE. | VACATED | |
| 06/03/2011 | EXPARTE APPLICATION FOR IN CAMERA HEARING FILED BY DANIEL GARCIA | | |
| 06/03/2011 1:30 PM DEPT. 1B | TRIAL READINESS CONFERENCE | DISPOSED | TRC |

**Minutes**    [ Print Minute Order ]

HONORABLE DAVID B DOWNING PRESIDING.
COURTROOM ASSISTANT: KRH-K. HINOS
COURT REPORTER: KPC-K.CAGNEY
PEOPLE REPRESENTED BY DEPUTY DISTRICT ATTORNEY: DDA L. DIMARIA.
DEFENDANT REPRESENTED BY PRO PER.
DEFENDANT PRESENT.

Exhibit 1, Page 4

Exhibit 2

1          SUPERIOR COURT - STATE OF CALIFORNIA

2                   COUNTY OF RIVERSIDE

3

4

5

PEOPLE OF THE STATE OF CALIFORNIA,  )
6                                    )
                        Plaintiff,   )
7                                    )
                        vs.          )  Case No. INF 064492
8                                    )
DANIEL CARLOS GARCIA,                )
9                                    )
                        Defendant.   )
10   _____)

11

12

13   MOTION TO DISMISS AND/OR RECUSE THE DISTRICT ATTORNEY

14            FOR PROSECUTORIAL MISCONDUCT

15         Before the Honorable David B. Downing

16                   February 3, 2011

17

18

19   APPEARANCES:

20   For the Plaintiff:     OFFICE OF THE DISTRICT ATTORNEY
                            BY:  IVY FITZPATRICK
21                               MATTHEW REILLY
                            3960 Orange Street
22                          Riverside, California  92501
                                 LISA DiMARIA
23                          82-675 Highway 111, Fourth Floor
                            Indio, California  92201
24

25   For the Defendant:     DANIEL CARLOS GARCIA, IN PRO PER
                            BK 200911640
26                          P.O. Box 1748
                            Indio, California  92202
27   **CERTIFIED COPY**

28   Reported by:           JULIE GIMINEZ, CSR NO. 8396

1

INDEX OF WITNESSES

2

DEFENDANT'S WITNESSES:                                                    PAGE

3

LISA DiMARIA
     Direct Examination resumed by Mr. Garcia              5
     Cross-Examination by Ms. Fitzpatrick                 68
     Redirect Examination by Mr. Garcia                   82
LUIS BOLANOS
     Direct Examination by Mr. Garcia                     91

4

5

6

7

8

EXHIBIT INDEX

9

DEFENDANT'S EXHIBITS:                              I.D.     EVD.

10

A Copies of inmate telephone monitoring           27       147
  system recording request forms
E Minute order dated 6-18-10                       27       147
F Copy of report on searching inmate             147       147
  property boxes

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JULIE GIMINEZ, CSR

1            INDIO, CALIFORNIA; FEBRUARY 3, 2011

2            BEFORE THE HONORABLE DAVID B. DOWNING

3        THE COURT:  Let's go on the record on Daniel Garcia and

4    Kaushal Niroula.  This is INF 064492.  Those folks are here

5    today for -- with their investigators and all that.  The DA,

6    Ms. DiMaria, and her associates are here.

7            And lawyers, and everybody, would you please announce

8    yourselves, because we have a new court reporter who doesn't

9    know you so she can keep, you know, you sorted out.  So starting

10   with Mr. Niroula.

11       MR. NIROULA:  Kaushal Niroula, in pro per, simply in an

12   observer status for court because I've not filed a joinder for

13   this motion.

14       MR. KARPF:  Scott Karpf, K-A-R-P, like Paul, F, like

15   Frank, motion writer, assisting Mr. Garcia.

16       MR. GARCIA:  Daniel Garcia, in pro per.

17       MR. REED:  Jeff Reed, investigator.

18       MR. REILLY:  Matt Riley, R-E-I-L-L-Y, District

19   Attorney.

20       MS. FITZPATRICK:  Ivy Fitzpatrick, I-V-Y, Fitzpatrick,

21   F-I-T-Z-P-A-T-R-I-C-K, Deputy District Attorney.

22       MS. DiMARIA:  Lisa DiMaria, Deputy District Attorney.

23       THE COURT:  All right.  Last time we're here, which I

24   think it was January 24th, Sergeant Hughes testified and

25   Investigator Diaz testified, Sarah Higuera testified, and what

26   are we going to do today, everybody?  Who's left?

27       MR. GARCIA:  I believe today is finishing up Lisa

28   DiMaria's testimony, and then Mr. Bolanos, Enrique Tira, and

Exhibit 2, Page 007

1

```
1    that should be today.  We also have a couple of other issues --
2            THE COURT:  Oh, just keep -- keep it on focus.
3            I had gotten -- Mr. Garcia and Mr. Niroula separately
4    had subpoenaed records from the GTL, and I thought I got the
5    response from Ms. Maker, who represents the law firm that
6    represents GTL.
7            Have you gotten this response back, Mr. Garcia?  Have
8    you seen this?
9            MR. GARCIA:  Yes, I have.
10           THE COURT:  And this is dated from March 4; right?
11           MR. GARCIA:  Correct.
12           THE COURT:  All right.  So you have it.  Okay.
13           And so the only witness left to testify after today
14   then is the GTL person.  Or not --
15           MR. GARCIA:  Correct.
16           THE COURT:  -- Mr. Garcia?  Pending any rebuttal
17   witness, but that's the only one that we haven't scheduled yet.
18           Okay.  Ms. DiMaria, I think at some point in one
19   of these many proceedings you were on the stand, and we
20   interrupted your testimony and, I think, I don't remember
21   why, but we did, and then we took Sergeant Hughes and the
22   Investigator Diaz out of order because they were here, and
23   Mr. Garrett, also.  Correct?  So you're up.  I guess that's the
24   way to put it.  Ms. DiMaria.
25           MS. FITZPATRICK:  Yes, I believe Ms. DiMaria is next
26   up.  I do believe there's some witnesses, though, that are in
27   the courtroom.
28           THE COURT:  Do you have names?
```

Exhibit 2, Page 008

```
 1              MS. FITZPATRICK:  Mr. Bolanos and -- is that it?  We
 2    ask for them -- Mr. Bolanos to be excluded.
 3              THE COURT:  I don't know.  Who is making -- let me ask.
 4              Let me ask you this: Mr. Bolanos is here.  How much
 5    time are you going to take with Ms. DiMaria and Mr. Bolanos?  If
 6    Mr. Bolanos is going to take five minutes, I'm going to put him
 7    on and get him out of here.  If he's going to take five hours,
 8    then we --
 9              MR. GARCIA:  Um --
10              THE COURT:  I don't care how much time you take.  I'm
11    just trying to figure it.
12              MR. GARCIA:  I imagine it would be brief, but he was
13    being called for a rebuttal.
14              THE COURT:  So you need Ms. DiMaria to testify first;
15    is that what you're telling me?
16              MR. GARCIA:  Correct.
17              THE COURT:  Okay.
18              MS. FITZPATRICK:  Your Honor --
19              THE COURT:  Yes, go ahead.
20              MS. FITZPATRICK:  -- I'm a little confused, because I
21    believe all these witnesses were called by Mr. Garcia.  So
22    Mr. Bolanos wouldn't be a rebuttal witness, he would be another
23    witness being called by -- by Mr. Garcia.  The People have not
24    called any witnesses.
25              THE COURT:  Yeah, I know, but I think I know what he
26    means.  Well, so he wants to call -- finish with Ms. DiMaria
27    first before you call Mr. Bolanos, is that --
28              MR. GARCIA:  Correct, Your Honor.
```

Exhibit 2, Page 009

3

```
 1              THE COURT:  No, that's fine.  The District Attorney has
 2   made a motion to exclude/separate witnesses.  Mr. Bolanos is --
 3   it's cold outside.  If you want to sit down in the lobby of 1A,
 4   that's fine.  We can find you down there.  Okay?
 5              MR. BOLANOS:  Thank you.
 6              THE COURT:  Welcome.  All right.  Let's recall
 7   Ms. DiMaria then, please.
 8              MS. FITZPATRICK:  Before we proceed with the testimony
 9   from Ms. DiMaria, I had a chance to read the transcript from the
10   prior proceedings, and it seems to me that the only thing
11   relevant in, you know, to this court's inquiry into
12   determination of Mr. Garcia's motion is: Were there any
13   privileged calls where there were privileged calls accessed by
14   the District Attorney's Office; what was the extent of the
15   access; and was that access intentional; and then finally, was
16   the defendant prejudiced by any of the access.  And in reading
17   the transcript from the prior proceeding, it seems that the
18   question -- question posed by Mr. Garcia became rather far
19   afield to relevant inquiry.  So I'd ask that Mr. Garcia's
20   questioning of Ms. DiMaria be limited to what is relevant and
21   not -- to this court's proceeding and maybe not what's relevant
22   to his civil lawsuit.
23              THE COURT:  Yes, I know.  All right.
24              MR. GARCIA:  Your Honor, if I may?
25              THE COURT:  No, let's just get on with it.
26              MR. GARCIA:  Okay.
27              THE COURT:  The DA thinks you've gone too far, she'll
28   object, and I'll rule on the objection.  So let's just go.
```

1          Ms. DiMaria, if you'd please just take the stand.

2          All right.  Ms. DiMaria is still under oath, so

3    proceed, folks, please, where we left off last time.

4          MR. GARCIA:  May I proceed, Your Honor?

5          THE COURT:  Yeah, go ahead, sure.

6          MR. GARCIA:  Oh.

7                      LISA DiMARIA,

8    recalled as a witness by the defendant, having been previously

9    sworn, testified as follows:

10                 DIRECT EXAMINATION RESUMED

11   BY MR. GARCIA:

12     Q.   Ms. DiMaria, last time we're here, we looked at several

13   exhibits of that request form for calls.  Did you direct your

14   investigators in every instance to make these requests?

15     A.   I asked them to make the request.  I didn't instruct

16   them how to fill out the forms, but I did ask them to make the

17   requests.

18     Q.   Okay.  Did you give them any special instruction to

19   fill in the specialized notes?

20          THE WITNESS:  I apologize, Your Honor.  I believe you

21   just did an order to exclude witnesses, and a witness has just

22   walked in the courtroom.

23          THE COURT:  Yeah, I know, I saw him.

24          Mr. Garcia, was Mr. Tira going to be one of your

25   witnesses?

26          MR. GARCIA:  Yes, he is.

27          MR. NIROULA:  Your Honor, you had already made a ruling

28   that Mr. Tira would not be removed from the courtroom when we

1   started this motion.

2        THE COURT:  I think so because he's Mr. Niroula's

3   investigator.

4        MS. FITZPATRICK:  Your Honor, my understanding is

5   Mr. Niroula has not joined in this motion, however.

6        THE COURT:  Well, that's okay.  He can stay.

7        Mr. Tira, you can stay.

8        THE WITNESS:  I apologize, Mr. Garcia, I need you to

9   repeat your last question.

10       MR. GARCIA:  Yes.

11   Q.   BY MR. GARCIA:  On each of the forms that are -- or on

12   some of the forms there's specialized notes asking for specific

13   numbers to be blocked.  Did you give instructions to block those

14   specific numbers?

15   A.   Yes.  Once I realized there was an issue with attorney

16   calls being inadvertently recorded, to ensure that my office and

17   myself did not receive any of those calls, I believe I

18   personally went around to the attorneys, gathered phone numbers,

19   provided them to my investigator and requested that those phone

20   numbers specifically be excluded if we had any recordings

21   provided to us.

22   Q.   Okay.  And which attorneys were those?

23   A.   I was on knowledge that Mr. Mario Rodriguez's calls had

24   gotten recorded, and I later learned that Mr. Cameron Quinn's

25   calls got recorded.  So those were the attorneys whose phone

26   numbers I asked for.

27       Out of an abundance of caution, to make sure everything

28   else was covered when those instances arose, I obtained phone

Exhibit 2, Page 012

6

JULIE GIMINEZ, CSR

1   numbers from Mr. Joe Forth, because he was counsel for

2   codefendant; I obtained phone numbers, I believe, from

3   Mr. Dolan, because he was counsel for a codefendant -- I don't

4   recall.  I just know when the issue came up in court, I tried to

5   get phone numbers from everybody that I could, and I had asked,

6   if I recall, for any phone numbers they used to speak with their

7   clients, not just office numbers, but if they used cells or

8   homes.

9       Q.   Okay.  And you made those requests only after you had

10  already received a CD containing privileged calls; correct?

11      A.   Well, prior to that I wasn't aware that this was an

12  issue.  It normally -- they're normally not recorded.  So --

13      Q.   So this has never come up in any other cases that you

14  were aware of?

15      A.   My cases that I'm aware of, no, it has not come up.

16      Q.   Okay.  And do you have any knowledge prior to this of

17  the Medina case?

18      A.   No.

19      Q.   Okay.  So there's -- there's no memos within the

20  District Attorney's Office discussing this issue?

21      A.   No, there are thousands of cases in the District

22  Attorney's Office.  There's -- there's no way we could send out

23  memos of everything that came up on every case.  We would

24  drown.

25      Q.   Okay.  And as far as you mentioned, some attorneys

26  whose numbers you were asked to be excluded, but weren't you

27  also aware that I was represented by Mr. James Silva?

28      A.   I had no knowledge of their being an issue.  If the

Exhibit 2, Page 013

JULIE GIMINEZ, CSR

1   protocol was followed that the attorneys are supposed to follow,

2   their calls are not supposed to be recorded.  So I did not take

3   measures until I became aware of an issue.  I did not have this

4   issue prior.  So no, I did not make a special request of

5   Mr. Silva.

6           MR. GARCIA:  Your Honor, I --

7           THE WITNESS:  And to my knowledge, none of Mr. Silva's

8   calls were recorded, either.

9           MR. GARCIA:  Your Honor, I'd object as nonresponsive,

10  and I'd ask that she be instructed to answer my question.

11          THE COURT:  Well, Mr. Garcia, I -- you know, I'm a

12  little liberal about stuff, but I'm the judge of the facts; in

13  other words, no jury is here, so I can sort out what I need to

14  keep and what I don't.  So the purpose of this proceeding is to

15  get to the truth of all this.  So I can sort out that, I will

16  let both sides go further than maybe they should, but I need to

17  hear what the answers are.  I don't want to be spending the next

18  six years doing this.  So I'm trying to get this done in an

19  expeditious manner.  So the answer will stand.  Proceed.

20      Q.   BY MR. GARCIA:  Ms. DiMaria, you mentioned a --

21  policies, the written policies.  Is that a --

22      A.   I apologize, I don't mean to be difficult.  I'm not

23  even sure how I used the word "policy."  What did I say?  I'm

24  sorry, Mr. Garcia.

25      Q.   A policy that appears that the attorneys must register

26  their numbers.

27      A.   I don't know.  That's outside of the District

28  Attorney's Office.

Exhibit 2, Page 014

8

JULIE GIMINEZ, CSR

1      Q.   Okay.

2      A.   So I don't run the jail system or the phone system at

3   the jail.

4      Q.   But -- so that's speculation on your part that there's

5   a policy?

6      A.   Not speculation.  I'm to understand that there is some

7   type of procedure because in other cases I haven't had an

8   attorney's calls recorded.  This is the only time I've had this

9   issue.

10     Q.   And where do you understand that, that that's policy?

11     A.   Where do I understand it?  In my brain.  I don't mean

12   to be sarcastic but --

13     Q.   Has someone informed you that this policy is there?

14     A.   Definitely since this case arose.  Since this occasion

15   arose for sure.  I just know that in the past when calls have

16   been requested, I've never gotten attorney calls before.

17     Q.   But to your knowledge, you know of no written policy

18   from the sheriff's department that requires attorneys to

19   register their phone numbers?

20     A.   I've learned what I've learned in this case.  I -- I

21   don't work for the sheriff's department nor GTL, and I don't

22   wish to speculate on what other departments do or don't do.

23     Q.   And are you aware if GTL has a specific policy

24   regarding privileged calls?

25     A.   I don't work for GTL and I don't wish to speculate.

26     Q.   Okay.  And were you also aware at some point that

27   Mr. David Wright was representing me, at least in some capacity?

28     A.   I became aware when I saw him at court, and I'm the one

1   who went up to him.  You have never notified me of anyone you

2   were working with.  Other than who was appointed in court, be it

3   attorneys or investigators, you have never advised me who you

4   were working with.  When I saw Mr. Wright in court, sitting on

5   your side, I am the one who took the affirmative action of

6   walking up to him, asking him who he was, how he was involved in

7   this case.  When he mentioned he was an attorney, I said to him,

8   oh, well, you should be aware we've had issues before, and I'm

9   the one who apprised him of the process of going and registering

10  his phone number at the jail because I knew this issue had

11  arisen with two other attorneys.

12      Q.   So you apprised him of the procedure which you're

13  unaware of if it's an official policy?

14      A.   You're putting words in my mouth, Mr. Garcia.

15      Q.   Okay.

16      A.   After we had the issue with Mr. Rodriguez, I started

17  looking into the issues, and that's when I learned.  So that was

18  back in -- I'd have to look at my notes -- but I believe it was

19  June of 2009 where the issue with Mr. Rodriguez's calls were

20  recorded, and Mr. Wright got involved.  Well, he came into court

21  in 2010.  So yes, by the time Mr. Wright came into court, at

22  that point I had learned of what the attorneys were supposed to

23  do in regard to registering a phone number.

24      Q.   And yet on none of these forms did you ever ask to have

25  his phone numbers secluded -- or excluded from copying;

26  correct?

27      A.   I did not have his phone numbers, I did not ask for

28  them, and to my knowledge he wasn't attorney of record; I did

Exhibit 2, Page 016

10

JULIE GIMINEZ, CSR

```
1    not.  But I did ask him or I apprised him of the procedure to go
2    register his number so that it would not be recorded.
3             Furthermore, I don't believe, with the exception of
4    October of this year, looking for one specific phone call, that
5    we ordered your phone calls after that point in time.  I -- I --
6    I don't have the exact dates.  I could probably look them up.
7    But I know we stopped ordering your calls somewhere by June of
8    this year or 2010 -- wow, we're in '11 already -- after there
9    was a ruling made by this court about your mother now being
10   privileged.  We stopped ordering calls.  Mr. Wright came into
11   court right close to that period of time.  So since I was no
12   longer ordering calls, I did not obtain his phone numbers and
13   exclude them.  Besides, I thought asking him to appropriately
14   register his number would have taken care of his phone calls.
15        Q.   Okay.  You were here on June 18th, 2010; correct?
16        A.   I was.
17        Q.   And so you were present when I addressed the court over
18   concerns that despite our best attempts, the jail was still
19   recording privileged calls?
20        A.   I do not believe about privileged calls.  I recall that
21   one -- you had motions.  One of the people on your motion was to
22   have your mother deemed privileged, and the judge did indicate
23   she would fall under -- I don't recall if he called her a clergy
24   privilege or a spiritual advisor privilege -- but I recall that
25   he deemed she would be considered she would be privileged from
26   that date forward.  I recall you requesting the judge to make
27   the order retroactive, and he said he couldn't do that.  So from
28   June 18th, 2010 forward, she would be considered privileged.
```

Exhibit 2, Page 017

JULIE GIMINEZ, CSR

1    Q.   In fact, that's not what the court did, did they?   The

2  court said that we could address my concerns of previous calls

3  in 402 motions; is that correct?

4    A.   I don't recall that.   My notes -- Mr. Garcia, we've

5  been in court sometimes weekly, sometimes twice a week.

6         THE COURT:   Over 50 times.

7         THE WITNESS:   Thank you.

8         THE COURT:   Yes.

9         THE WITNESS:   I -- and when we were in court, we are in

10  court for hours, and you tend to bring up excessive concerns and

11  issues.   I don't recall exactly what you said.   My notes

12  indicate that the judge would not make the order retroactive and

13  that from that date forward, your mother's calls would be deemed

14  privileged.

15    Q.   BY MR. GARCIA:   Would you like to see a copy of the

16  transcript to see what the court actually said?   Would that help

17  refresh your memory?

18         THE COURT:   Mr. Garcia, let me see a copy of it so I

19  can refresh my memory.   I remember an order on June 18th in

20  which you had a laundry list of names.   If that's the date, I

21  think -- don't hold me to it -- but let me look.   I did block

22  calls of other folks, also; correct, Mr. Garcia?

23         MR. GARCIA:   Yes, Your Honor, most of them were

24  attorneys.

25         THE COURT:   Yeah, I know.   And one point I went over to

26  the jail with the command -- with the captain, that was later

27  in -- with a list that you had given me and stood there while

28  they inputted those into the computer, but that was probably

1    like, in November; right?

2              MR. GARCIA:  I believe so.

3              THE COURT:  Yeah, yeah, okay.

4              MR. GARCIA:  I believe line 16 or 19.

5              THE COURT:  Yeah, I'm reading.  Go ahead.  Do you want

6    Ms. DiMaria to refresh her recollection with that?

7              MR. GARCIA:  Yes, please.

8              THE COURT:  Deputy, could you show it to Ms. DiMaria

9    for the purpose of refreshing her recollection.

10             THE WITNESS:  Okay.  So what's your question, sir?

11        Q.   BY MR. GARCIA:  The court didn't state that, that the

12   calls previous to the June 18th order were not privileged;

13   correct?

14        A.   Actually, he did.  I said, "Your Honor, to be clear,

15   granted from this day forward?"  The court said, "Yes.  And any

16   other -- any other --" You then asked, "What about the previous

17   call?"  And the court refused to get into that, and he said they

18   would be subject to a 402 hearing.  We could decide that later.

19             But to answer your question, I very clearly had asked

20   the court, "Your Honor, to be clear, granted from this day

21   forward?" and his response was "Yes."

22        Q.   So I was asking for a protective order for the jail not

23   to record calls from that day forward; correct?

24        A.   I don't know what you were asking for.  I don't have

25   the motion in front of me.  My notes indicate that you were

26   asking that she be deemed privileged.  I at that point stopped

27   ordering calls, with the exception of one month that that's

28   another issue.  It hasn't -- those calls haven't been

Exhibit 2, Page 019

13

JULIE GIMINEZ, CSR

1  listened -- that was recently.  But I have not listened to nor

2  received any phone call after that date.  I can only speak for

3  myself, Mr. Garcia.

4      Q.   Okay.  But in your motion, you claim that no one from

5  the District Attorney's Office has listened to any of my

6  privileged calls; correct?

7      A.   Well, I don't care to use the word "privilege," but

8  from the District Attorney's Office, I am the one who listened

9  to the CD's.  There were a couple of interesting comments you

10  made that I had Mr. Blanck come in and say, listen to this.  But

11  I am the one who listened to the CD's.

12      Q.   And what were those interesting comments?

13      A.   I really don't recall.

14      Q.   You recall what phone calls they were?

15      A.   No.

16      Q.   Do you recall what party they were with?

17      A.   No.  I can tell you they were definitely not with

18  lawyers, and I can tell you they were not with your mother after

19  June 18th.

20      Q.   How do you know they're not with lawyers?

21      A.   Prior to you going pro per, I was aware of the lawyers

22  assigned to your case or that were representing you.  I'm

23  familiar with most of their voices.  The second I heard

24  Mr. Quinn's voice, I called him immediately, ejected the CD

25  immediately; we've already addressed that, came to court.  I was

26  speaking of knowing voices.

27          I will clarify one thing that Mr. Wright said in court.

28  Mr. Wright said when I approached him I had said, "I've heard

Exhibit 2, Page 020

1    your voice on the calls.  You need to go register your number."

2    That's false.  I had just met Mr. Wright that day; I did not

3    know his voice.  So I never told him I've -- I've heard your

4    phone calls.  I don't know his voice.  I just met him that day.

5         Q.    Okay.  And I believe you testified before that you

6    wouldn't recognize the voice of Bill Nemo; correct?

7         A.    Correct.

8         Q.    And you -- yet are you aware of that I was consulting

9    with Bill Nemo over the phone to represent me?

10        A.    No.

11        Q.    Are you aware that his calls are recorded?

12        A.    No.

13        Q.    Are you aware that you received a CD with his calls on

14   it?

15        A.    No.  I did not listen to every call on the CD.  I did

16   not have the time.

17        Q.    Would you recognize Tom Eckhardt's voice?

18        A.    I don't know if I would recognize Mr. Eckhardt's voice.

19   I know him, but I don't know that I've spoken to him frequently

20   enough to recognize his voice.

21        Q.    But you know he's an attorney?

22        A.    I do know he's an attorney.

23        Q.    Do you know that I consulted with him on the

24   telephone?

25        A.    I did not.

26        Q.    Do you know that his calls were recorded?

27        A.    Do not.

28        Q.    Do you know that you received some of his calls?

Exhibit 2, Page 021

1      A.    No.

2      Q.    Did you know that I had an appellate attorney named

3    Michael Goldstein working for me?

4      A.    No.

5            I can also say, Mr. Garcia, that when these issues

6    arose from Mr. Garcia -- Mr. Rodriguez, excuse me, and

7    Mr. Quinn, you were in court for those.  You were aware of the

8    issue, and you never apprised me of any of these people you're

9    speaking of.  I had no way of knowing who you were speaking

10   with.

11     Q.    Do you feel that in order for me to have a privilege, I

12   have to inform you?

13     A.    I'm not saying that.

14     Q.    Okay.

15     A.    I'm saying that they were not specific people that I

16   was particularly paying attention to.  But no, I never heard

17   those calls, to my knowledge.  If anyone would identify

18   themselves as an attorney, I won't listen to the calls.  If

19   anyone ever said, hey, this is Tom Eckhardt, attorney at law, I

20   would not listen to the call.

21     Q.    Have you ever come across any other calls where the

22   person has identified themselves as an attorney?

23     A.    I don't believe so because that would have put red

24   flags up for me.

25     Q.    So the only call you ever heard which you recognized as

26   an attorney was Cameron Quinn?

27     A.    Yes.

28     Q.    All right.  Would you recognize Michael Meehan?

Exhibit 2, Page 022

16

JULIE GIMINEZ, CSR

1           THE REPORTER:  I'm sorry, again, please.

2      Q.   BY MR. GARCIA:  Michael Meehan, M-E-E-H-A-N.

3      A.   I don't know who that is, so the answer is going to be

4  no.

5      Q.   In fact, don't you know that Mr. Meehan represents me?

6      A.   I have no idea.  I don't know who he is.

7      Q.   Didn't you, in fact, subpoena and receive copies of the

8  case file for my DUI in Sacramento?

9      A.   We may have.  I have to be honest with you, Mr. Garcia,

10 there are thousands and thousands of pages in this case.  When I

11 organize, I plan what's relevant for trial and what's not.  And

12 when I organize, I have binders of what's relevant and what's

13 not.  So I don't know, to be honest with you, if we requested

14 that or if Palm Springs Police Department did.  And I probably

15 threw it in the irrelevant binder because I didn't plan on using

16 it in this case.

17     Q.   Okay.  You were here when, I believe, both Bruce Blanck

18 and Detective Linda Hughes testified regarding a -- regarding a

19 search of my property; correct?

20     A.   I was here when they testified about the search of your

21 property box.

22     Q.   Okay.  And you reviewed the documents that

23 Investigator Blanck received from Detective Linda Hughes?

24     A.   Yes.

25     Q.   Okay.  And you released those into -- in the discovery;

26 correct?

27     A.   Yes.

28     Q.   And in there, there were copies of various pages of my

Exhibit 2, Page 023

17

```
 1    address book; correct?
 2          MS. FITZPATRICK:  Objection, Your Honor.  I believe at
 3    this point we've determined that none of those -- or the court
 4    determined that none of those papers were privileged at all, so
 5    I don't understand the relevance of this testimony.  And this is
 6    one of those areas that I mentioned earlier that I think could
 7    be relevant of -- for his civil suit that you may find relevant,
 8    but is irrelevant to this court's determination.
 9          MR. GARCIA:  I would appreciate if they would allow me
10    to continue my question without jumping to conclusions.  I'm not
11    asserting a privilege of this document.
12          THE COURT:  Mr. Garcia, remember how this works, okay.
13    When either side objects, the other side shuts up until I make
14    my ruling and then -- or -- or I ask for -- sometimes I'll say,
15    what is your opinion, depending.  In a jury trial, Mr. Garcia,
16    this stuff isn't going to go on.  Okay.  I don't like speaking
17    objections.  Just say objection; relevance.  I got it.  But here
18    I'm a little more liberal about it because there's no jury
19    present.  Just keep that in mind.
20          What's the relevance of the address book and a property
21    box?
22          MR. GARCIA:  I'm -- I'm getting to that.  My next
23    question is --
24          THE COURT:  Just tell me what --
25          MR. GARCIA:  Well, the address book contains phone
26    numbers for my various attorneys.  So I'm --
27          THE COURT:  All right.  Go ahead and ask.
28          Go ahead, Ms. DiMaria, if you can answer it.
```

```
 1              THE WITNESS:  I believe I said yes.  If he asked me if
 2    I looked at those documents; I said yes.
 3              THE COURT:  Go ahead.  Next question.
 4        Q.   BY MR. GARCIA:  Do you recall ever seeing the names of
 5    my attorneys in that address book?
 6        A.   I honestly don't know.
 7        Q.   Okay.
 8        A.   I skimmed through your address book.  I assumed most of
 9    them were going to be people I didn't know.  I looked for names
10    that may have stood out for me to -- like, Alex Shahbazian, but
11    I don't recall paying attention to a specific name.  I pretty
12    much assumed I'm not going to know your friends and -- and your
13    family.
14        Q.   And why would Alex Shahbazian's name mean something to
15    you?
16              MS. FITZPATRICK:  Objection; irrelevant.
17              THE COURT:  Well, I know the answer because I heard his
18    name repeatedly in the Replogle-Bustamante trial.  I know what
19    his involvement may have been.  So you may answer.  It is
20    relevant.  Sort of.
21              Go ahead, Ms. DiMaria.
22              THE WITNESS:  Mr. Shahbazian's name came up throughout
23    this case, so it was a name I knew to look for.
24        Q.   BY MR. GARCIA:  Are you aware that Mr. Shahbazian is an
25    ordained minister?
26              MS. FITZPATRICK:  Objection; relevance.
27              THE COURT:  Well, it's relevant if he's -- if it's a
28    privileged call.
```

Exhibit 2, Page 025

1        But, Mr. Garcia, you know, this is news to me, and I

2   heard Shahbazian's name bantered about in the other trial

3   repeatedly.  His name came up, who knows, a couple dozen times

4   in testimony.  So it's news to me he's a minister.  May have

5   privilege or not.

6        Mr. Garcia, the problem is -- which everybody kind of

7   overlooked something -- I don't run the jail system, neither

8   does anybody here, other than Captain Taylor, maybe, but the

9   system is set up for recording and not recording phone calls.

10   Have nothing to do with any of us.  And the only way lawyers

11   could protect their client's privileged calls were to record

12   those numbers.  If -- and apparently, it looks to me like

13   lawyers didn't, did not record numbers sometimes.  And so those

14   were recorded.  If lawyers recorded their numbers, and then the

15   sheriff, hypothetically, deliberately recorded those, that's a

16   different issue.  But -- but I'm hearing here there are a lot of

17   calls listened to because the -- may have been privileged, but

18   the sheriff didn't know it because no one told them this number

19   is a privileged number, block it.  That's the way it's sounding

20   to me.

21        You know, when I found out on June 18th that there were

22   certain people that were privileged, you prepared an order for

23   me that I -- I signed and was delivered to the jail.  And then

24   as backup to that, in November I personally went to the jail

25   with a list of numbers that you had given me with the jail

26   commander at the time and stood there while he inputted those

27   numbers in the -- into the computer.  That's a double-check,

28   really.  And I think Mr. Wright's name might have been on the

```
 1   list.  I don't remember.
 2            MR. GARCIA:  Your Honor --
 3            THE COURT:  So just appears to me that a lot of this,
 4   candidly, is the lawyers's fault or people who -- who may be
 5   privileged who didn't tell the jail.  I mean, that's what I'm
 6   hearing.
 7            MR. GARCIA:  Your Honor, I think that's a mistaken
 8   assumption because --
 9            THE COURT:  Well, I'm -- no, it's not the assumption.
10   That's the evidence, on some people.  Maybe not all but some.
11            Shahbazian being a minister, arguably, may be
12   privileged.  First I've heard of it, that he's a minister.
13            THE WITNESS:  May I respond to that question?
14            THE COURT:  So I'm just saying that's the way it's
15   looking to me.
16            Go ahead, Ms. DiMaria, you may respond.
17            THE WITNESS:  I am not aware of that.
18            What I do recall from listening to your phone calls is
19   that when you received the law books from your mother, you got
20   really excited that there was privilege, and you were trying to
21   figure out, with Mr. Shahbazian and with your mother, how to get
22   them to fall under the privilege.  And I recall a conversation
23   with Mr. Shahbazian where you were trying to say, hey, maybe I
24   can get you appointed or deemed as my investigator and you would
25   fall under the privilege that way.  I also recall that none of
26   your conversations with Mr. Shahbazian did you refer to him as
27   Father Shahbazian, none of them were religious, spiritual or
28   ministerial in nature.  You talked to him like one of your best
```

Exhibit 2, Page 027

1    friends.  You two would get off the phone by saying things like,

2    love you.  You would talk about what a bitch I was.  You would

3    talk about the proceedings in this case.  You never had any

4    spiritual or religious type of conversations with him.

5         And, in fact, I recall after getting the law, you were

6    pretty excited about how to figure out about how to get him to

7    fall under the privilege but never did you say, thank you,

8    Father, or anything -- anything that ever gave me an inclination

9    that he was anything other than a friend.  In fact, I also

10   remember you discussing with him ways to find defenses in this

11   case.

12        So no, I never -- he never appeared to be any type of

13   minister.

14   Q.    BY MR. GARCIA:  So unless I refer to him as "Father" or

15   "priest," then you don't believe it's privileged --

16        MS. FITZPATRICK:  Objection; misstates the testimony.

17        THE COURT:  Yeah, sustained.

18        Mr. Garcia, what did I just say?  If -- if nobody knew

19   that somebody was privileged, then nobody knew it.  And nobody

20   can be responsible for something they don't know.

21   Q.    BY MR. GARCIA:  Do you know --

22        THE COURT:  Go ahead.

23   Q.    BY MR. GARCIA:  Do you know what year Alex Shahbazian

24   was ordained?

25   A.    I haven't --

26        MS. FITZPATRICK:  Objection; relevance.

27        THE COURT:  Sustained.  Ms. DiMaria said she didn't

28   know.  All right.

1    Q.   BY MR. GARCIA:  Ms. DiMaria, were you present with --
2    for the suppression hearing?
3    A.   Yes.
4    Q.   Did you learn through testimony from Sacramento PD that
5    Mr. Shahbazian showed his ministerial card at the time of his
6    arrest?
7         MS. FITZPATRICK:  Objection; relevance.
8         THE COURT:  Sustained.  And I presided over the
9    suppression hearing, and I -- and I do not remember that.
10   Doesn't mean that it didn't happen, Mr. Garcia, but I don't
11   remember it.
12   Q.   BY MR. GARCIA:  Do you recall an affidavit or
13   declaration attached to my motion from Mr. Shahbazian?
14        MS. FITZPATRICK:  Objection; relevance.
15        THE COURT:  Sustained.
16        Mr. Garcia, if your position is that Mr. Shahbazian has
17   a priest-penitent privilege, as it's called, then he needs to
18   inform the sheriff's department or file a motion with the court
19   so that your conversations with him would be not recorded.  I
20   don't know if he's a priest -- I mean a minister or not, but I'm
21   just saying.  Again, my point is if no one tells the sheriff,
22   who runs the recording system, then they don't know it.  Those
23   calls were going to be recorded.  I mean they just are.
24        MR. GARCIA:  But Ms. DiMaria --
25        THE COURT:  Hold on.  And whenever this case does get
26   to trial, I assume that you will, or the DA, or both, will be
27   arguing about some of this in 402 hearings, whether it's
28   admissible or not.  We'll go over it then.  I don't know.  I

1   mean, I don't know what the relevance of some calls may be.  For

2   example, maybe if the privilege is violated but neither side is

3   going to try to admit that call, what difference does it make

4   for the purposes of the trial.  You see?  I don't know.  We're

5   not anywhere near there, I don't think, unfortunately.  But

6   that's another issue so . . . but go ahead.

7        Q.   BY MR. GARCIA:  Ms. DiMaria, you've testified earlier

8   that you don't run the jail; correct?

9        A.   Correct.

10       Q.   Okay.  And you have nothing to do with the phone

11  system; correct?

12       A.   Correct.

13       Q.   And you do not register privileged calls?

14       A.   Correct.

15       Q.   Okay.  So do you have any direct knowledge of whether

16  or not Mr. Shahbazian registered his phone number with the jail?

17            MS. FITZPATRICK:  Objection; relevance.

18            THE COURT:  Overruled.  Just answer yes or no.

19            THE WITNESS:  No.

20       Q.   BY MR. GARCIA:  Do you have any knowledge of whether or

21  not I requested the jail to block or to designate any phone

22  numbers as privileged?

23       A.   No.

24       Q.   Okay.  So you have no knowledge of whether or not I

25  took steps to, in fact, protect my privilege?

26       A.   No.

27       Q.   Okay.  And --

28       A.   And -- and I did -- I agree with the term privilege,

Exhibit 2, Page 030

JULIE GIMINEZ, CSR

 1    but to answer your question: I don't know if you took steps to

 2    register phone numbers.

 3        Q.   Okay.  And you don't know if any of the particular

 4    attorneys who I've mentioned, in fact, contacted the jail to

 5    register their phone numbers?

 6        A.   The attorneys, I would agree, are privileged under the

 7    law.  I don't know any measures they did or did not take.

 8        Q.   Okay.  And, in fact, you stated you were in court on

 9    June 18th, when the protective order was issued by

10    Judge Downing; correct?

11        A.   Yes.

12        Q.   And were you aware that the jail still continued to

13    record privileged phone numbers that were included in that

14    protective order?

15        A.   I don't know what the jail did or did not do.

16        Q.   Okay.  You received a CD in November, I believe;

17    correct?

18        A.   No.

19        Q.   You never received a CD in November of 2010?

20        A.   Me personally?

21        Q.   Yes.

22        A.   Me personally, no.

23        Q.   Did the District Attorney's Office receive a CD?

24        A.   Yes.

25        Q.   Okay.  Who received that CD?

26        A.   My investigator, Ed Berakovich, B-E-R-A-K-O-V-I-C-H.

27             THE COURT:  Mr. Garcia, what CD are you talking about?

28             MR. GARCIA:  There was a request made by Mr. Berakovich

Exhibit 2, Page 031

```
 1    on November 9th, 2010, and he received 65 recordings between the
 2    dates of 10-01-2010 and 11-02-2010.
 3          THE COURT:  Hold on a minute.  65 recordings.  What are
 4    the dates, please, again?
 5          MR. GARCIA:  10-01-2010 and 11-02-2010.
 6          THE COURT:  Okay.
 7      Q.   BY MR. GARCIA:  Did you direct Mr. Berakovich to make
 8    this request?
 9      A.   I heard on KESQ you giving an interview that was played
10    on the air, a portion of it.  When I heard a portion of that
11    interview, I was curious what you had to say, because often your
12    stories that you have told to the police or to Alex Shahbazian
13    or your mother are not truthful.  So I was curious what you had
14    told KESQ.  KESQ would not turn over the interview to the
15    District Attorney's Office, so my investigator chose to pull the
16    jail phone calls, assuming that if you were in jail it must have
17    been a call through the jail that would have been recorded.  He
18    pulled the calls.  We were in the middle of trial.  He was
19    working with transportation of witnesses and had other issues
20    and did not have an opportunity to listen to the calls.  This
21    motion got filed, and I told him out of an abundance of caution
22    right now, don't listen to that CD.  So I've spoken with him
23    recently to ensure that he has not listened to any of the calls
24    on that CD, and he has assured me that he has not.  So that CD
25    was ordered.  It remains in Mr. Berakovich's custody.  And he
26    has not listened to any further calls on it.
27      Q.   So the answer to my question: yes, you requested those
28    calls?
```

Exhibit 2, Page 032

1    A.    Yes.

2    Q.    Okay.  And on that --

3    A.    Actually, let me clarify.  I don't entirely recall if I

4  did or if Mr. Berakovich did.  In light of what we were looking

5  at the -- for one interview.  My office did, I can say that for

6  certain.  But I cannot honestly tell you if I asked him to do it

7  or if he did it, I don't recall, but my office most certainly

8  did do it.

9    Q.    Okay.  And on that request form, there's no specific

10  note to exclude any phone numbers from being copied?

11    A.    I don't have the request form in front of me.

12          If you have a copy of it, that's -- and that's what

13  you're saying --

14          THE COURT:  Mr. Garcia, the document you're referring

15  to, is that -- has that been marked in evidence already?

16          MR. GARCIA:  Yeah, defense exhibit A.  And I'm not sure

17  which --

18          THE COURT:  Well, we need to know because the record

19  needs to reflect what you're talking about by exhibit number so

20  anyone reading the transcript or whatever can line them up,

21  otherwise they wouldn't know because the transcript just shows a

22  document.  Nobody would know what that means.  We need an

23  exhibit number so --

24          MR. GARCIA:  I believe it's defense exhibit A.

25          THE COURT:  Okay.  Defense A has multiple parts,

26  doesn't it?

27          THE CLERK:  Yes, Your Honor.

28          THE COURT:  So -- yeah.  So did you designate A1, A2,

1    A3?

2          THE CLERK:  No, it's all one document.  They are

3    numbered.  The pages are numbered.

4          THE COURT:  Okay.  Let's use defense A and then the

5    page numbers so we can make sense.

6          Do you want to -- Mr. Garcia, that's the original.

7    Just don't forget to give it back to us.  So if you would do it

8    that way, please.  Okay.

9          MR. GARCIA:  Page 16, I guess.

10         THE COURT:  All right.  So for the record, the deputy

11   is showing defense A -- page 16, Mr. Garcia?

12         MR. GARCIA:  16.

13         THE COURT:  -- page 16 to the witness.

14         THE WITNESS:  I'm looking at it.  What was your

15   question?  Did we ask it Mr. -- or, excuse me,

16   Investigator Berakovich ask that any phone numbers be excluded?

17   Was that your question?

18         MR. GARCIA:  Yes.

19         THE WITNESS:  It appears on the form he did not.

20   Q.    BY MR. GARCIA:  Do you know why?

21   A.    No, I -- I do not.

22   Q.    Okay.  I believe earlier you testified that you went

23   above and beyond what was required of you to make sure that

24   privileged calls were not received?

25   A.    When it came to the issues that occurred with Mr. Quinn

26   and Mr. Rodriguez, yes, I believe I did go above and beyond.

27   Q.    But not for other people?

28   A.    I was aware that Mr. Quinn and Mr. Rodriguez were your

Exhibit 2, Page 034

28

JULIE GIMINEZ, CSR

1    attorney of record.

2        Q.    Only in the criminal matter?

3        A.    Yes.

4        Q.    Okay.  And you were unaware of any other attorneys who

5    were writing motions or who I was consulting with; correct?

6        A.    At what point in time are you asking me to, Mr. Garcia?

7        Q.    At the time that you made this request.  Were you aware

8    of any other attorneys that were assisting me?

9        A.    Investigator Berakovich made the request.

10       Q.    Okay.

11       A.    And I can't give you a time line.  Like I said, I have

12   learned people that are assisting you by who shows up in court.

13   You have never notified me or my office of who you've been

14   consulting with nor when.  So attorney Mr. Karpf -- I apologize

15   if I'm mispronouncing that name -- I've learned of him since

16   I've seen him in court.  Attorney Sax, I've learned of her since

17   I've seen her in court.  I do not recall the time line of when

18   I've started seeing these people compared to when that motion or

19   that request for those jail calls were made.

20       Q.    So unless you know who is assisting --

21             THE COURT:  Captain Taylor, did you have a few minutes

22   today, or do you need to leave right now or --

23             CAPTAIN TAYLOR:  I've got to run real quick, but I'm

24   going to leave a number, but I'll come right back if that's

25   okay.

26             THE COURT:  Yeah, sure.

27             CAPTAIN TAYLOR:  Be here like, in two minutes.

28             THE COURT:  Okay.

Exhibit 2, Page 035

29

JULIE GIMINEZ, CSR

```
 1              THE WITNESS:  And, Mr. Garcia, I further know that
 2     during this period of time you're discussing, October, I was in
 3     the middle of a codefendant special circumstances jury trial.  I
 4     had other things going on, as well.  Your codefendant.
 5        Q.    BY MR. GARCIA:  So does that mean that you have less of
 6     an obligation to follow the law?
 7        A.    No.
 8              MS. FITZPATRICK:  Objection; misstates testimony,
 9     argumentative.
10              THE COURT:  Sustained on both grounds.
11              Mr. Garcia.
12        Q.    BY MR. GARCIA:  Ms. DiMaria, aside from making requests
13     to block a couple of phone numbers after you were -- already
14     received privileged calls, did you make any other attempts to
15     ensure that your office did not receive privileged calls?
16        A.    Such as what, Mr. Garcia?  My understanding is that
17     your attorneys are to register their number with the jail.
18     Since I did not know if you were working with anyone else, and I
19     don't have a crystal ball, I'm not entirely sure what it was
20     that you was -- you wanted me to do.
21        Q.    Did you ever issue a subpoena?
22        A.    To whom?  For what?
23        Q.    Did you issue a subpoena to request the records?
24        A.    What records?
25              MS. FITZPATRICK:  Objection; vague.
26              THE COURT:  Sustained.  What records?  Go ahead.
27        Q.    BY MR. GARCIA:  Did you issue subpoenas to the
28     sheriff's department requesting these calls?
```

Exhibit 2, Page 036

```
 1              MS. FITZPATRICK:  Objection; vague.  What calls.

 2              THE COURT:  Yeah, sustained.  What calls, please.

 3              MR. GARCIA:  My telephone calls that were recorded in

 4    the jail.

 5              MS. FITZPATRICK:  Objection; vague as to time.

 6              THE COURT:  When?

 7              MR. GARCIA:  Since I've been in custody.

 8              THE COURT:  All right.  You can answer that yes or

 9    no.

10              THE WITNESS:  A subpoena?  No.

11        Q.   BY MR. GARCIA:  Okay.  Did you ever issue a search

12    warrant?

13              MS. FITZPATRICK:  Objection; vague.

14              THE COURT:  For what?

15              MR. GARCIA:  To the same calls for the same time

16    period.

17              THE WITNESS:  Neither a search warrant nor a subpoena

18    is necessary, so no.

19        Q.   BY MR. GARCIA:  Did you ever have -- ask for a special

20    master to review these calls for any privileged contents?

21        A.   No.

22        Q.   Did you ever put together a taint team of independent

23    lawyers or investigators to review the calls for privileged

24    content?

25              MS. FITZPATRICK:  Objection; relevant.

26              THE COURT:  What's a tank team, Mr. Garcia?

27              MR. GARCIA:  In federal court they actually have a

28    policy for federal prosecutors that when they receive a disk
```

Exhibit 2, Page 037

31

JULIE GIMINEZ, CSR

1  which they believe may contain privileged material they have a

2  policy of putting together what we call a taint team of

3  independent investigators or attorneys who then review the calls

4  so that it didn't taint the assigned prosecutor.

5          MS. FITZPATRICK:  Your Honor --

6          THE COURT:  Well, they have lots of resources in

7  federal court, Mr. Garcia.  So that's a good idea but, you know,

8  what are you going to do.  Okay.  Thank you for informing me of

9  that.  I didn't know that.  But it makes sense, it's a good

10  idea, but, you know, it's all about money.  How many times have

11  we had that discussion before.  Anyway, go ahead.

12          MS. FITZPATRICK:  Your Honor, there was an objection

13  pending.  Was that --

14          THE COURT:  Overruled -- sustained.  Yes, go ahead.

15  Next question.

16      Q.   BY MR. GARCIA:  Did you ever ask someone else other

17  than yourself to review the calls before you listened to them?

18      A.   Your call; no.

19      Q.   Did you ever request a list of all the phone numbers

20  before listening to the calls?

21      A.   Requests a list of phone numbers from whom?

22      Q.   A list of all the calls with the phone number and the

23  time and the dates.

24      A.   I apologize, I still don't understand your question.

25      Q.   Obviously, when the jail records the calls, there are

26  records that are kept.  You're aware of those records?

27      A.   I believe -- I don't know if you and I are on the same

28  page.

Exhibit 2, Page 038

1    Q.   All right.

2    A.   I believe when they record calls, there is -- and they

3  download them to the CD, there is a list of what calls are

4  downloaded to the CD.

5    Q.   Okay.   And you've seen in my motions the attached

6  exhibits which show the lists of all the calls; correct?

7    A.   I've glanced through it.   I've also noticed, for

8  example, you put on that list as a privileged phone number,

9  quote unquote, a member of -- I think you called it my

10  codefendant's defense team.   And that phone number was, in fact,

11  to Anh Nguyen.   He also goes by Alec.   I believe Anh is A-n-h,

12  N-G-U-Y-E-N.   He goes by Alec.   I know that phone number

13  personally, and I also know for a fact that Mr. Nguyen is not,

14  in fact, a member of Mr. Replogle's defense team but is rather

15  Mr. Replogle's domestic partner, yet you considered him to be

16  privileged.

17    Q.   Are you a hundred percent certain about that?

18    A.   That he's his domestic partner?

19    Q.   No, that he's a member of Mr. Dolan's defense team.

20    A.   I know that he is Mr. Replogle's domestic partner.

21    Q.   Okay.

22    A.   He, in fact, brought his certification of their

23  domestic partnership into court that this, His Honor,

24  Judge Downing, took judicial notice of.   So I know his

25  relationship with Mr. Replogle.

26    Q.   And so are you aware of whether or not he works for

27  Mr. Dolan?

28    A.   I have absolutely no knowledge that he works for

1    Mr. Dolan in any way, shape or form.

2        Q.    So you don't have any knowledge that he was assisting

3    Mr. Dolan in preparing the defense?

4        A.    He was reading the discovery, but that does not mean

5    that he was assisting Mr. Dolan.

6            THE COURT:  And, Mr. Garcia, even if he was, he's not

7    privileged.  At least in -- you know, I presided over the

8    Replogle trial and the 402 motions before it and during it,

9    nothing like that ever came up in any way.

10            MR. GARCIA:  Well, Your Honor --

11            THE COURT:  So --

12            MR. GARCIA:  Your --

13            THE COURT:  Just so you know.  I mean these things are

14    all new to me.  And unless someone tells even me and asked is

15    this person privileged or records -- goes to the jail and says

16    that is a privileged number, please don't record it, those

17    numbers are going to -- calls are going to get recorded, because

18    everything -- all calls out of any institution in California

19    jails and prisons are recorded.  Everything is recorded unless

20    they are privileged calls and the institution knows it and

21    blocks them.  Okay.  So go ahead to some other subject, please.

22        Q.    BY MR. GARCIA:  Aside from the jail recording the

23    calls, don't you have an affirmative duty to make sure that you

24    personally do not listen to privileged calls?

25        A.    When I realized that Mr. Quinn's voice was on there, I

26    took every step I possibly could.  I ejected the CD.  I

27    personally called Mr. Quinn that night at home.  I never put the

28    CD in.  I immediately sealed it up.  I apprised Mr. Quinn what

Exhibit 2, Page 040

JULIE GIMINEZ, CSR

```
 1   happened on the phone, I memorialized it in a letter, I brought
 2   the CD and the letter to court.  I had him take possession of
 3   the only copy of the CD.  I had him sign the letter
 4   acknowledging that we had had the discussion whereby I apprised
 5   him of the procedure of registering his number with the jail,
 6   and we put all of that on the record.
 7       Q.   Okay.  So that protected yourself?
 8       A.   I don't understand your question.
 9       Q.   You were protecting, you know, over liabilities; isn't
10   that correct?
11       A.   I didn't think we were here for civil liability.  I
12   thought we were here for a prosecutorial misconduct motion.  I
13   know that I am not to listen to attorney-client phone calls.
14   The second I heard an attorney's voice, I did everything in my
15   power to ensure that I did not listen to that CD, and no one
16   from my office did.
17       Q.   But that was only an attorney whose voice you
18   recognized?
19       A.   How can I know if there's another attorney if I don't
20   recognize the voice and he doesn't identify himself as one,
21   Mr. Garcia.  What I am telling you is when there was an issue
22   with an attorney that I had knowledge of, I did everything I
23   could to not only not listen to it but to do what I could to
24   ensure that the problem ended up being rectified.  I have no
25   interest in violating the law.  I have no interest in listening
26   to privileged calls.  I have an extreme interest in protecting
27   the rights of defendants as much as I do as prosecuting them.
28   Number 1, for my bar card and my liability I will not violate
```

1    someone's rights.  It's not worth it to me, and I have no

2    interest in violating what my ethical duties are in the law and;

3    number 2, to ensure that there are no appellate issues.  I

4    derive nothing by listening to calls that I shouldn't be

5    listening to.  I don't want to -- it's not in my makeup.  And I

6    didn't do it in this case.

7         Q.    Did you ever contact the jail directly?

8         A.    In my life?  Yes.

9              MS. FITZPATRICK:  Objection; vague.

10             MR. GARCIA:  I wasn't finished with the question.

11             THE COURT:  Well, the answer to "my life" stands.  Go

12    ahead, Mr. Garcia.

13        Q.    BY MR. GARCIA:  Did you ever contact the jail directly

14   to ensure that these attorneys' phone numbers were blocked?

15        A.    Me --

16             MS. FITZPATRICK:  Objection; vague as to the attorneys

17   as to time.

18             MR. GARCIA:  Okay.

19        Q.    BY MR. GARCIA:  Did you ever contact --

20             THE COURT:  Sustained.

21             Narrow it, Mr. Garcia, please.

22        Q.    BY MR. GARCIA:  Did you ever contact the jail to ensure

23   that Mr. Quinn's telephone number was, in fact, blocked from the

24   recording?

25        A.    I did not.  I definitely apprised Mr. Quinn verbally on

26   the phone and in writing of the procedure and his obligations,

27   but I did not do it.

28        Q.    Okay.  Did you ever contact the jail directly to ensure

Exhibit 2, Page 042

1    that Mr. Rodriguez's telephone numbers was blocked from

2    recording?

3         A.   Me personally?  No.  Again, we requested

4    Mr. Rodriguez's phone numbers and try to exclude them, but he

5    was apprised of the situation, as well, I believe on the record

6    even, and no, I left it to the attorney.  Those are not my

7    duties, Mr. Garcia.

8         Q.   So you didn't do everything you could; isn't that

9    correct?

10             MS. FITZPATRICK:  Objection; argumentative.

11             THE COURT:  Sustained.

12             And, Mr. Garcia, she's not responsible for doing

13   defense lawyer's work.  You know, what do we say here?  The

14   lawyers should go tell the jail who they were and what the

15   numbers are so they would be blocked.

16             MR. GARCIA:  Well, Your Honor, the record speaks for

17   itself.

18             THE COURT:  Yeah.

19             MR. GARCIA:  The attorneys did register the numbers,

20   and the jail continued to record them, and Ms. DiMaria continued

21   to request calls and get privileged calls.  So she didn't do

22   everything she could to ensure that she didn't received them.

23             MS. FITZPATRICK:  That's proper argument but not proper

24   questioning.

25             THE COURT:  I agree with that.

26             Mr. Garcia, save it for argument.

27             THE WITNESS:  Your Honor, may I comment now?

28             Mr. Garcia used the word to make sure that I didn't

1  receive them.  And I did do what I could that we didn't receive

2  the calls.

3          THE COURT:  All right.

4      Q.   BY MR. GARCIA:  Ms. DiMaria, had you used a special

5  master to review the calls before you did, it would have allowed

6  the defense an opportunity to assert any privileges; correct?

7          MS. FITZPATRICK:  Objection; speculation, relevance.

8  Asked and answered.

9          THE COURT:  Sustained.  It's not relevant.  There

10 wasn't a special master used in this case other than Mr. Dean,

11 who was used in Mr. Replogle's, because Mr. Replogle, a

12 codefendant here, is a lawyer.

13         THE WITNESS:  My apologies to the court and to

14 Mr. Garcia, do you have an estimated time of your questioning?

15 If you don't, may I request a personal break?

16         MR. GARCIA:  Yeah, we can take a break.

17         THE WITNESS:  I just need -- need the rest room, Your

18 Honor.  In all frankness, I need the rest room, Your Honor.

19         THE COURT:  All right.  We'll take a recess, folks,

20 thank you, till five after.  Okay.

21         Mr. Garcia, I'm not going to hold you to it, I'm just

22 asking how much time you're going to need?

23         MR. GARCIA:  Little while longer.

24         THE COURT:  That's fine.  I'm just -- then you're going

25 to call Mr. Bolanos; right?

26         MR. GARCIA:  Correct.

27         THE COURT:  Is that all you got on for today?

28         MR. GARCIA:  And then Mr. Tira.

Exhibit 2, Page 044

JULIE GIMINEZ, CSR

1          THE COURT:  Okay.  All right.  Okay, all right, let's

2    take a break then.

3          THE WITNESS:  Thank you, Your Honor.  I apologize.

4          THE COURT:  All right.  We're off.

5                    (A recess was taken.)

6          THE COURT:  All right.  We're back on the record in the

7    Garcia and Niroula matter.  Those folks are present with their

8    investigators.  The DA is present with DA representatives are

9    present.  Ms. DiMaria is on the stand.

10          And we will proceed, Mr. Garcia.

11     Q.   BY MR. GARCIA:  Ms. DiMaria, out of all the calls that

12    you've received, how many of my calls from the jail have you

13    personally listened to?

14     A.   I don't know.

15     Q.   Do you have an estimate?

16     A.   Wow.  Maybe I -- this is really a rough estimate.  I

17    hate to be held to it, but maybe 50 to 75.

18     Q.   All right.

19     A.   And not always the entire call.  You have some really

20    lengthy conversations.

21     Q.   Are you able to identify which calls you've listened

22    to?

23     A.   No.

24     Q.   Okay.  How many different CD's obtained calls that you

25    have listened to?

26     A.   I honestly do not know.

27     Q.   Well, you stated that you didn't listen to the one from

28    November 2nd; correct?

Exhibit 2, Page 045

1      A.    Correct.  I've never even had that one in my

2   possession.

3      Q.    So are there any CD's that you absolutely have not

4   listened to?

5      A.    I'm sure there are.  I'm sure -- I'm sure there are.

6           To make this a little more understandable for you, when

7   we would request calls, sometimes other things would come up.

8   For example, in addition to this trial, last year I did two

9   additional jury trials.  We also had the prelim at the end of

10  '09.  So my availability to listen to calls also depended on

11  what else I had going on.  So if I had trials, if I had prelims,

12  if I had other cases, I didn't have time.  And then sometimes if

13  I had -- I'd have a lull, then I'd listen to calls.  So my best

14  guess is yes, there are probably some CD's that I've never even

15  put in the computer.

16     Q.    Okay.

17     A.    But I couldn't tell you exactly.

18     Q.    Do you keep a log of which CD's or which calls you're

19  listening to?

20     A.    Sometimes.

21     Q.    Do you take notes?

22     A.    Sometimes.

23     Q.    And so from those notes or those logs, would you be

24  able to tell at least some of the calls that you've listened

25  to?

26     A.    Some.

27     Q.    Okay.  And are you able to determine who the other

28  person was on that call in every instance?

Exhibit 2, Page 046

40

JULIE GIMINEZ, CSR

1    A.    In every instance?  I honestly -- let me think.  I know

2    for a fact I listened to many calls between you and Alex

3    Shahbazian.  I know I listened to many calls between you and

4    your mom.  And again, let me make that abundantly clear, that

5    was in 2009, before the judge's order.  I think there may have

6    been a couple with you and Matthew Herip, H-E-R-I-P.  I'm trying

7    to think.  Those are the ones that mostly stand out.

8    Q.    Okay.  And how did you determine which calls on a CD to

9    listen to?

10   A.    It varied.  Sometimes it was random.  For example, I

11   recall there were some calls around Thanksgiving of 2008 where

12   you guys were talking a lot about Thanksgiving and holiday-type

13   stuff, who was doing what -- I'm sorry?

14   Q.    2008, you mean 2009 or --

15   A.    2009, I apologize.

16   Q.    All right.

17   A.    So I would think to myself, well, let me just go to

18   another period of time.  There was no way I was going to be able

19   to listen to all the calls.  It just wasn't practical.  So I

20   went -- I don't want to listen to more holiday stuff, and then

21   maybe I would jump to another point in time.

22   Q.    Okay.  So you didn't just listen to the calls

23   sequentially, as they appeared on the CD?

24   A.    No, sometimes I did.  Maybe I listened to a few in a

25   row, and then sometimes I'd jump.

26   Q.    Are you aware that there was a change in phone

27   companies in 2009?

28        MS. FITZPATRICK:  Objection; relevance.

Exhibit 2, Page 047

1          THE COURT:  Well, it's relevant.  Overruled.

2          THE WITNESS:  Are you asking me if I'm aware now?

3     Q.   BY MR. GARCIA:  Were you aware when you were receiving

4     these disks?

5     A.   Let me think.  I'm aware now for sure.  I think I was

6     aware because I think that the format to open them changed, and

7     I don't know -- I have to be honest -- I don't know if I was

8     aware that the phone company changed and that's why the format

9     changed or if I just noticed the format changed.

10    Q.   That was my next question was whether or not you

11    noticed a change in the file format?

12    A.   I did.  And I have to be honest, I don't really recall

13    if I knew why the format changed, if I knew that it was a --

14    the -- a phone company change or not.

15    Q.   Do you recall that the first CD's had rather lengthy

16    file names?

17    A.   I'm not a computer person; I don't pay attention to the

18    file names.

19    Q.   Were you aware that --

20    A.   I mean, I'm sure -- I have to be honest -- at the time,

21    probably.

22    Q.   Okay.

23    A.   I have not put any of those CD's in, in well over a

24    year or about a year, so I don't want to mislead you.  At the

25    time, Mr. Garcia, I may have noticed it.  Sitting here on the

26    stand right now, I don't recall.

27    Q.   Were there -- to your recollection, were there any

28    individuals who you were not able to identify?

Exhibit 2, Page 048

1       A.    I don't recall.   We -- as you've received in discovery,

2   also had your cell phone contact list, so I recall one number, I

3   couldn't tell who it was, and I looked at your contact list, and

4   it -- I believe it turned out to be Dennis Ukalovic, probably --

5   can I ask you, Mr. Garcia, for a favor?   Can you spell Dennis's

6   last name for Madam Reporter?

7       Q.    Yes, it's U-K-A-L-O-V-I-C.

8       A.    I recall that happening.   And Mr. Herip, as well.   I

9   don't recall if I had to check your contact list or if you guys

10  referred to each other by name, and his name is in the

11  discovery.   So if you would have referred to him as, hey, Matt,

12  or whatnot, I would have recognized that name.   I don't really

13  remember on him.

14      Q.    Did you use any other sources aside from the contact

15  list from the iPhone to verify phone numbers?

16      A.    No.

17      Q.    Okay.   Did you ever --

18      A.    Oh.

19      Q.    Oh.

20      A.    Maybe the police reports.

21      Q.    Okay.

22      A.    I don't remember.   But maybe.   I mean, that would have

23  been possible.

24      Q.    And on some of these request forms, there were requests

25  for specific phone numbers; correct?

26      A.    I don't recall.   There may have been.

27          THE COURT:   Are you talking about defense 1,

28  Mr. Garcia?

```
 1              MR. GARCIA:  Defense A, yes.

 2              THE COURT:  Defense A, I'm sorry.

 3              MR. GARCIA:  Like to view the --

 4              THE COURT:  Are you talking about defense A now?

 5              MR. GARCIA:  Correct.

 6              THE WITNESS:  Any specific page, Mr. Garcia, or the

 7    whole thing?

 8         Q.    BY MR. GARCIA:  In general.  If you could just flip

 9    through some of them, there's -- or I'll give you a specific

10    one.  For example, the request -- I don't have the page

11    number -- but it's the request from Bruce Wancon, February 9,

12    2010.

13         A.    Okay.

14         Q.    Okay.  And there's four numbers listed there;

15    correct?

16         A.    Yes.

17         Q.    Okay.  How did you -- well, first of all, did you

18    determine that those were four numbers that you were interested

19    in?

20         A.    I have to be honest, my memory on this is a little bit

21    hazy.  I can tell you what I think I remember happening.  You

22    know, I know I'm under oath, so I want to be careful.  I don't

23    want to say anything -- I have to be honest, my memory is a

24    little bit hazy.  I could speculate.

25         Q.    Okay.  Would you have put these four numbers into your

26    names' request?  Investigator Blanck.

27         A.    I don't remember.  Investigator Blanck and I -- he was

28    assigned to this case, so sometimes we -- I could do verbal
```

Exhibit 2, Page 050

44

1    requests from him, so I -- I don't recall.

2        Q.   Okay.  In reviewing calls, could you ever hear any

3    assertion of privilege during the call?  In other words, someone

4    saying, this call shouldn't be recorded because I'm talking to

5    the priest or an attorney?

6        A.   What I remember is the recordings coming on, warning

7    you that you were being recorded.  That it was a call from

8    the -- I don't remember the exact wording anymore.  That it was

9    a call from the Indio jail, either calls are being recorded or

10   could be being recorded and could be monitored and listened to.

11   So that standard recording would come on.

12       Q.   Okay.  But that wasn't my question.

13            My question was, did you ever hear either myself or

14   whoever I was speaking to make some assertion of privilege?

15       A.   I don't recall that.

16       Q.   Okay.

17       A.   I don't.  I don't recall that.

18       Q.   Okay.

19       A.   I don't know that that would trump anyway.  I mean

20   anybody who --

21       Q.   I'm not -- I'm not saying that -- asking that.  I'm

22   just asking if you heard --

23       A.   I don't recall.

24       Q.   You did testify that you've reviewed several calls with

25   my mother; correct? between me and my mother?

26       A.   Prior to the judge's order.

27       Q.   Correct.

28       A.   Yes.

Exhibit 2, Page 051

JULIE GIMINEZ, CSR

1      Q.   Okay.  And during those calls, did you ever hear us
2   assert any kind of privilege?
3           MS. FITZPATRICK:  Objection; relevance.
4           THE COURT:  Overruled.  You can answer it.
5           THE WITNESS:  I remember a discussion you had, and I
6   think actually it started with your father and then maybe your
7   mother got on the call, where after you got your law book and --
8   and you saw that there was, I think, like a psychology privilege
9   that you were trying to determine if you could fit your mother
10  into that.  I recall you asking her about that, about her
11  education, if she ever finished her psychology degree because
12  that maybe she'd be able to fit under that privilege, and she
13  told you, I believe, I believe, she hadn't finished her degree.
14  And I recall you asking her about -- asking her about
15  counseling, if she had been acting as a counselor for some
16  number of hours or something along those things, and she told
17  you she hadn't, and your response was -- I don't want to say,
18  oh, crap, but it was something along the lines of disappointed
19  that she didn't fit under that privilege.
20     Q.   BY MR. GARCIA:  Okay.  But there were discussions
21  regarding whether or not we felt our calls would be
22  privileged?
23     A.   I remember you trying to get her to fit under privilege
24  under the law after you got your law book.
25     Q.   Okay.  Did you ever take any steps to verify yourself
26  whether or not a privilege existed?
27     A.   No.  In fact, I recall you and your mother very
28  specifically having conversations where your mother would tell

```
 1   you not to say too much over the phone; you both acknowledged
 2   you were being recorded.  In fact, one conversation you -- you
 3   addressed me specifically: Ms. DiMaria, if you're listening to
 4   this, I hope you're enjoying it, or something along those lines,
 5   and you guys both laughed about it.  You guys were both fully
 6   aware that they were being recorded.  And I remember you
 7   addressing me, and you would say after, I think, your mom took
 8   hula dancing and said something like, oh, maybe if Ms. DiMaria
 9   would loosen up a little bit -- I don't remember.  You said
10   something very negative or derogatory toward me and joked if I
11   was listening, maybe I could take some advice from that.
12        Q.    Did you take up hula dancing?
13             MS. FITZPATRICK:  Objection, Your Honor.
14             THE COURT:  Folks, we're getting too far afield.  Let's
15   narrow it or we'll be here forever.
16             THE WITNESS:  Your Honor, I will say I did not take up
17   hula dancing.
18             THE COURT:  My comment remains; we're getting far
19   afield here.
20        Q.    BY MR. GARCIA:  Did you ever hear any phone calls
21   regarding -- with any -- hold on.  Let me rephrase that.
22             Do you recall the contents of any conversations --
23   calls where you couldn't identify who I was speaking to?
24             MS. FITZPATRICK:  Objection; asked and answered.
25             THE COURT:  Yeah, sustained.  She's answered that,
26   Mr. Garcia, several times.
27             MR. GARCIA:  I actually didn't ask the content of the
28   calls.  I asked if she was aware of any calls where she couldn't
```

Exhibit 2, Page 053

JULIE GIMINEZ, CSR

```
 1    recognize who I was speaking to.
 2              THE COURT:  Yeah, she answered already.  Asked and
 3    answered.  Sustained.
 4              Mr. Garcia, you've gotten as much out of this witness
 5    as I suspect you're going to get.
 6              MR. GARCIA:  All right.  Well --
 7              THE COURT:  What else is there?
 8              MR. GARCIA:  There's other subject areas.
 9              THE COURT:  There's others?  Like what?  What's an
10    offer of proof at this point?  What?
11              MR. GARCIA:  Well, there's a couple of things regarding
12    speaking with the jail investigators regarding in-house
13    informants.
14              THE COURT:  Well, ask.  Let's go then, Mr. Garcia, come
15    on.
16       Q.   BY MR. GARCIA:  One quick question before we leave the
17    phone call issue.
18              Did you ever make a request to San Francisco for any
19    calls recorded in their jail?
20       A.   I don't fully understand your question.  Sounds vague
21    to me.
22       Q.   Okay.  Sorry.  Did you make a specific request to the
23    San Francisco jail for recordings of Mr. Niroula while he was
24    incarcerated there?
25       A.   I'm not entirely sure how Mr. Niroula applies to your
26    motion.
27              MR. GARCIA:  It goes to habit, Your Honor.
28              THE COURT:  Well, just answer yes or no and then go
```

Exhibit 2, Page 054

 1   from there.  If it's no, we move on.

 2          THE WITNESS:  Your Honor, I believe Palm Springs may

 3   have.  I don't believe I -- I ever did.

 4          THE COURT:  Okay.  So the answer is no.  Next question.

 5     Q.   BY MR. GARCIA:  And with all of these disks, did you

 6   release them in discovery to other codefendants?

 7     A.   What disks?

 8     Q.   Sorry.  The recordings of my calls that you received

 9   from the jail, did you release them in discovery to other

10   codefendants?

11     A.   Yes.

12     Q.   Without reviewing all of the calls?

13     A.   Correct.

14     A.   I believed I had a discovery obligation I wanted to

15   fulfill.  I didn't believe there was any way I was going to be

16   able to listen to thousands of hours of calls, and I did not

17   want to be accused of being in violation of discovery.

18     Q.   And were these calls going to be used as evidence?

19          MS. FITZPATRICK:  Objection; work product.

20          THE COURT:  Well, that and it's too soon to tell,

21   Mr. Garcia.

22          MR. GARCIA:  Well, I think if there was no intention to

23   use it as evidence then --

24          THE COURT:  Mr. Garcia, everything is released.  We've

25   been through this before.  The District Attorney's Office

26   releases all discovery to everybody.  It doesn't mean

27   necessarily it will ever be used in trial or not.  It may not

28   be.  It may not even be relevant, but because the DA has an

Exhibit 2, Page 055

JULIE GIMINEZ, CSR

```
 1   obligation to release all discovery in their possession, they
 2   do, to all the defendants.  It's a separate determination
 3   whether they would use it.  And then if hypothetically they
 4   wanted to use it, and you didn't, we have 402 hearings, and I
 5   decide yes, you can use it or no, you can't.  So it's a
 6   threshold requirement that we release everything, and the DA's
 7   for years has done that.
 8       Q.   BY MR. GARCIA:  Did you release discovery copies of
 9   CD's of Mr. Niroula's calls that were recorded from the
10   San Francisco jail?
11            MS. FITZPATRICK:  Objection; relevance.
12            THE COURT:  Sustained.  Let's go to something else.
13            MR. GARCIA:  Your Honor, if I could.  It is relevant
14   because the CD's were specifically for calls between Mr. Niroula
15   and Mr. Replogle, who at the time was an attorney.
16            THE COURT:  He's also a codefendant.
17            MR. GARCIA:  No, before the time that he was arrested
18   for anything pertaining to this case.
19            THE COURT:  Okay.  So what relevance does it have to
20   this?
21            MR. GARCIA:  It goes to habit.  Ms. DiMaria opened the
22   door when she said that she has never released -- or would not
23   never violate a privilege.  Clearly at that time those calls
24   between Mr. Niroula and Mr. Replogle, who is a member of the bar
25   and who was not a defendant in this case, would have been
26   privileged.  So she's already established a habit of now
27   releasing privileged calls in discovery to other codefendants
28   when she clearly stated that she would never risk that.
```

Exhibit 2, Page 056

JULIE GIMINEZ, CSR

```
 1          THE COURT:  Ms. DiMaria, can you answer that in one
 2   minute or less?
 3          MS. FITZPATRICK:  May I be heard?
 4          THE COURT:  Yes.
 5          MS. FITZPATRICK:  I fail to see how -- first of all, I
 6   don't think there's any -- Ms. DiMaria's testimony as far as,
 7   you know, her being ethical and not wanting to do that in this
 8   particular case with Mr. Garcia.  I don't understand how
 9   conversations that occurred -- and I'm not sure because I'm not
10   familiar with the facts of the case -- much that it occurred
11   years prior not relating to Mr. Garcia -- have anything to do
12   with this motion about his calls from the Indio jail that
13   Ms. DiMaria received over the course of the last two years.
14          THE COURT:  Well, all four of these people -
15   Bustamante, Replogle, Niroula, and Garcia - were charged -- and
16   McCarthy -- were charged in the same complaint and information.
17          MS. FITZPATRICK:  But how does the calls from another
18   codefendant or between two codefendants even before the time
19   that that person was named as a codefendant have anything to do
20   with Mr. Garcia and this motion right now before this court?
21          THE COURT:  All right.  I just want to hear the answer,
22   so answer it, Ms. DiMaria, please, quickly.  Let's get it and
23   move on to something else.
24          THE WITNESS:  I believe my answer to you, Mr. Garcia,
25   was I never personally listened to any privileged phone calls.
26   I did also try to comply with my discovery obligation of
27   releasing discovery to counsel.  So --
28          THE COURT:  Let me ask it this way then: Were -- in
```

1    that discovery, were there phone calls from -- recorded in the

2    San Francisco, one of the jails up there, between Garcia --

3    between Replogle and Niroula or Replogle and Garcia or Replogle

4    and Bustamante?

5            THE WITNESS:  Your Honor, during one of the times that

6    Mr. Niroula was arrested, in jail up there -- and as I sit here

7    I don't remember which time it was.  It was prior to this case.

8    It wasn't this case.

9            THE COURT:  Okay.

10           THE WITNESS:  There were some jail calls that were

11   obtained from Palm Springs Police Department.  I released them

12   in discovery.

13           THE COURT:  Right.  Okay.

14           THE WITNESS:  I -- I --

15           THE COURT:  That's what I mean, Mr. Garcia, everything

16   gets released.  It may not be relevant.  It very well may not

17   be, but it's still released to everyone because it's in the

18   possession of the DA.  They release all the discovery.  Again --

19      Q.   BY MR. GARCIA:  So before releasing all of the

20   discovery, do you take any steps to ensure that you're not

21   releasing anything that may be deemed privileged?

22      A.   As I told you, I don't have time to listen between your

23   calls.

24           THE COURT:  Ms. DiMaria, the answer is no?  Yes?  The

25   answer is no?

26           THE WITNESS:  The answer is I don't have time to listen

27   to all of it.

28           THE COURT:  All right.  Let's move on to something

```
 1   else, please.
 2       Q.   BY MR. GARCIA:  Ms. DiMaria, in discovery did you also
 3   release copies of communications that were taken off of a
 4   MacBook computer between me and Mr. Replogle?
 5            MS. FITZPATRICK:  Objection; relevance.
 6            MR. GARCIA:  Mr. Replogle is an attorney.
 7            THE COURT:  Yeah, I know.  Go ahead, answer.  Yes, it's
 8   overruled.  You may answer.
 9            THE WITNESS:  I released the discovery of the download
10   from the computer.
11       Q.   BY MR. GARCIA:  And did you take any precautions to
12   ensure that that did not include privileged material?
13       A.   I think you and I are going back and forth of what is
14   deemed privileged, so I will leave my answer as I released the
15   discovery of the download of the computer.
16            THE COURT:  To all five defendants?
17            THE WITNESS:  Yes, sir.
18            THE COURT:  All right.
19       Q.   BY MR. GARCIA:  And so because you didn't have time and
20   you were trying to abide by your discovery obligation, you --
21   you did not go through everything prior to releasing it and make
22   sure that you were not releasing privileged material?
23       A.   Prior to releasing the download of the computer, no, I
24   don't believe I had time to review it in its entirety.  I do
25   know that you and Mr. Replogle were discussing creating
26   counterfeit bank accounts and bank statements for another con
27   scheme that was occurring in San Francisco.
28       Q.   Okay.  So you -- you're aware that there were
```

Exhibit 2, Page 059

53

JULIE GIMINEZ, CSR

```
 1    communications between me and Mr. Replogle in the discovery?
 2        A.    Yes, I'm aware of that.
 3        Q.    Okay.  And how did you receive those?
 4        A.    I received the -- a report of the download of the
 5    MacBook computer.
 6        Q.    Okay.  And, in fact --
 7        A.    That was purchased with Mr. Lambert's credit card.
 8        Q.    In fact, wasn't there a special master appointed to
 9    this case?
10        A.    Not that computer.
11        Q.    Okay.
12        A.    There was a special master appointed to review the
13    search of Mr. Replogle's office and Mr. Replogle's computer.
14    The computer in question that you're discussing was seized from
15    the apartment of Nick Seitze, where you were found hiding when
16    you were arrested.
17            THE COURT:  And it's sitting in a big box in front of
18    me.
19            THE WITNESS:  No, that's Mr. Replogle's computer.
20            THE COURT:  Correct.  Mr. Replogle's computer is
21    sitting there.
22            MR. GARCIA:  Okay.
23            THE WITNESS:  Any documents or communications between
24    you and Mr. Replogle that were obtained from Mr. Replogle's
25    computer were released after a special master conducted the
26    search, and a judge flew down from San Francisco and he
27    conducted a special master hearing.
28        Q.    BY MR. GARCIA:  Was I present at that hearing,
```

Exhibit 2, Page 060

54

JULIE GIMINEZ, CSR

```
 1   Ms. DiMaria?

 2       A.   I was excluded from the hearing.  I assume you were

 3   present, but I was excluded.

 4       Q.   Are you aware that I was not transported to court that

 5   day?

 6       A.   I don't know.  I may have been at the time, but I don't

 7   know now.  I know I was excluded from the hearing.

 8       Q.   If you knew the special master was required to ensure

 9   that any communications found on the -- Mr. Replogle's computer

10   were not released without being reviewed, why would you release

11   the same communication simply found on a different source?

12          MS. FITZPATRICK:  Objection; assumes facts not in

13   evidence.

14          THE COURT:  Sustained.

15       Q.   BY MR. GARCIA:  You found communications reportedly

16   between me and and Mr. Replogle; correct?

17       A.   I don't understand what you're asking me.  I don't know

18   from where.  I don't know from when.

19       Q.   All right.  This -- on the Apple computer that was

20   searched, you found communications between me and

21   Mr. Replogle?

22       A.   The Apple computer that was purchased with

23   Mr. Lambert's credit card that was found when you were arrested,

24   is that the computer you're discussing?

25       Q.   A simple yes or no would suffice.

26       A.   I need to understand what you're --

27          THE COURT:  Ms. DiMaria, you can't answer that yes or

28   no.
```

Exhibit 2, Page 061

55

1          There were multiple laptops seized by the Sacramento

2     Police Department.  Which one are you talking about?

3          MR. GARCIA:  There was only one that was ever

4     searched.

5          THE COURT:  Well, I don't know.  There were multiple

6     laptops seized so . . . okay.  Was only one searched?

7          THE WITNESS:  Of the ones seized when he was arrested?

8     Yes.

9          THE COURT:  Okay.  I think you're right.  Okay.  Go

10    ahead.  All right.

11         MR. GARCIA:  Correct.

12         THE COURT:  All right.  So we know.  Okay.  Go ahead.

13    Q.    BY MR. GARCIA:  On the Apple computer that was seized

14    and searched in this case, there were communications which you

15    personally reviewed purportedly between me and Mr. Replogle;

16    correct?

17    A.    Yes.

18    Q.    Did you ever bring that to the court's attention and

19    ask that they be reviewed by a special master?

20         MS. FITZPATRICK:  Objection.  Mr. -- he's assuming

21    facts not in evidence assuming that calls were privileged and

22    that this special master provision would apply.

23         THE COURT:  Mr. Garcia, hypothetically, let's say a

24    lawyer crook and a nonlawyer crook are scheming together to

25    steal something.  The lawyer can't then say, oh, the

26    conversations with my cocrook are privileged and therefore you

27    can't use them.  He could say it, but there would be hearings to

28    decide whether this was a part of the attorney-client privilege,

Exhibit 2, Page 062

56

JULIE GIMINEZ, CSR

1    this scheming to violate the law, and probably those

2    conversations would come in.  Tarasoff versus University --

3    Regents of University of California.  In that case it talks

4    about it.  So in any case, we've gotten far afield here.  Let's

5    proceed, please.

6        Q.   BY MR. GARCIA:  Ms. DiMaria, did you personally make

7    the determination that no privilege existed in those

8    communications that were found?

9            MS. FITZPATRICK:  Your Honor, objection; relevance.

10           THE COURT:  I thought I covered that.  Sustained.

11           MR. GARCIA:  Your Honor, you just said that hearings

12   are held and the court makes a determination.

13       Q.   BY MR. GARCIA:  Ms. DiMaria --

14           THE COURT:  No.  My point was there would be a 402

15   hearing whether this will be evidence at trial.  Everything

16   seized by the police isn't going to be admitted necessarily.  So

17   if that were to happen, in my hypothetical, then there would be

18   motions, and the judge would decide somewhere whether that

19   conversation could come in or not or whether or not it was

20   attorney-client privilege.  I don't know the answer because I

21   don't know hypothetically what was said, in my hypothetical,

22   okay, so I'm just telling you.

23           In this instance, I know that anything when the police

24   searched Mr. Replogle's office, his home and all that, a special

25   master was involved because Mr. Replogle is a lawyer, and the

26   concern is that the police would find names of his clients or

27   conversations with other clients that clearly are privileged,

28   and that's why a special master is involved.  When your computer

Exhibit 2, Page 063

57

JULIE GIMINEZ, CSR

```
 1    was seized, you're not a lawyer, so there's no privilege.
 2         Q.    BY MR. GARCIA:  Ms. DiMaria --
 3              THE COURT:  Now at some point in the trial, if that
 4    happened and you want to make a 402 hearing, you know, this
 5    conversation between myself, Mr. Garcia, and Mr. Replogle is
 6    under the attorney-client privilege, then you bring that before
 7    me, I would rule yes, it was, it's not admissible, and no, it
 8    wasn't and it is admissible.  We haven't gotten there yet.
 9         Q.    BY MR. GARCIA:  Ms. DiMaria, prior to the search of the
10    Apple laptop computer, were you aware that I had been
11    Mr. Replogle's client?
12              MS. FITZPATRICK:  Again, objection; relevance.
13              THE COURT:  Sustained.
14              Bring it up in the 402 motions, Mr. Garcia.  If it's
15    something that she's trying to admit that she got from that
16    search, and you think it's attorney-client privilege, bring it
17    up, I'll rule.
18              MR. GARCIA:  Your Honor, the problem here is that, Your
19    Honor, we're trying to establish a pattern of conduct.
20    Ms. DiMaria has very clearly said she wouldn't risk her bar
21    license.  It's not worth it to her.
22              THE COURT:  Yeah.
23              MR. GARCIA:  She had knowledge that there was
24    potentially privileged communications on this computer.  She
25    knows I'm Mr. Replogle's client.
26              THE COURT:  I don't know.
27              MR. GARCIA:  Well, you sustained the objection, so
28    unfortunately we didn't get the answer.
```

Exhibit 2, Page 064

58

```
 1              THE COURT:  Correct.  That's correct.  Since we're not
 2    going down that road at the moment, since I said we're not, so
 3    go to something else.  At this point I find it not to be
 4    relevant.  I told you what the options are.  It may be relevant
 5    in trial at some point, and you may win some of those in a 402.
 6    I don't know.  That's the time to bring it up.  Obviously, in
 7    trial I'm not going to let in stuff that's -- that I shouldn't
 8    let in that I find to be privileged, but I haven't gotten there
 9    yet, and we're not doing it today.
10       Q.   BY MR. GARCIA:  Ms. DiMaria, have you ever spoken to
11    the jail investigator of Sandra Pemberton?
12       A.   In my life?  Yes.
13       Q.   Pertaining to this case?
14       A.   Yes.
15       Q.   Okay.  Did you speak with her specifically regarding an
16    inmate named John Childs?
17       A.   I don't recall.
18            MS. FITZPATRICK:  Objection; relevance.  Can I ask for
19    an offer of proof on this line of questioning?
20            THE COURT:  Well --
21       Q.   BY MR. GARCIA:  Did you receive a packet of documents
22    from Ms. Pemberton that pertained to Mr. John Childs?
23            MS. FITZPATRICK:  Objection; relevance.  I'd ask for an
24    offer of proof on this line of questioning.
25            THE COURT:  What's the relevance to John Childs?
26            MR. GARCIA:  John Childs was a jail-housed informant --
27            THE COURT:  Yeah, I know
28            MR. GARCIA:  -- who -- yeah.
```

Exhibit 2, Page 065

59

JULIE GIMINEZ, CSR

```
 1              THE COURT:  But what's the relevance to this case?
 2              MR. GARCIA:  My belief that he provided information to
 3    the District Attorney's Office.
 4              THE COURT:  On this case?
 5              MR. GARCIA:  Yes.
 6              THE COURT:  Why don't you just ask her that question.
 7              MR. GARCIA:  I'm getting there but I keep getting
 8    interrupted.
 9              THE COURT:  Mr. Garcia, just ask.
10         Q.   BY MR. GARCIA:  Did Mr. John Childs ever provide any
11    information pertaining to this case to the District Attorney's
12    Office?
13         A.   With all due respect, I'm not sure how that applies to
14    a motion for prosecutorial misconduct.  If I received
15    information --
16         Q.   Yes or no?
17              THE COURT:  You can answer this yes or no and go from
18    there.  We're not going to get into it.
19              THE WITNESS:  Yes.
20              THE COURT:  All right.  Next question about some other
21    subject.
22         Q.   BY MR. GARCIA:  Were you aware of whether or not
23    Mr. Childs was acting as an agent for the sheriff's
24    department?
25         A.   To my knowledge, he was absolutely not acting as an
26    agent.
27         Q.   Do you know if he had a long-standing relationship with
28    the sheriff's department to provide information on numerous
```

Exhibit 2, Page 066

JULIE GIMINEZ, CSR

1    cases?

2         MS. FITZPATRICK:  Objection; relevance.

3         THE COURT:  Sustained.

4         Some other subject, Mr. Garcia.

5         MR. GARCIA:  Your Honor, it goes to a Messiah

6    violation.

7         THE COURT:  Okay.  It may.  But that's not -- we're not

8    in that area at the moment, so go to something else.  Or not, I

9    don't know.  We'll -- but go to something else, please.

10   Q.   BY MR. GARCIA:  Ms. DiMaria, in this case a large

11   number of text messages have been introduced into evidence that

12   were taken from an iPhone that was used at the time of my

13   arrest; correct?

14   A.   When you say, "in this case," are you talking about the

15   preliminary hearing, sir?

16   Q.   Correct.

17   A.   There were text messages introduced; taken from your

18   iPhone, yes.

19   Q.   Okay.  And are you aware of how those text messages

20   were obtained?

21        MS. FITZPATRICK:  Objection; relevance.  I think he's

22   getting into probably some sort of suppression.

23        MR. GARCIA:  Oh, I think this will be very very

24   relevant, Your Honor.  If you allow me to ask about four or five

25   questions.

26        MS. FITZPATRICK:  Ask for an offer of proof.

27        THE COURT:  Yeah, so the way it works, Mr. Garcia, is I

28   don't know what the relevance of it is, so I'm asking you, as an

1    offer of proof, what are you trying to show here?  I --

2    remember, I presided over the Replogle-Bustamante trial for four

3    months.  During that trial there was lots of evidence from cell

4    phones and computers admitted into evidence.  Are you talking

5    about those things?

6              MR. GARCIA:  Yes.

7              THE COURT:  All right.  What's your point?  You're

8    going to get the transcript.  It's going to show you everything

9    that was admitted.

10             MR. GARCIA:  Yeah, I'm not worried about that.  I'm

11   talking -- talking specifically about the preliminary hearing.

12             THE COURT:  And --

13             MR. GARCIA:  Which I was a part of.

14             THE COURT:  Okay.  And your offer of proof as to why

15   this is relevant to this proceeding is what, please?

16             MR. GARCIA:  Is will go to prosecutorial misconduct.

17             THE COURT:  In what -- how?

18             MR. GARCIA:  Tainted evidence.

19             THE COURT:  Okay.  I'll give you -- see what time it is

20   on the clock?  I'll give you till quarter of.  Go ahead,

21   proceed.

22      Q.   BY MR. GARCIA:  Ms. DiMaria, are you aware of how those

23   text messages were obtained?

24      A.   I've learned of it through the discovery.

25      Q.   Okay.  Did you instruct Detective Simon to download

26   those text messages?

27      A.   No.

28      Q.   Okay.  Are you aware that he's the one who facilitated

Exhibit 2, Page 068

JULIE GIMINEZ, CSR

1   the downloading of the phone?

2       A.   I don't understand what you mean by "facilitated."

3       Q.   Did he personally take the phone out of the evidence

4   and have it processed to download the contents?

5       A.   I don't know what you mean by "processed."  He

6   personally removed it from evidence and took it to certain

7   places.

8       Q.   Okay.  And was he the person who handled the chain of

9   custody for that device?

10          MS. FITZPATRICK:  Objection; relevance.

11          THE COURT:  You can answer yes or no.  Overruled.  You

12  can answer it.

13          THE WITNESS:  Yes.

14      Q.   BY MR. GARCIA:  Okay.  And after those text messages

15  were downloaded, do you know how long it took for them to be

16  placed into evidence?

17      A.   I believe Detective Min placed it right back into

18  evidence as soon as was feasibly possible.

19      Q.   So you're unaware that it took 19 days?

20      A.   No.

21      Q.   Okay.  What method did you receive the text messages

22  on? a CD? on a thumb drive?

23      A.   I think CD.  I don't think it was a thumb drive.

24      Q.   Okay.  And you personally redacted the document to

25  exclude certain text messages?

26      A.   No, I didn't redact the discovery.

27      Q.   The exhibit that was introduced, I believe People's 74

28  at the preliminary hearing.

```
 1              MS. FITZPATRICK:  Objection; relevance.  I --
 2              THE COURT:  All right.
 3              MS. FITZPATRICK:  I don't have --
 4              THE COURT:  Sustained.
 5              We're going to take a short recess because I need to
 6    talk to Captain Taylor about the laptop issues so . . .
 7    Captain Taylor is here, and I got hold of him, I'll talk to him
 8    for a few minutes.  I want to do that now before we get
 9    sidetracked, so I want to use that, going to give me 10 minutes.
10    We'll start back at five after.
11              Captain Taylor, can I talk to you briefly, please.
12                       (A recess was taken.)
13              THE COURT:  Okay.  Let's go back on the record in the
14    Garcia and Niroula matter.
15              After the short recess, the -- a short recess because I
16    wanted to talk with Captain Taylor, who now the new commander of
17    the Indio jail facility, and bring him up to speed to the laptop
18    issue, and I did.  I told him basically what had happened, and
19    it's in the appellate courts.  We have not seen any county
20    counsel brief yet?  Anyway, he's aware of it, gentlemen, so --
21    and I've known Captain Taylor for 20 years or more, and so any
22    problems come up, and I -- I agree -- we'll talk about it, but
23    we'll see how it shakes out, gentlemen, on the laptop.  We'll
24    see.  I don't know yet.  It's too soon.  But now he's aware of
25    what happened historically, and so I wanted to bring him up to
26    speed.
27              Okay.  All right.  Back to the evidence in this case.
28    Ms. DiMaria is on the stand.
```

Exhibit 2, Page 070

64

1    And, Mr. Garcia, you had a few other questions to ask

2    her?

3    MR. GARCIA:  Yeah, I'm almost done.

4    THE COURT:  Yeah.

5    Q.   BY MR. GARCIA:  Ms. DiMaria, which calls did you place

6    to Investigator Blanck; do you recall?

7    A.   I don't -- you asked me that earlier.  I really

8    don't -- to be honest with you, I don't remember doing it until

9    he testified.

10   Q.   And you're clearly aware that allegations have been

11   made that you received privileged calls; correct?

12   A.   Absolutely.  That's why we're here.

13   Q.   Okay.  And have you returned any of those CD's to the

14   court pending the conclusion of this motion?

15   A.   No, I've never been asked or ordered to.

16   Q.   So you still have those CD's in your possession?

17   A.   I do.

18   Q.   Did you ever have a conversation after court with

19   Investigator Enrique Tira regarding calls with his client?

20   A.   You'll have to refresh my memory.  From what you're

21   asking me, blanket like that, I don't remember.

22   Q.   Did you ever advise him that he was obligated to

23   disclose information about his -- if his clients attempted to

24   receive any kind of funds?

25   A.   No.

26   Q.   Did you ever advise him that he could be liable for any

27   criminal conduct if he assisted his client in any way in

28   obtaining funds?

Exhibit 2, Page 071

65

JULIE GIMINEZ, CSR

```
 1      A.   Obtaining funds?

 2      Q.   Correct.

 3      A.   I don't understand what you're talking about.

 4      Q.   Okay.  Do you ever recall having a conversation with

 5  Tom Reed in the courtroom pertaining to listening to privileged

 6  calls?

 7      A.   Tom Reed?

 8      Q.   Correct.

 9      A.   Not off the top of my head, no.

10      Q.   Okay.  So you don't recall having a conversation with

11  Mr. Reed in the courtroom?

12          MS. FITZPATRICK:  Objection.

13          THE WITNESS:  Ever in my life?

14          MS. FITZPATRICK:  Objection; vague.

15          THE COURT:  Sustained.

16      Q.   BY MR. GARCIA:  In April of 2010, did you have a

17  conversation with Mr. Tom Reed in the courtroom?

18          MS. FITZPATRICK:  Objection; vague as to time.  As to

19  what day?  As to what about?

20          THE COURT:  Sustained.  You need to narrow it down.

21          MR. GARCIA:  Unfortunately, I don't have information.

22  Obviously, if there's more than one conversation, we could

23  narrow it down that way.  Does she recall having a

24  conversation --

25          THE COURT:  Mr. Garcia, you need a good faith belief

26  that something happened to bring it up.  We all -- I've talked

27  with Mr. Taylor, I've talked with Mr. Bolanos about money and

28  other things, not about the -- in the system people talk.  But
```

Exhibit 2, Page 072

66

JULIE GIMINEZ, CSR

1    about what, folks?  What do you want to know?  Of course she's

2    talked to Mr. Reed; Mr. Reed is the investigator through the

3    DA's office.  I've seen Mr. Reed in here on the Duncan case on

4    occasion.  He's an investigator.  So what?  What specifically

5    are you driving at?

6        Q.   BY MR. GARCIA:  Do you recall having a conversation

7    with Mr. Reed in this courtroom in or about April of 2010

8    discussing listening to telephone recordings in this case?

9        A.   I do not recall that.  Mr. Reed has not been my

10   investigator for this case.  I do not recall that.

11       Q.   You do not recall a conversation on a day when both

12   this case and Mr. Duncan's case was on calendar?

13       A.   I know I've been in court with Mr. Reed when both cases

14   were on calendar.  Is it possible we discussed what you have

15   accused me of?  I don't know.  I don't remember.  You're asking

16   me to remember some casual conversation from a year ago, April

17   2010.  I -- I don't remember every casual conversation I have in

18   every courtroom waiting for every case.

19       Q.   Okay.

20       A.   And in regard to your question about Mr. Tira, if you

21   were more specific.  I have a feeling I think I know where

22   you're going.  Your questions are very vague, though.

23       Q.   Do you recall a specific conversation that you had with

24   Mr. Tira discussing in any way his client -- his client's

25   attempting to obtain fund?

26       A.   Well, I recall -- and I don't recall where I got this

27   information -- that Mr. Niroula may -- there was speculation

28   about him having money somewhere, and I don't even know if it

Exhibit 2, Page 073

JULIE GIMINEZ, CSR

1    was money left over from this case, and I believe I asked him if

2    he had ever been asked to find money not -- when you say "fund,"

3    I'm thinking court funds.

4        Q.    Oh.

5        A.    But I recall asking him about funds, if -- looking for

6    funds that had been hidden.  He said no, and that was the extent

7    of it.

8        Q.    And you don't recall the source of your information?

9        A.    I really don't.  I have to be honest.  I'll leave it at

10   that.  I really don't.

11       Q.    Do you recall if it was from listening to any of

12   Mr. Niroula's jail phone call recordings?

13       A.    I really don't recall.

14       Q.    Okay.  So it is possible that you could have learned it

15   from listening to a jail call?

16           MS. FITZPATRICK:  Objection; misstates the testimony.

17           THE COURT:  And the court will note that almost

18   anything in life is possible.  Sustained.  Next question,

19   please.

20           MR. GARCIA:  No further questions, Your Honor.

21           THE COURT:  Folks, if you would like to

22   cross-examine.

23           MS. FITZPATRICK:  Yes.

24           THE COURT:  Okay.  Go ahead.

25                        CROSS-EXAMINATION

26   BY MS. FITZPATRICK:

27       Q.    Okay.  We've covered a great deal, but when was this

28   that you were assigned this case, Ms. DiMaria?

Exhibit 2, Page 074

JULIE GIMINEZ, CSR

1    A.    I'm not positive when I was assigned it because I think

2   I was still in trial when it got technically assigned to me.   I

3   was in a murder trial.

4    Q.    An approximate time frame.

5    A.    I believe it was assigned to me after we staffed it,

6   would have been March 2009, but I was still in trial, so I don't

7   think I started actually handling it until April 2009.

8    Q.    Okay.   And at some point after being assigned this

9   case, did you submit a request for phone calls of the defendants

10  who were in custody?

11   A.    I did.

12   Q.    Okay.   And Mr. Garcia in particular?

13   A.    Yes.

14   Q.    When was that first request?

15   A.    I'd have to look at the request forms.   I honestly

16  don't recall.   I know it was probably pretty close to when I got

17  the case assigned to me, but I don't remember the first request.

18        Ms. Hinos, do you still, by any chance, have exhibit A?

19        THE CLERK:   Your Honor, yes.

20        THE WITNESS:   Your Honor, with your permission, may I

21  look at it to refresh my memory?

22        THE COURT:   Yes.

23        THE WITNESS:   First request I have is May 11 of '09.

24   Q.    BY MS. FITZPATRICK:   Have you had an opportunity look

25  at exhibit A?

26   A.    I have.

27   Q.    Does that refresh your recollection as to the date of

28  the first request?

Exhibit 2, Page 075

69

JULIE GIMINEZ, CSR

1      A.    It appears that our office made the very first request

2  in May of 2009; yes.

3      Q.    Okay.  And did you receive any CD's as a result of that

4  request?

5      A.    I'm sure I did.

6      Q.    And who did you receive that the CD from?

7      A.    On this particular request, I don't really recall.

8  There was a change of assigned investigators during the pendency

9  of this case.

10      Q.    Okay.

11      A.    So like, who actually gave it to me?  I don't really

12  recall.

13      Q.    Okay.  Let's put it this way: When do you recall the

14  first time that you actually listened to a CD?

15      A.    It would have been in 2009.  I don't recall exactly

16  when.

17      Q.    Okay.  Prior to listening to any of the CD's, were you

18  contacted by Mr. Garcia's attorney at the time, Mario

19  Rodriguez?

20      A.    I was contacted -- I don't mean to be difficult.  I was

21  contacted by Mr. Rodriguez that he heard his voice on a CD.  I

22  had not listened to that CD yet.  And I think that was probably

23  the first CD.  If not, it was the second.  It was very close to

24  the beginning of when we ordered CD's.  I think it was the first

25  CD.

26      Q.    Do you recall the time frame of that?

27      A.    If I could look at --

28      Q.    With Mr. Rodriguez.

Exhibit 2, Page 076

70

JULIE GIMINEZ, CSR

1      A.   If I can look at my notes, absolutely.   It was the

2  beginning of June 2009.  And actually, now that I'm looking at

3  my notes, yes, it was.  I had not listened to any of the jail

4  calls at all.

5      Q.   Okay.  Before listening to any of the calls at all on

6  any of the CD's that were ordered by the office, whether you or

7  an investigator, you received a call from Mr. Rodriguez, and

8  what did Mr. Rodriguez tell you?

9      A.   He had told me that when he was listening to the calls,

10  he heard his calls recorded by -- between him and Mr. Garcia,

11  and I was stunned.  I had not had that happen before.  I

12  immediately apologized.  He and I reached an agreement that we

13  would address it when we went to court, and that I absolutely

14  would not listen to the CD whatsoever.  I didn't want to take

15  the chance on even clicking on maybe the wrong call and having

16  it be his call, so I never even inserted that CD in the

17  computer.

18      Q.   So he identified which CD it was because you had

19  provided him a copy of that CD?

20      A.   Yes.  And looking at my notes, I'm pretty sure it was

21  the first request because by the second request, we started

22  excluding phone numbers.  So yes, it was the first CD.  And I

23  never inserted that CD into the computer, never listened to any

24  calls on it.

25      Q.   Okay.  And you said that you returned -- decided to

26  address it in court.  And so you returned to court on what date;

27  do you remember?

28      A.   I can look at my notes.  And I believe Mr. Reilly also

Exhibit 2, Page 077

71

JULIE GIMINEZ, CSR

1    probably has a transcript of that proceeding, which would have

2    the date on it.  Let me check my notes.  It was June 4th, 2009.

3    And Mr. Rodriguez and I spoke in the beginning of June.  So I

4    would say it was only a matter of -- at most -- yeah, I have in

5    my notes -- just a couple days past.

6        Q.    So within a few days of receiving Mr. Rodriguez's phone

7    call, you returned to court, and at that time you memorialized

8    your conversation with Mr. Rodriguez for the court?

9        A.    Yes.

10       Q.    And you notified the court that Mr. Rodriguez had

11   called you, that he had identified certain attorney-client

12   calls?

13       A.    He didn't identify which calls.  He just said that he

14   heard that some of his calls were recorded.  And I didn't even

15   ask him which ones because I knew I wasn't going to listen to

16   the CD.  I just took his word for it that they were on the CD,

17   and I never listened to.

18       Q.    Did you bring that CD to court?

19       A.    I did bring it to court.

20       Q.    And what did you do when you -- with that CD when you

21   came to court?

22       A.    My memory -- and I apologize, I don't have the

23   transcript in front of me.  But my memory was that I asked the

24   court what to do with it, and I believe I offered it to the

25   court.  And I don't -- that's my memory of it.  But the court

26   just ordered me basically to not listen to any of the calls.  So

27   I immediately put that CD -- because I don't think the court

28   wanted it -- I put that CD under seal, and it has not -- it's

1    been kept under seal ever since.

2        Q.   Okay.  And did the court make any orders that day with

3    regard to the recording of Mr. Rodriguez's telephone calls?

4        A.   The court asked if I would -- if -- my memory is that

5    he asked if he -- if I would have any problem with him ordering

6    me not to listen to the calls, and I believe I responded

7    absolutely not.  I have no problem with that order because I

8    don't intend to listen to them anyway.

9        Q.   Okay.  And after that time, you mentioned that after

10   that you had started to note the actual attorney phone numbers

11   on the request for those to be excluded for the CD to be given

12   to the District Attorney's Office; correct?

13       A.   Yes.  When Mr. Rodriguez had notified me that his calls

14   got recorded, I called my investigator to ask how that had

15   happened.  And I believe he checked with someone -- I don't know

16   if it was the jail or whom -- and told me of the procedure that

17   they're supposed to register their phone numbers, and those

18   calls shouldn't have been recorded, but we could go above and

19   beyond, if we get their phone numbers, and request to exclude

20   them.  Then in case there was an accidental recording, if we

21   asked for a CD, since those numbers were requested to be

22   excluded, we wouldn't get those.

23           So when we went to court that day, I believe I went

24   around the room and asked Mr. Forth for phone numbers,

25   Mr. Rodriguez for sure I asked for phone numbers.  I don't

26   recall, probably Mr. Dolan.  But yes, I requested phone numbers.

27   And I think I may have even put on the record so that when we

28   made requests we could exclude those numbers.

Exhibit 2, Page 079

73

JULIE GIMINEZ, CSR

1     Q.   So you -- in an abundance of caution, you began listing

2  those numbers on the requests for -- to be excluded from your

3  requests for jail recordings to be used?

4     A.   Yes, just to be abundantly cautious.

5     Q.   And you advised -- I believe you stated earlier that

6  you advised those counsel that they should register their phone

7  numbers with the Indio jail; correct?

8     A.   Yes.

9     Q.   Okay.  And then -- so you never inserted that

10  particular CD in the player and never listened to the calls of

11  that CD?

12     A.   Never ever to this date, never.

13     Q.   Okay.  So after being represented by Mr. Rodriguez,

14  Mr. Garcia was then represented by Attorneys Jake Devane and Jim

15  Silva; is that correct?

16     A.   Yes.  Mr. Rodriguez was fired by Mr. Garcia.

17     Q.   Okay.  To your knowledge, were there any recordings of

18  calls from Mr. Garcia to Attorneys Devane and Silva?

19     A.   No.

20     Q.   Did you ever listen to any recordings of conversations

21  between Mr. Garcia and Mr. Devane or Mr. Silva, to your

22  knowledge?

23     A.   No.

24     Q.   At some point -- or after Mr. Devane and Mr. Silva,

25  Mr. Garcia became represented by Cameron Quinn; is that

26  correct?

27     A.   Yes.

28     Q.   Okay.  And do you remember receiving a CD with calls

Exhibit 2, Page 080

JULIE GIMINEZ, CSR

1    and hearing Mr. Quinn's voice speaking with Mr. Garcia?

2        A.    Yes.

3        Q.    And what did you do when you heard Mr. Quinn's voice?

4        A.    Honestly -- and excuse me, Your Honor -- but the

5    thought that went my through my mind was, oh, crap, and

6    immediately I -- I recognized Mr. Quinn's voice -- he has a

7    distinctive voice -- and I can't recall if Mr. Quinn either

8    identified himself, you know, hi, Danny, this is -- Danny would

9    have been the one to call him.  I believe the name was used, as

10   well.  Either way, I recall knowing that it was Mr. Quinn

11   because -- again, Your Honor, excuse me -- but I remember

12   thinking, oh, crap.  I immediately hit stop because I knew that

13   was a problem.  I immediately ejected that disk so, again, I

14   wouldn't maybe accidentally listen to calls later in the CD.  As

15   soon as I knew there was a call on the CD, I ejected it.  Never

16   listened to it.

17       Q.    Was what you listened to limited to pleasantries, what

18   you would describe as pleasantries?

19       A.    Absolutely.

20       Q.    Between Mr. Quinn and Mr. Garcia?

21       A.    It was the minute I recognized the voice and who the

22   caller was, I don't think I listened to more than, I don't know,

23   the first few seconds of it.  As long as it --

24       Q.    So you never listened to anything about the actual

25   defense strategy, anything about the case.  Simply exchanging

26   pleasantries?

27       A.    I don't even know if I got as far as pleasantries.  The

28   second I recognized the voice, I hit eject.  And further, if I

Exhibit 2, Page 081

JULIE GIMINEZ, CSR

1    may, that was after-hours, I think I was at home, and I even

2    called Mr. Quinn that night.  I didn't even wait till the next

3    day.

4         Q.   So you phoned Mr. Quinn on the cell phone?  Or some

5    other phone -- phone number that you had for him?

6         A.   Yes.

7         Q.   Did he pick up or did you leave a message?

8         A.   No, he picked up and we --

9         Q.   What is the substance of that conversation?

10        A.   I immediately that night explained to him what had

11   happened and that I didn't listen to the call.  And he actually

12   said, oh, Lisa, I don't discuss strategy on my calls, anyway.

13   It wouldn't matter.  And I remember smiling -- Mr. Quinn is a

14   nice man -- and I said, Mr. Quinn, that's nice of you.  I won't

15   listen to the call, anyway.  I can't, I won't.  I explained the

16   procedure of registering his phone number with the jail to him.

17   I told him that I had not listened to the CD and that I was

18   going to seal it and provide it to him at our very first court

19   appearance, and that way he would have the only copy of the

20   CD.

21        Q.   Do you recall what date that was that you listened to

22   the CD from -- involving a conversation between Mr. Quinn and

23   Mr. Garcia?

24        A.   I want to say it was Friday, February 19th, 2010.  If I

25   may have one moment just to double-check my notes.  It was

26   either Friday, February 19th, 2010, or it was February 18th,

27   2010.  I know when I wrote my notes, I put one date in the

28   notes, and then what I did was I memorialized our conversation

Exhibit 2, Page 082

1    in a letter, and I wrote Mr. Quinn a letter, and in the letter I

2    think the date is the 19th, or it was the 18th or 19th.

3        Q.    Okay.  Now, in the conversation with Mr. Quinn on the

4    phone, did you -- and you told him the procedure for attorneys

5    to register their numbers with the jail; correct?

6        A.    I did.

7        Q.    And did Mr. Quinn indicate that he had not done so yet?

8        A.    He indicated he had not done that.

9        Q.    Okay.  And you told him that you would provide him with

10   the only CD and that the CD had not yet been provided in

11   discovery; correct?

12       A.    Correct.

13       Q.    And did you obtain Mr. Quinn's phone numbers from him?

14   In addition to whatever ones you called, did you obtain other

15   phone numbers for -- from him?

16       A.    I did.  I don't remember if I did it on the phone that

17   night or we went to court that Monday the 22nd.  So I did obtain

18   his phone numbers.  I just don't recall if I did it on the 22nd

19   or if I did it on the phone call.

20       Q.    And why did you obtain those phone numbers?

21       A.    Like -- again, like with Mr. Rodriguez, knowing that

22   there was an accidental recording, I wanted to make sure that

23   our requests would include a "please exclude the following

24   numbers" and exclude any numbers that Mr. Quinn spoke to his

25   client on.

26       Q.    And did your requests after that exclude Mr. Cameron's

27   number -- or Mr. Quinn's number and ask for them to be excluded

28   from the CD?

Exhibit 2, Page 083

1       A.   They did.

2       Q.   You mentioned that you went to court on the following

3    Monday.  So that occurred either Thursday evening or Friday

4    evening, either the 18th or 19th.  So you went to court on the

5    first available date, which would have been the 22nd?

6       A.   Which is even more the reason I think it happened

7    Friday night, the conversation.

8       Q.   Excuse me.  Did you say Monday -- you said Monday the

9    22nd you came back to court, or Monday the 22nd that you wrote

10   the letter?

11      A.   Monday the 22nd, I wrote the letter.  And I told

12   Mr. Quinn that I would be writing a letter.  And then we

13   returned to court on February the 26th.  Yeah, I wrote the

14   letter on Monday the 22nd.  We had a court date already set for

15   the 26th, and that was here in 1B in front of Judge Downing.

16      Q.   Okay.  And so on the next court you -- so you sent the

17   letter on the 22nd.  On the next court date, which you indicated

18   was the 26th, you turned over the CD and the copy of the

19   letter?

20      A.   When we came to court on the 26th, I brought the CD and

21   the letter.  I had him sign the letter, acknowledging that he

22   had received the CD, and I gave him a copy of the letter.

23      Q.   Okay.

24      A.   And then we also memorialized on the record what had

25   occurred.

26      Q.   Okay.

27      A.   And that was in front of Judge Downing.  Judge Downing

28   indicated it was wise to put that on the record, and his words

```
 1   were "that takes care of it."

 2       Q.   Okay.  Do you recall in May 2010 Mr. Garcia becoming

 3   pro per?

 4       A.   Yes.

 5       Q.   And do you recall when -- do you recall exactly what

 6   date that was?

 7       A.   May 10th.

 8       Q.   Okay.  And do you recall when the last requests for

 9   phone calls was made?

10            THE WITNESS:  Your Honor, may I have permission to

11   refresh my memory with exhibit A?

12            THE COURT:  Go ahead.

13            THE WITNESS:  Well --

14       Q.   BY MS. FITZPATRICK:  Other than the one that was

15   requested later on about the KESQ interview.

16       A.   Okay.

17       Q.   The last date --

18       A.   Right.  It appears that the last request we made was

19   May 13th, 2010.

20       Q.   Okay.  So Defendant Garcia was granted a Faretta motion

21   and he became pro per on May 10th, and on May 13th was the last

22   request for phone calls?

23       A.   Yes.

24       Q.   Okay.

25       A.   Yes.  Last request for -- routinely requesting phone

26   calls.

27       Q.   Routinely requesting phone calls other than the KESQ

28   interview.
```

Exhibit 2, Page 085

79

JULIE GIMINEZ, CSR

1    A.   Correct.

2    Q.   Okay.  And did you listen to any calls after May 10th,

3  2010?

4    A.   No, I didn't have any CD's.

5    Q.   Have you listened to any calls since that time?

6    A.   No.

7    Q.   So you've not listened to any of Mr. Garcia's calls

8  since he began representing himself?

9    A.   Correct.

10    Q.   Have you ever listened to any calls between

11  Investigator Bolanos and Mr. Garcia?

12    A.   No, absolutely not.  And I know Mr. Bolanos' voice.

13    Q.   Other than Mr. Bolanos, has Mr. Garcia ever indicated

14  to you who other members of his defense team are?

15    A.   No.

16    Q.   Mr. Garcia named a number of individuals during his

17  questioning of you, including Mr. Rodriguez and Mr. Quinn, who

18  we already covered, but he also mentioned a Joe Forth,

19  Mr. Dolan, Mr. Wright, Bill Nemo, Tom Eckhardt, Michael

20  Goldstein, Michael Meehan, and Mr. Karpf, Ms. Sax.  Do you

21  remember him mentioning these individuals during his questioning

22  of you?

23    A.   Probably.  I remember him listing a number of people.

24  Those sound familiar.

25    Q.   To your knowledge, have you ever listened to -- and he

26  identified these individuals, I believe, as attorneys.

27       Have you ever listened to, to your knowledge, between

28  any conversations between those individuals and Mr. Garcia?

Exhibit 2, Page 086

80

JULIE GIMINEZ, CSR

1      A.    No.

2      Q.    You ever listened to any phone calls, other than the

3  one you indicated about Mr. Quinn, have you ever listened to any

4  phone calls between -- attorney-client calls between Mr. Garcia

5  and another attorney?

6      A.    Not to my knowledge.  Absolutely not.

7      Q.    We discussed that Ms. Gar -- or Mr. Garcia's mother was

8  granted either spiritual advisor or satisfied the court on June

9  18th, 2010.  Have you ever listened to any phone calls between

10  Mr. Garcia and his mother after that date?

11      A.    No.

12      Q.    Have you ever directed your District Attorney

13  investigator to listen to attorney-client phone calls between

14  Mr. Garcia and his attorneys ever?

15      A.    Absolutely not.

16      Q.    Have you ever directed your investigator, since the

17  granting of the spiritual advisor status for Garcia's mother,

18  have you ever directed your advisor, excuse me, your -- or your

19  investigator to listen to phone calls between Mr. Garcia and his

20  mother?

21      A.    Absolutely not.

22      Q.    Have you ever directed -- same questioning: Have you

23  ever directed a jail staff member or anyone in the sheriff's

24  department to listen to attorney-client phone calls between

25  Mr. Garcia and any of the attorneys mentioned?

26      A.    Absolutely not.

27      Q.    Have you ever directed a jail staff member or anyone at

28  the Riverside County Sheriff's Department, don't listen to

Exhibit 2, Page 087

JULIE GIMINEZ, CSR

81

1   conversations between Mr. Garcia and his mother after June 18th,

2   2010?

3        A.   Absolutely not.

4        Q.   Are you aware of any other District Attorney employee

5   having access to the jail recording CD's that you've obtained

6   via requests through the jail?

7        A.   The only one was the October 2010 one.  My

8   investigator, Ed Berakovich, has that one in his possession to

9   this day.  All the prior ones, from 2009 in the beginning of

10  2010, were given to me directly after they were requested, and

11  they stayed in my possession.

12       Q.   And did you ever share these CD's with any other

13  individuals in law enforcement?

14       A.   No.

15            MS. FITZPATRICK:  That's it, Your Honor.  Thank you.

16            THE COURT:  Mr. Garcia, any redirect?

17            MR. GARCIA:  Yes, Your Honor, a few questions.

18                      REDIRECT EXAMINATION

19  BY MR. GARCIA:

20       Q.   You stated that when you learned from Mario Rodriguez

21  that the calls had been recorded, you were stunned; correct?

22       A.   Yes.

23       Q.   Okay.  And after that date, you started making special

24  requests to exclude his phone number?

25       A.   Yeah.

26       Q.   Okay.  And then you learned that I was represented by

27  Mr. Silva and Mr. Devane, but you never made any requests to

28  exclude their phone numbers; correct?

Exhibit 2, Page 088

82

JULIE GIMINEZ, CSR

1    A.    Correct.

2    Q.    Okay.  And then you learned again that Mr. Quinn's

3    calls had been recorded and you were again stunned?

4    A.    Correct.

5    Q.    But weren't you already previously put on notice with

6    the incident with Mr. Rodriguez that there were irregularities

7    with the jail's recording system?

8    A.    No.

9    Q.    Okay.  So --

10    A.    I mean, you say irregularities with the recording

11    system.  No, I knew that there was -- somehow his call got

12    recorded, but I didn't know what to attribute it to.

13    Q.    Okay.  And did you ever advise Mr. Silva -- Mr. Silva

14    to register his phone number with the jail?

15    A.    No, I don't -- no, I don't believe -- you know what?  I

16    don't remember.

17    Q.    Okay.

18    A.    Since that incident had occurred with Mr. Rodriguez, I

19    don't know.  I -- I -- I can't tell you.  I may have, I may not

20    have.

21    Q.    Okay.  Did you ever instruct Mr. Quinn to register his

22    number before requesting his calls?

23    A.    No, I don't believe I did.

24    Q.    And you stated that you turned over the CD with

25    Mr. Rodriguez's calls to the court; correct?

26    A.    Turned it over to the court?  No, I offered to.  My

27    memory is that I offered to or that I asked what he wanted me to

28    do with it.

Exhibit 2, Page 089

83

JULIE GIMINEZ, CSR

1       Q.    And what did you do with it?

2       A.    He ordered me to never listen to it.  So it's sealed in

3    my office.

4       Q.    Okay.  Did you put any other CD's under seal?

5       A.    That's the only one I've been ordered not to listen to.

6    The one that had Mr. Quinn's voice on it, I turned over to

7    Mr. Quinn.

8       Q.    If -- you've been in court when I've asserted that I

9    believed you obtained CD's that had other privileged calls on

10   them; correct?

11      A.    I've listened to your assertions and your accusations.

12      Q.    Okay.  And you've never then placed any other CD's in a

13   sealed envelope?

14      A.    I have not been given an order by a judge to do so on

15   any other CD.

16      Q.    So you feel you have to have an order in order to place

17   them under seal?

18      A.    I don't believe your accusations are enough to tell me

19   what to do, with all due respect, Mr. Garcia.

20      Q.    Did you ever take any steps to verify if my accusations

21   were; correct?

22      A.    You have made so many accusations against me that are

23   false that I don't believe your accusations are correct.  You

24   have accused me of actually listening to calls, which I did not.

25   You accused me on KESQ of listening to your calls, which I have

26   not.  To my knowledge, you are the only one who has the copy

27   of -- well, the only copy I have of the call with Mr. Quinn I

28   released to Mr. Quinn.  I am under the assumption that he

1  released that to you because when you went pro per, he was

2  directed to release all of the discovery to you; therefore, it

3  would have been in your control.  KESQ then broadcast a portion

4  of the phone call between you and Mr. Quinn, and what KESQ

5  broadcasts, I believe, was more than even I had listened to.

6      Q.   And are you aware about having the CD's in my

7  possession?

8           MS. FITZPATRICK:  Objection; calls for speculation.

9           MR. GARCIA:  I'm asking if she's aware if I have --

10          THE COURT:  Overruled.  You can answer it.

11          THE WITNESS:  I know that Mr. Quinn was to release all

12  the discovery to you.  You have since indicated to the court and

13  myself that you have a defense team.  I don't know where your --

14  your discovery is.  You seem to have very many people working on

15  your side.  I have no idea who has what.

16     Q.   BY MR. GARCIA:  Okay.  So you don't know if I'm the one

17  who released that call to KESQ?

18     A.   I -- no.  I know that you're the one who gave KESQ an

19  interview.  Your voice was played on the air.  And I know that

20  you are the one who told KESQ about it.  Your voice was on the

21  air.

22     Q.   Okay.

23     A.   And with a little label that said "Daniel Garcia" as

24  your voice was playing.

25     Q.   Okay.  You were asked if you were aware of any other

26  members of the District Attorney's Office had copies of any of

27  my jails calls; do you recall that?

28     A.   Uh-huh.

1    Q.   Are you aware of a request made by Elba Jimenez, from

2   the DA's office, to receive copies of my calls?

3    A.   No, I've learned that in the pendency of this motion.

4    Q.   Okay.  So, in fact, there are other individuals that

5   you have now become aware of who have copies of my calls?

6    A.   I cannot say that.  What I can tell you is that the

7   CD's that I have requested, that were turned over to me by my

8   investigators, have stayed in my possession.

9        THE COURT:  Who is the other person you just named?

10  Jimenez?  Who is that?

11       MR. GARCIA:  I believe it's an investigator tech, Elba

12  Jimenez.

13       THE COURT:  Ms. DiMaria, what about it from her?

14       THE WITNESS:  I don't know, Your Honor.  The only thing

15  that I could speculate -- and I'm looking for it -- I thought

16  one of these requests, the one by her, may have had an RIF

17  number.  I can't find it.  Let me look, please, sir, and then I

18  can tell you all -- here we go.  There was a request, Elba

19  Jimenez, dated November 2nd, 2009.  If Your Honor's pages are

20  numbered the same as exhibit A, it would be page number 10.

21       THE COURT:  They're not but go ahead.

22       THE WITNESS:  There's an RIF number.  I don't have an

23  RIF case, so I did not make this direction to obtain these

24  calls.  I could possibly -- I could speculate.  I don't really

25  want to do that.  I know that one of the DA's in Riverside was

26  discussed in court earlier had contacted me at some point about

27  Mr. Garcia wanting to provide information pertaining to a

28  Riverside case and a Riverside defendant.  So I have no idea if

Exhibit 2, Page 092

1   this request was made pursuant to that information.  All I know

2   is I don't know Elba Jimenez, and I don't have an RIF number

3   with Mr. Garcia.  So I am not the one who requested or

4   authorized this request for calls, and I was unaware of it until

5   this motion, Your Honor.

6          THE COURT:  Okay.

7          MR. GARCIA:  All right.

8      Q.   BY MR. GARCIA:  Ms. DiMaria, why didn't you put a

9   notation to exclude Mr. Quinn's number before requesting any

10  more calls?

11     A.   Because my understanding, as I learned the process, is

12  that the attorneys were supposed to register their own numbers,

13  and they weren't supposed to be recorded at all.  I had not had

14  this issue before.  Mr. Rodriguez was the only one to my

15  knowledge that I'd ever had the issue with.  So I addressed the

16  issue as it pertained to Mr. Rodriguez's phone number, then did

17  not have the issue with Mr. Silva nor Mr. Devane, which was why

18  when it happened with Mr. Quinn, unfortunately, and not to be

19  disrespectful in this court of law, but the first thought that

20  went through my head was, oh, crap.

21     Q.   And are you aware that -- or aware of the jail having a

22  policy that the calls are to be monitored or recorded for the

23  safety and security of the facility?

24     A.   I don't work for the jail; I'm not familiar with their

25  policies.

26     Q.   So you know if the jail gives any kinds of notice that

27  they will then turn those calls over to the prosecution?

28     A.   I just told you, I am not familiar with the jail and

Exhibit 2, Page 093

JULIE GIMINEZ, CSR

1    their policy.  We got the phone calls that we requested.  I am

2    unaware of the jail voluntarily or on their own, sua sponte,

3    just turning calls over to me.

4        Q.   Correct.  You had to request them; correct?

5        A.   Yes.

6        Q.   In regards to the request on May 13th, 2010 for calls,

7    you had testified that I went pro per on May the 10th; correct?

8        A.   I can check the exact dates.  That's what -- May 10th,

9    let me check.  Yes, May 10th.

10       Q.   And yet this request was for calls for the month prior

11   to me being pro per; isn't it?

12       A.   I did not make this request.

13       Q.   Did you instruct Investigator Blanck to make the

14   request?

15       A.   I probably asked him to obtain the calls.  The note

16   that he put on there, which I can't -- I -- I can't find it, but

17   I know what note you're talking about where he indicates you're

18   pro per, I did not indicate for him to make that note.  He,

19   however, knew you had gone pro per.  So I suppose that was

20   something he did in his mind to his knowledge.  He didn't -- he

21   wasn't aware of you having any attorneys at that point.  But I

22   didn't instruct him to include this note on your request that

23   Mr. Garcia is pro per.  And I'm still not seeing it, and unless

24   you want me to find it exactly, I'm not going to look for it.

25   But I do note the note that you're talking about.

26       Q.   Did you inform Investigator -- yeah,

27   Investigator Blanck that I had gone pro per?

28       A.   I'm sure I did.  I mean I have no memory of this now,

Exhibit 2, Page 094

JULIE GIMINEZ, CSR

88

```
 1    it's a year ago, but I'm sure I must have.  I probably did.  He
 2    was my investigator.
 3        Q.    And when you received the CD, do you also receive a
 4    copy of the request form?
 5        A.    You know, I don't really remember.  Sometimes I believe
 6    I did.  Sometimes I believe I didn't.  But it wasn't, quite
 7    frankly, something I ever paid attention to because it's not
 8    discovery.  Our internal requests that we make with our
 9    investigators I don't pay attention to.  They're not discovery.
10    These requests became relevant, the form, after you filed this
11    motion.  So to be honest, it's not something I paid attention
12    to.  I think sometimes he gave them to me.  I probably, quite
13    frankly, disregarded them.  I think sometimes he didn't.  I
14    don't remember.
15        Q.    Prior to this case, did you know Mr. Quinn?
16        A.    Yes.
17        Q.    Okay.  Did you know his phone numbers?
18        A.    I don't remember.  I must have because I called him
19    that night.
20        Q.    Okay.  Do you know if the number you called him on was
21    the same number that I called on the recording?
22        A.    I didn't pay attention.  I didn't -- I don't know.
23        Q.    Okay.
24        A.    Again, the second I heard his voice, the first thing I
25    did was hit eject.  I didn't sit there and pay attention what
26    was what.  The only thing I could think of was get this CD out
27    of here.
28              MR. GARCIA:  No further questions, Your Honor.
```

Exhibit 2, Page 095

89

1          THE COURT:  Okay.  Any recross?

2          MS. FITZPATRICK:  No, Your Honor.

3          THE COURT:  All right, Ms. DiMaria, thank you, ma'am.

4   You're excused, subject to recall.

5          THE WITNESS:  Thank you, sir.

6          Ms. Hinos.

7          THE COURT:  What was your next witness, Mr. Garcia?

8          MR. GARCIA:  Mr. Bolanos.

9          THE COURT:  Would you call down to 1A or one of your

10  deputies go get him, please.  He should be sitting right outside

11  or in 1A.

12          MS. FITZPATRICK:  Your Honor, may I ask for an offer of

13  proof and a time estimate for Mr. Bolanos?

14          THE COURT:  Well, let's agree it's not going to be done

15  in 10 minutes.  And what is Mr. Bolanos' role today, Mr. Garcia?

16          MR. GARCIA:  It should be pretty brief.  Just

17  basically --

18          THE COURT:  You can do it in 11 minutes?

19          MR. GARCIA:  I think the answers are short,

20  absolutely.

21          MS. FITZPATRICK:  What's the offer of proof?

22          THE COURT:  Yeah, what's -- what's he going to talk

23  about?

24          MR. GARCIA:  That we took every precaution necessary to

25  ensure our numbers were registered with the jail.

26          THE COURT:  All right.  Call him, let's go.

27          MS. DiMARIA:  If I may, Your Honor.  With all due

28  respect, Mr. Bolanos wasn't appointed until after he went

Exhibit 2, Page 096

JULIE GIMINEZ, CSR

```
 1    pro per, so the time line at this point is irrelevant.
 2              THE COURT:  I don't know.
 3              MS. FITZPATRICK:  And Ms. DiMaria testified that she
 4    never listened to any calls between Mr. Bolanos and Mr. Garcia
 5    so --
 6              THE COURT:  Mr. Bolanos can testify, if he's done by
 7    noon, otherwise, let's go, I want to get him out of here.  He's
 8    been here all morning.  Call him and let's go.  You got 10
 9    minutes.
10              MR. GARCIA:  Call Investigator Bolanos.
11              THE CLERK:  You do solemnly state that the evidence you
12    shall give in this matter shall be the truth, the whole truth,
13    and nothing but the truth, so help you God.
14              THE WITNESS:  I do.
15              THE CLERK:  Please have a seat in the witness stand.
16              Will you please state your first and last name and
17    spell them for the record.
18              THE WITNESS:  First name is Luis, last name is Bolanos.
19    Luis, L-U-I-S, Bolanos is B, as in boy, O-L-A-N-O-S.
20              THE CLERK:  Thank you.
21              THE COURT:  Mr. Garcia, go ahead.
22                            LUIS BOLANOS
23    called as a witness by the defendant, was sworn and testified as
24    follows:
25                         DIRECT EXAMINATION
26    BY MR. GARCIA:
27       Q.   Mr. Bolanos, at some point you were appointed to
28    represent me on this case; correct?
```

```
 1        A.    Yes, sir.

 2        Q.    Okay.  And at some point did it come to your attention

 3   that the jail had recorded privileged phone calls?

 4        A.    Yes, sir.

 5        Q.    And how did you come to realize that?

 6        A.    Combination of conversations with you and also going

 7   through the discovery.

 8        Q.    Okay.  And did you ever take any precautions to make

 9   sure that your phone number was registered with the jail?

10        A.    Yes, sir.

11        Q.    And did you repeat that process with Attorney David

12   Wright?

13        A.    I was with him when he registered his number one

14   time.

15        Q.    Okay.

16        A.    But he did that entire transaction.  I simply observed

17   it.

18        Q.    And do you recall when that was?

19        A.    About six months ago.  About 30 days or so after I was

20   first assigned to this case.

21        Q.    Okay.  And subsequent to that, did you learn that the

22   jail was still continuing to register -- to record Mr. Wright's

23   telephone calls?

24        A.    Yes, sir.

25        Q.    Okay.  Were you also present in court on June 18th when

26   the court issued a protective order?

27        A.    I believe I was.

28        Q.    Okay.
```

Exhibit 2, Page 098

JULIE GIMINEZ, CSR

1       A.    Yes, sir.

2       Q.    And did you subsequently learn that the jail continued

3   to record various phone numbers listed in that protective

4   order?

5       A.    Yes, sir.

6       Q.    Okay.  Did you ever have an opportunity to talk to jail

7   staff regarding the recording of privileged calls?

8       A.    Yes, sir.

9       Q.    And who have you spoken to?

10      A.    Sergeant Testinsky, I believe Investigator Lewis --

11  Corporal Lewis.  That may be it.  Maybe someone else, but that's

12  the top of my head.

13      Q.    Were you present in court when Sergeant Testinsky spoke

14  with both you and I -- or do you recall the conversation where

15  Sergeant Testinsky spoke to you and I on June 17th regarding

16  blocking certain phone numbers from being recorded?

17      A.    I don't recall the exact date, but I do remember

18  conversations with Sergeant Testinsky about that.

19      Q.    Do you recall whether or not he told us that we should

20  disregard the message that comes on because it comes on

21  regardless, that this call is being recorded?

22      A.    I don't remember that specifically.  He may have, but I

23  don't recall it specifically.

24      Q.    Do you recall you asking him the difference between a

25  blocked and privileged phone number?

26      A.    Yes, I did ask him that a few times.

27      Q.    Okay.  And did he give you an answer?

28      A.    I believe he did.

1    Q.   Do you recall what the answer was?

2    A.   My recollection at the time that if the recording comes

3  on advising the caller that the call may or may not be recorded

4  that it is not a privileged call.  If it's not there, then it's

5  already been blocked and is being treated as a privilege/blocked

6  call.

7    Q.   Have you had any discussions with Ms. DiMaria regarding

8  privileged telephone calls?

9    A.   Yes.

10   Q.   Okay.  Have you advised her of any specific phone

11 numbers which we assert our privilege?

12   A.   I don't know if I gave her the exact phone numbers, but

13 I believe the -- I discussed who the individuals they were.

14   Q.   And did you -- who are those individuals?

15   A.   I believe Mr. Wright is one of them.  At the time it

16 may have been your mother, and I may have spoke generically

17 about other attorneys.

18   Q.   Did you ever advise her that attorney Michael

19 Goldstein --

20   A.   I don't recall that specifically.

21   Q.   Or Ms. Sax?

22   A.   No, not Ms. Sax.

23   Q.   Okay.  Did you ever advise any of those individuals -

24 Ms. Sax or Mr. Karpf or Mr. Goldstein - to register their phone

25 numbers with the jail?

26   A.   Yes, sir, I did.

27       MR. GARCIA:  No further questions, Your Honor.

28       THE COURT:  Okay.  Any cross-examination?

Exhibit 2, Page 100

94

JULIE GIMINEZ, CSR

1          MS. FITZPATRICK:  No, Your Honor.

2          THE COURT:  All right.  Mr. Bolanos, when did you

3    become involved in this case, the date; do you remember?  It was

4    obviously after May 10, but do you remember off the top of your

5    head?

6          THE WITNESS:  I want to say it was the last week of

7    May.  In that area, sir.

8          THE COURT:  Of 2010; right?

9          THE WITNESS:  Correct, yes, sir.

10         THE COURT:  Okay.

11         MR. GARCIA:  Actually, May 14th.  If it helps, Your

12   Honor, there's a minute order to that effect.

13         THE COURT:  Mr. Bolanos, do you agree with May 14th

14   then?

15         THE WITNESS:  It sounds about right, yes, sir.

16         THE COURT:  And -- and the last day that you were

17   involved in this case is what date?

18         THE WITNESS:  I -- it's been about two months, I

19   believe.  I don't recall exactly the date, sir.

20         THE COURT:  Do you know what it is, Mr. Garcia?

21         MR. GARCIA:  I think it was around December 17th, I

22   think was his last appearance.

23         THE COURT:  Okay.  So, Mr. Bolanos, you were the

24   private investigator assigned -- appointed by the court to

25   assist Mr. Garcia from May 14th, 2010 till on or about

26   December 17th, 2010; is that fair?

27         THE WITNESS:  Correct, yes, Your Honor.

28         THE COURT:  Any other questions by anybody about that

```
 1    time frame?

 2              MS. FITZPATRICK:  No, Your Honor.

 3              MR. GARCIA:  No, Your Honor.

 4              THE COURT:  All right.  Thank you, Mr. Bolanos.  You

 5    may be excused.

 6              THE WITNESS:  Thank you, sir.

 7              THE COURT:  Would you wait around the back a minute.

 8              THE WITNESS:  Yes, sir.

 9              THE COURT:  Mr. Bolanos is excused, subject to recall

10    then.

11              It's five minutes to 12:00.  Mr. Garcia, I assume your

12    next witness can't be on and off in five minutes?

13              MR. GARCIA:  Actually, I think we'll have no further

14    witnesses today.  We'll just wait for the GTL person.

15              THE COURT:  Yeah, my recollection was the GTL person

16    was going to be here today, but then when I looked at the

17    documents last night, I realized that we had set that to

18    March 4; right?

19              MS. DiMARIA:  Yes, sir.

20              THE COURT:  Because -- in that case -- so in other

21    words, Mr. Garcia, is the GTL person going to be your last

22    witness in this matter?

23              MR. GARCIA:  Yes, Your Honor.

24              THE COURT:  So we can conclude this matter on March the

25    4th?

26              MR. GARCIA:  Yes, Your Honor.

27              THE COURT:  Okay.  All right.  Then anything -- well,

28    we're not going to --
```

Exhibit 2, Page 102

JULIE GIMINEZ, CSR

1           MS. FITZPATRICK:   Your Honor.   Your Honor.

2           THE COURT:   Yes, ma'am.

3           MS. FITZPATRICK:   I'd like to at least see what the

4      offer of proof is for the GTL person because there's a potential

5      maybe we'll be able to stipulate to something and not have to

6      have that even go forward --

7           THE COURT:   Well, there's --

8           MS. FITZPATRICK:   -- so we can argue the motion --

9           THE COURT:   Well, there's a transcript of the GTL

10     person, Mr. McNeil, who testified on November the 5th.   I have a

11     transcript of it up here that I was reading, because my

12     recollection of talking with Ms. Maker, who is the lawyer for

13     GTL, who filed objections to him testifying on all that, and my

14     recollection was I told her that, be back here on May -- strike

15     that, March 4 with Mr. McNeil, and if we need to put him on

16     then, we could.   But again, if nobody needs Mr. McNeil, then

17     there's no sense in doing that.

18          MR. REILLY:   Our recollection was that if the GTL

19     representative testified on direct, that we were unprepared at

20     that time to go forward in terms of cross-examination.   That

21     there was an agreement that if -- if -- if the representative --

22     if the People wanted to call him back to cross, we could do

23     that.   We declined to do that.   We have -- we see no purpose in

24     his testimony today.   And given the state of the evidence to

25     date, I don't see how it -- how it is relevant to the court's

26     decision at this point.

27          THE COURT:   I don't know.   I don't know what -- well,

28     who -- if either one of you is going to call --

Exhibit 2, Page 103

JULIE GIMINEZ, CSR

1      MR. REILLY:  We are not -- the People are not going to

2   call him.

3      MS. DiMARIA:  Yes, Your Honor, the People have decided

4   not to call -- you gave the option to us -- and I apologize, I

5   don't mean to speak over Mr. Reilly -- but you had given us the

6   option -- I don't think you were even here that day, Mr. Reilly.

7      MR. REILLY:  Right.

8      MS. DiMARIA:  Ms. Wang and I were here and we were

9   unprepared because we were given no notice.

10     THE COURT:  Right, I remember.

11     MS. DiMARIA:  We chose not to call him back to

12  cross-examine.  And I guess the offer of proof and the concern

13  that prosecution has is this particularly is a prosecutorial

14  misconduct motion.  Mr. Garcia has already had the opportunity

15  to question GTL and --

16     THE COURT:  Yeah, I know.

17     MS. DiMARIA:  -- and so without an offer of proof, we

18  feel that, if Your Honor is available at 1:30, that perhaps this

19  motion can be argued today and ruled upon today, because I still

20  don't see the relevance that GTL and any policies or procedures

21  that they had is relevant to myself, the prosecutorial

22  misconduct motion, and this office.

23     THE COURT:  Okay.  Mr. Garcia, were you going to

24  call -- any reason -- I looked through the transcript of

25  Mr. McNeil, and between the questions you asked and I asked him,

26  I got as much out of him as I needed but, that's right, the DA

27  hadn't cross-examined.  They objected to him testifying at that

28  point.  I told him to testify anyway since he was here, and I

Exhibit 2, Page 104

JULIE GIMINEZ, CSR

```
 1    didn't want to pay for him to come back, so he did.  The DA
 2    would have the right to cross-examine if they want to and if
 3    they don't want to, then they don't have to.  So given what the
 4    DA has now just told me, I see no reason then to bring
 5    Mr. McNeil back here.
 6             MR. GARCIA:  Your Honor, I think the concern is that we
 7    have since learned that GTL did not provide us with everything
 8    that was subpoenaed.
 9             THE COURT:  Yeah, but that's not Mr. McNeil -- I know,
10    I've got the objections up here, big stack, 50 pages of stuff.
11    I know that already.  But that's got nothing to do with
12    Mr. McNeil.
13             MR. GARCIA:  Yes, it does, Your Honor, because
14    Mr. McNeil is the only one that can actually interpret some of
15    the evidence that we received from GTL.  And specifically what
16    I'm trying to get to is when were these calls -- or when were
17    these telephone numbers designated as privileged.  The -- the
18    defense is asserting that we registered them with the jail
19    months before these calls were received.  And so we did
20    everything within our ability to ensure that calls are not going
21    to be recorded and yet there appears to be some discrepancies,
22    such as Mr. Wright's number being designated privileged one day,
23    then taken -- being taken off the privileged list and being put
24    back on the privileged list, which shows direct intent for
25    someone, and we need to determine who, to purposely record those
26    privileged calls.
27             THE COURT:  Or somebody sitting in the jail didn't put
28    the numbers in when they should have.  Or they -- the computer
```

Exhibit 2, Page 105

1    dropped them.  Or every -- any number of imaginable reasons.

2    There's no question that Mr. Wright's number was blocked at one

3    point and they recorded them anyway.  I know that already.  But

4    I don't know why, and no one has told me why.  It could be a

5    glitch, or somebody could have done it willfully, on purpose.

6    But there's no evidence that the DA had done it willful, on

7    purpose, is my point.  So what more can we do.

8         It's two after 12:00, folks, we have to stop.  We'll

9    resume at 1:30.  Everybody is ordered back at 1:30.  We'll

10   discuss this further.  I'll look at the transcript again and

11   decide how much relevance as to Mr. McNeil's testimony will be,

12   if at all.  Okay.  We're in recess till 1:30, folks.  Thank you.

13                        (Lunch Recess.)

14        THE COURT:  All right.  Let's go back on the record on

15   the Garcia matter.  All the parties who were present this

16   morning are present now.

17        After our afternoon recess, Mr. Garcia, did you say you

18   were going to call Mr. Tira or not?  I don't remember.

19        MR. GARCIA:  No, I'm not.

20        THE COURT:  So you exhausted your witnesses?

21        MR. GARCIA:  With the exception of the GTL

22   representative.

23        THE COURT:  Okay.  All right.  I'm looking at

24   Ms. Maker's documents -- her document with attachments filed

25   January 21st to motion to quash and attached to is the

26   transcript of November 5 in which Mr. McNeil testified.  Okay.

27   And I have read through that testimony in its entirety last

28   night and today.  Hold that thought for a minute.  Also, the

1    other day, a day or two ago, I got a document from Mr. Garcia

2    entitled reply to People's opposition to defendant's motion to

3    dismiss, et cetera.

4              Ms. DiMaria, do you have a copy of this?

5              MS. DiMARIA:  Yes, sir.

6              THE COURT:  All right.  One of the times we were

7    here -- because we've been here several times on this issue -- I

8    told everyone that I want to wrap this up the last time we were

9    here, and we put it over till today because we couldn't get a

10   hold of some witnesses.  And then Ms. -- and then the DA asked

11   for -- that was January 24th, and we put it over till today

12   because the DA wanted to a get a copy of the transcript, I

13   guess, of the testimony or whatever, so we put it over till

14   today, and Ms. DiMaria has finished her testimony on direct and

15   cross.  Mr. Garcia wanted to call witnesses, so he has an offer

16   of proof that Mr. Bolanos and whoever else, and it was my

17   understanding that today was the drop-dead day for this case --

18   this issue rather, not -- not this case.  So my intention all

19   along was that I would rule today on this motion.  It was -- was

20   that not the intention of everyone's understanding that that's

21   my position a couple of months ago?  And we kept bumping it

22   because of witness availability, really, is what happened.  So I

23   bumped it for that reason.

24             MR. GARCIA:  My understanding, Your Honor, was that

25   again we ran into the issue of Mr. McNeil not being available,

26   GTL wanting to object.

27             THE COURT:  Yes.

28             MR. GARCIA:  And in light of some of Your Honor's

Exhibit 2, Page 107

```
 1   comments --
 2            THE COURT:  What comments are those?
 3            MR. GARCIA:  Regarding the -- the questioning of
 4   Ms. DiMaria.  For example, I think one of the things that --
 5   correct me if I'm wrong -- that the court wants to see is that
 6   how -- how did this all occur, who made the decision to record
 7   calls or to not record calls.  And the only people who can
 8   competently testify to that is Mr. McNeil.  I brought in
 9   Sergeant Testinsky and Corporal Lewis.  They acknowledged that I
10   did, in fact, make requests, however -- and that those requests
11   may have be memorialized in the classification notes; however,
12   county counsel objected for me to obtain that.  So as a result
13   I've been excluded that piece of evidence which very well may
14   establish I did do everything imaginable to ensure that my
15   privilege was protected.  So --
16            THE COURT:  Okay.  Let's hypothetically agree you did.
17   Okay?
18            MR. GARCIA:  Okay.
19            THE COURT:  So what's your point?
20            MR. GARCIA:  Well, I think --
21            THE COURT:  No one says you didn't.
22            MR. GARCIA:  I think the District Attorney's Office is
23   trying to make the implication that we didn't, that we're
24   somehow the ones who should be held accountable for not
25   registering our numbers, and that's plainly not the case.
26            THE COURT:  Okay.  The -- I also try to tell everybody
27   what my thoughts are before I proceed.  I did not do that
28   yesterday in a long hearing, but I usually do, and there's a
```

Exhibit 2, Page 108

102

```
 1    case called People versus Scott, which is a California Supreme
 2    Court case, that says that sentencing -- before a judge
 3    sentences anybody, the judge should give his tentative sentence
 4    first so the lawyers can argue intelligently as to what their
 5    positions are.  So tentatively here -- Scott does not require
 6    that I do this, but I always do.  I didn't do this yesterday,
 7    but I usually do with everything else.  Tentatively my motion is
 8    to deny the defendant's motion to -- because as I told you,
 9    Mr. Garcia, when we started this, which was so long ago I don't
10    remember the date, but I have my notes that I had written out
11    and I read into the record in the beginning of this
12    proceeding -- and I basically told everybody that the burden is
13    upon the defense, and I'm not going to do it unless I have been
14    shown that the DA is liable, responsible, et cetera, for what
15    happened as to the telephone calls.
16            And at some point in this proceeding I told you,
17    Mr. Garcia, I just don't see -- actually, what I said was
18    before, if the evidence shows that Ms. DiMaria did listen to any
19    of those calls, I don't care if she had buckets of disks with
20    phone calls on them, if she didn't listen to them and/or her
21    investigator didn't listen to them, then I wasn't concerned
22    about it because there is no detriment to the defense.  And I
23    told you that a month ago.  Maybe not in that language but
24    basically that.
25            So far I have heard in this case Ms. DiMaria testify
26    under oath, one or two of her investigators testified under
27    oath, Detective -- Investigator Bolanos has testified here today
28    under oath, and at -- now quarter of 2:00 on February the what,
```

1    3rd, I've not heard anything to the contrary.  I've not heard

2    that the District Attorney's Office listened to the privileged

3    recordings and used them against you somehow to your detriment.

4         The only thing I've heard is Ms. DiMaria heard the

5    beginning of Mr. Quinn's call with you and stopped, and she may

6    have heard something about Mr. Rodriguez's call with you.  I

7    have no doubt that in the DA's possession in the discovery there

8    are calls that are privileged that were listened to and

9    recorded.  I'm sure.  I don't know how many.  But my point is so

10   what?  The DA doesn't -- hasn't used them, you know.

11        And when this all started a long time ago and,

12   Mr. Garcia, you told me, you said, well, I have calls, and you

13   played them, and you played a call between yourself and Mario

14   Rodriguez, and I recognized your voice and I recognized Mario

15   Rodriguez's voice, so I knew it was a call between yourself and

16   him when you were in the jail.  And you told me that you had

17   gotten that in discovery, along with all the other discovery,

18   which I believe to be true.  But the point is that the DA hasn't

19   listened to any of these calls.  The DA didn't willfully go down

20   and listen to your privileged calls and then use them against

21   you.  They haven't listened at all.

22        My read on all this, without listening to your side

23   yet, but my read is that clearly Mr. Wright's call was blocked.

24   His phone number was blocked; I believe that to be true.  And

25   clearly at some point after that occurred, they recorded his

26   calls between you and he.  How did that happen?  I don't know.

27   Somebody messed up.  I took a list down to the jail, remember,

28   myself personally, and saw it inputted into the computer.  The

Exhibit 2, Page 110

104

JULIE GIMINEZ, CSR

```
 1   only thing I can glean from all this is that clearly the calls
 2   were listened to that should not have been, but that was not at
 3   the behest of the District Attorney's Office.  How frustrated
 4   can I be here?  How many times have I said, I don't run the
 5   jail.  How many times have you heard the DA say, I don't run the
 6   jail.  The DA's office doesn't run the jail.  Court system
 7   doesn't run the jail.  Sometimes I wish I could, but I don't.
 8          So it isn't -- how is it the DA's fault -- and fault is
 9   the word you're using here because you're blaming them for
10   this -- how is it their fault that your calls arguably
11   improperly were listened to?  How is it the DA's fault?  I don't
12   see how they had anything to do with it, as far as I can tell.
13          It is true that Investigator Blanck went down and
14   pulled some calls for whatever reason.  But the truth is, is
15   nobody listened to them.  It's a nullity.  It doesn't matter.
16          And, you know, on the last eight days, yesterday, I
17   listened to 17 witnesses about what had happened.  At the
18   conclusion of that proceeding, I had changed my mind as to what
19   I was going to do because I listened to the witness testimony
20   and I listened to what they told me, and I believed what the
21   witnesses said, so I changed my mind.  I listened to all the
22   witnesses in this case.  As the judge in this type of
23   proceeding, I weigh the credibility of those witnesses and
24   decide whether they're truthful or not.  In a jury trial, the
25   jury does that.  And I haven't found any witnesses that
26   testified here on either side in this proceeding -- I believe
27   all of them are telling the truth.  So my conclusion is that,
28   yes, the phones calls were listened to, somebody messed up
```

Exhibit 2, Page 111

105

JULIE GIMINEZ, CSR

1   somehow, but it wasn't done willful, on purpose, by the District
2   Attorney's Office.
3          And the sheriff is not the investigating agency here.
4   Palm Springs is.  So the sheriff's role in this case is they
5   are -- are your -- how shall I put that -- your hotel keeper,
6   your jailer, whatever.  You live in their hotel.  That's all
7   they have to do with this.  They have nothing to do with this
8   case otherwise.  In the case of Nocona Rio, the deputies or --
9   witnesses against anything.  They had nothing to do with this
10  case other than to be a jailer.  So even if the sheriff,
11  hypothetically, improperly listened to calls -- I'm not finding
12  that -- if they did, it's irrelevant to the prosecution of this
13  case, Mr. Garcia.
14         MR. GARCIA:  May I respond, sir?
15         THE COURT:  So that's where I'm at.  You know, had this
16  been the case where you were charged with assaulting a
17  correctional officer, hypothetically, in the jail, and the
18  sheriff was the agency that prosecuted -- investigated and all
19  that, maybe it would be a little different, but they had
20  absolutely nothing to do with it.  So I just don't see that you
21  have made your burden because there's no evidence supporting the
22  facts that you have.  And I just don't -- I just don't see it.
23         Let me ask you all, though, when I looked through the
24  transcript of GTL's Mr. McNeil's testimony, county counsel,
25  Ms. Wang, was present and she was asking questions of
26  Mr. McNeil here and there, also along with everybody else.  She
27  is not here today.  The county obviously has a stake in this
28  because Ms. Wang represents the sheriff's department.  So I

```
 1    don't know what her position may be.  But it appears,
 2    Mr. Garcia, that your complaint here is against the DA's office,
 3    not against the sheriff per se.
 4              MR. GARCIA:  Your Honor, I -- I --
 5              THE COURT:  So, but anyway, you can tell me what?
 6              MR. GARCIA:  It's actually against both.  To clarify,
 7    my motion was for outrageous government misconduct, not just the
 8    prosecutor.  I think --
 9              THE COURT:  Okay.  Okay.  Keep that thought.  I haven't
10    found any evidence of any willful misconduct on anybody's part.
11    Either the DA or the sheriff.  I haven't.  There just hasn't
12    been any evidence of it.  None at all.  You know, I haven't
13    found any.  There's no witnesses that said that.  The only thing
14    that the property box was searched, but I don't know that that's
15    improper.  But in any case, the phone calls, I just can't
16    attribute them to any type of misconduct by anybody.
17              MR. GARCIA:  Your Honor --
18              THE COURT:  I saw the list.  I know what your position
19    is, but I don't see it, anything that happened being willful
20    misconduct on the part of the DA's, even if -- on the part of
21    anybody.  But go ahead.
22              MR. GARCIA:  I think there's a couple of issues here.
23    First that I would address is the Riverside Sheriff's Department
24    is absolutely involved in investigating this case.  They have
25    been since Mr. Bustamante was first arrested.  They're the ones
26    who first interfaced with Mr. Jimenez.  They resulted in maps
27    being turned over and notes.  Ms. Pemberton has interviewed
28    potential witnesses within the jail, informants.  They have
```

Exhibit 2, Page 113

107

JULIE GIMINEZ, CSR

1   conducted their own extensive investigation.  They provided

2   evidence to the prosecution's office.  And I think it -- the

3   attempt here is to distinguish between the sheriff's department

4   and the District Attorney's Office, but the District Attorney's

5   Office cannot willful be blind in choosing to say, well, we

6   acknowledge that yes, the sheriff's department's got a problem

7   and that these calls have been recorded and they shouldn't have

8   been, but there's no concerns of ours.  We're still going to

9   keep requesting them without taking necessary precautions.

10          There's -- I've seen no case law or legal authority

11  whatsoever that says that the District Attorney's Office has the

12  right to take these calls from the sheriff's department without

13  a subpoena, without a warrant.  The sheriff's department didn't

14  just volunteer these to the prosecution.  The prosecution sought

15  them.  They knew there was a problem.  Time and time again they

16  knew there was a problem, and they still did not take all the

17  necessary precautions above and beyond what they should have to

18  insulate themselves, like I suggested.

19          THE COURT:  Like what?

20          MR. GARCIA:  They very well could have easily asked for

21  a special master.  They could have asked for a warrant in the

22  first place asking the judge in the case to determine that there

23  was even probable cause for these calls.  They never tailored

24  what specific call they wanted.  They put blanket requests

25  saying "all calls."  And at a very best case scenario, they were

26  negligent in their requests.  But to simply say they did

27  absolutely nothing, I strongly disagree with that.

28          As Your Honor said during the suppression motion, it's

1    always best to get a warrant.  Had they gotten a warrant or had

2    they had issued a subpoena, it would have at least put me on

3    notice and given me an opportunity to address these concerns

4    with the court before the calls got released.  And remember,

5    these calls didn't just get released to the DA's office.  They

6    got released to every codefendant and their attorney in this

7    case.  So now the prosecution has already acknowledged in their

8    trial brief that there are competing interests amongst me and my

9    codefendants.

10            THE COURT:  There always are in codefendant cases,

11   Mr. Garcia.

12            MR. GARCIA:  Correct.  And now each and every one of

13   them has access to my privileged calls, discussing my trial

14   strategy, discussing what negative pieces of evidence or

15   arguments I may pose against each one of them, giving them

16   forewarning.  It's put us all at odds with one another.  So it's

17   definitely prejudiced me in being able to call someone such as

18   Mr. Replogle, who -- who initially said he would be a witness on

19   my behalf, and now due to him discussing the calls with Mr. Ahn

20   Nguyen, who apparently reviewed them, every single one of them,

21   he has now become unwilling, and this was before the jury came

22   back on his verdict, as well.

23            On top of that, if you look at Barber, this has created

24   a complete state of paranoia for the defense.  The way I've been

25   prejudiced most by all this is not necessarily the District

26   Attorney's Office having knowledge of my defense strategies, but

27   the threat that I cannot in any way be certain that I can

28   conduct privileged communications with any members of my defense

1    team, whether it's the motion writers, outside private

2    attorneys, the investigators, et cetera.  We know that they can

3    conduct a search surreptitiously of my property box so I sure as

4    heck don't want to have anything sensitive in there.  And as

5    Your Honor's ruling the other day stated, unless I very clearly

6    state at the top of it an attorney's address or this is legally

7    privileged mail, even my handwritten notes aren't going to be

8    privileged.

9          THE COURT:  Yes.  And that's one reason that I was

10   advocating and advocating the laptop for -- for yourself that --

11   so that everything in your case is on the laptop.  You have the

12   password for it.  It's held in the jail.  You go in there to

13   use -- you -- you go in a room by yourself, you use it for

14   whatever purposes you need to, make notes or whatever,

15   everything stays in one place and no one has access to it but

16   you.  The writ that the county counsel filed -- which they

17   didn't bother to give me before they got to you all, which is

18   true, you got it, I haven't got it -- doesn't want to do that.

19   But we're not there yet.

20   But the bottom line is still the same, Mr. Garcia.  The

21   DA hasn't listened to any of the calls between you and your

22   privileged people.  They haven't.  I believe that to be true.

23   If I thought they had listened, we would have a different

24   position here.  And I'm reading up here Judge Zellerbach's

25   finding in Medina.  Medina is not a published case, and I'm not

26   using it for that purpose.  But in that case, Mr. Zellerbach

27   found that the DA investigator had listened to the calls

28   improperly and bumped, bounced, relieved, whatever, that DA

Exhibit 2, Page 116

110

1    investigator from the case and replaced him with someone else.

2    In this case, we don't even have that.  The DA investigator here

3    didn't listen to the calls, by his own testimony.  So I have no

4    evidence to show the DA's office in toto did anything improper

5    in this case.  If anything, they did the proper thing.  When

6    they realized that you were -- that the conversation they were

7    listening to -- "they" being Ms. DiMaria -- was between yourself

8    and a privileged person, she immediately stopped, notified the

9    court, notified that person.  She did everything reasonably she

10   could have done.  I can't explain why those calls are recorded

11   but they were.

12           Also, from my understanding of the evidence here, if a

13   call is blocked -- and "blocked" is the word I use, which may be

14   technically improper -- but when a -- when a lawyer and a

15   lawyer's number is given to the sheriff, they put it in the

16   computer.  When that number is called, it can't be listened to.

17   At all.  So no one listens on calls that -- any call from --

18   from an inmate in the jail to someone on the outside.  There's

19   that little voice that comes on and says, every 180 seconds,

20   this is being recorded, blah, blah, blah.  If that

21   this-is-being-recorded voice does not come on, then it's not

22   being recorded.  That's the way the computer system is set up.

23   So if you're talking to somebody and you hear the voice come on,

24   you know that is being recorded.  No matter who it is.  With a

25   lawyer or whatever.  So everybody is on notice, the parties,

26   that the call was being recorded.  If you don't hear the voice,

27   it's not being recorded.  That's the way the system is set up,

28   as of August of '09, right.  Before that, I don't know.  But

```
 1    after August of '09, when they went to the new GTL system,
 2    that's the way it's set up.
 3              MR. GARCIA:  And --
 4              THE COURT:  So if you called your lawyer and you hear
 5    the voice come on and you have every 180 seconds saying, we're
 6    recording this, you know it's being recorded.  How you deal with
 7    it is you go to the jail commander and say this number is
 8    supposed to be blocked, or whatever you do, or -- but, you know,
 9    you have to do something, also.
10              So my understanding is that after August of '09, that's
11    how -- how the system works.  And you have as much of an
12    obligation to -- as anyone else does to -- if your calls are
13    being recorded, and they shouldn't be, but the bottom line is
14    still the same: the DA didn't listen to any of this, they
15    haven't listened to it.  Nobody is being -- there's no detriment
16    to you.
17              MR. GARCIA:  Your Honor, there's a couple of things --
18              THE COURT:  So --
19              MR. GARCIA:  -- Mr. McNeil actually testified that they
20    have the capacity to record calls without the recording coming
21    on.  In fact, we have --
22              THE COURT:  I read that.  I know he did.
23              MR. GARCIA:  In fact, I have copies of privileged calls
24    that were recorded without the recording that I could play for
25    Your Honor in chambers.
26              THE COURT:  Okay.  Let's say that -- let's say that
27    they have -- you have that ability and now in cases where they
28    can go in and override.  I think I asked the question.  Okay.
```

Exhibit 2, Page 118

112

```
 1    But the bottom line is still: Did the DA use that?  Have they
 2    listened to those calls?  And if they haven't, then no harm, no
 3    foul, which is not a legal decision, but that's the truth.
 4    What's your complaint?  What's your -- what -- they didn't use
 5    it, they haven't heard it.  You -- they can't be responsible
 6    for.  They haven't listened to it.
 7              MR. GARCIA:  Your Honor --
 8              THE COURT:  So -- so -- so the sheriff has a box full
 9    of these disks where they, hypothetically, if they have -- I'm
10    not saying they did -- and they've listened to all these calls
11    between you and your lawyers, but no one ever listens to those.
12    So what?  It doesn't matter.  Yes, they shouldn't have done it,
13    but there's no detriment to you.
14              MR. GARCIA:  Your Honor, I think, first of all,
15    Ms. DiMaria's testimony was not that she never listened to any
16    calls.  It was that she admittedly can't recognize some of the
17    individual's voices.  And she has testified that she could not
18    identify every call that she's listened to because there were so
19    many of them.
20              The concern here is I've got probably 20 plus odd
21    people who I communicate with, most of which were attorneys,
22    consulting on this case.  Some of them I was attempting to hire.
23    Some of them have done pro bono work.  Some of them were
24    privately retained, et cetera.  Every single one of them I
25    discussed sensitive trial strategy, strategy for motions and --
26    and detailed information regarding the case.  If Ms. DiMaria
27    cannot point to every single call that she did listen to, and we
28    know that she's been in prolonged possession of CD's containing
```

Exhibit 2, Page 119

113

JULIE GIMINEZ, CSR

 1    these calls, and she can't give us any direction further than "I

 2    listened to a lot of them," then we have to presume that there's

 3    a high probability that she listened to some of these calls and

 4    may not even realize it.  And so --

 5              THE COURT:  And how are we going to determine that?

 6              MR. GARCIA:  Well, for starters --

 7              THE COURT:  Ms. DiMaria doesn't know what she listened

 8    to or not.  Really.  Apparently made notes on some but not all.

 9    So how are we ever going to sort it out whether some of the --

10    some of the ones that she listened to were privileged or not?

11              MR. GARCIA:  That's exactly the point, Your Honor, but

12    we also can't definitively say that she didn't.  So what happens

13    is that like in Barber, where you have a defendant who is now

14    unwilling to participate in their defense, I have the opposite.

15    I have the investigators, motion writers, et cetera, who all

16    say, let's not discuss anything sensitive on the case over the

17    phone, and they come meet with me in person, and let's not

18    discuss anything sensitive in the attorney booth because this

19    might be recorded, as it was in the jail.  Then they say let's

20    not send anything sensitive via mail because that might get

21    intercepted.  Then they say, don't leave anything in your cell

22    because that might be searched without a warrant,

23    surreptitiously.  So I'm even being shut down by my own team

24    where no one wants to discuss anything where we would be afraid

25    the DA could hear it because apparently the court's order

26    doesn't get followed by the jail; that we seem to know.

27              THE COURT:  And when I do make that order, they appeal

28    me.

Exhibit 2, Page 120

114

JULIE GIMINEZ, CSR

```
 1              MR. GARCIA:  Correct.

 2              So clearly the conditions of my confinement are such

 3     the jail is going to do whatever they want with complete

 4     disregard to the law or complete disregard to the authority of

 5     this court.  I cannot be guaranteed that I'm going to be able to

 6     prepare my defense without the District Attorney being able to

 7     make informal requests, without subpoenas, without warrants,

 8     without any supervision from this court, and that the jail is

 9     going to be able to do whatever they want in blatant disregard

10     to this court's order.  And I won't be able to have any

11     privilege.  To say that I'm --

12              THE COURT:  So what do you want me to do?  Since we all

13     agree that I don't run the jail and when I make reasonable,

14     lawful orders, I get appealed, which is true.  I don't know how

15     the appellate court is going to rule, but so far the writ weighs

16     about 15 pounds.

17              MR. GARCIA:  I think at the very least, you know, if we

18     can't control the jail, then I'm sure the District Attorney's

19     Office, an office of the court, would not disobey Your Honor's

20     orders.  At the very least --

21              THE COURT:  Well, what orders I have issued then that

22     they haven't -- disobeyed?  Ms. DiMaria testified here that she

23     has not, will not ever listen to any phone calls on this case

24     ever again, basically.  And that should cure it.  If she did

25     listen to anything she shouldn't have.  At the moment, I don't

26     think Ms. DiMaria did anything improper.  I don't think she

27     listened to anything she shouldn't have listened to.  If you are

28     right, and the some of those calls that she heard were between
```

Exhibit 2, Page 121

115

JULIE GIMINEZ, CSR

1  somebody who's privileged, but nobody knew it.  These things

2  happen.  But it's not -- what prejudice is there.

3         You have -- under *Morrow* you have to show prejudice,

4  okay.  The burden is on the defense.  If misconduct is shown,

5  the burden shifts to the People, et cetera.  We know that

6  already.  The sanctions are not warranted because the defendant

7  was not prejudiced by the misconduct.  First of all, I'm not

8  saying there was any misconduct.  Because I don't find any.  So

9  the first threshold is there is no misconduct.  And prejudice is

10 always worrisome, anyway.  But how were you prejudiced?

11         MR. GARCIA:  Well --

12         THE COURT:  Other than what you've said.  But that's

13 just your theory.  I know, because I've sat here and listened to

14 what, 55 or so of your occurrences in which you have complained

15 constantly about the way you're treated in jail.  I agree with

16 some of what you say.  I've always agreed with some of what you

17 said.  I realize it's difficult to represent yourself, and I

18 told you that back in May, when you wanted to represent

19 yourself.  I understand all that.  I tried to talk you out of

20 it.  I tried to talk you out of it repeatedly because I see what

21 the problems are.  But some of them I can't fix.  You know, I

22 can't.  I realize that you don't trust the jail.  I realize you

23 don't trust your jailers.  I realize you're worried that

24 somebody will hear what you're talking about when you're talking

25 with one of your investigators.  I know all that.  I don't

26 necessarily blame you, Mr. Garcia.  But some things I can't fix.

27 It's not a perfect world.  I just don't see here in this motion

28 that you have shown any misconduct or certainly any prejudice.

1        MR. GARCIA:  Okay, Your Honor.  In regards to me being

2   pro per, I think that part of the -- is irrelevant because much

3   of the prejudice that I suffered was before I elected to go

4   pro per.  And, in fact, the whole reason why I went pro per was

5   a direct result of this, starting with Mr. Rodriguez, after

6   learning that the calls were being recorded, and that I was

7   being housed in Riverside, which was a great distance from

8   Mr. Rodriguez, we had a complete shutdown of communications.  He

9   said, let's not discuss anything over the phone.  He didn't want

10  to send anything in the mail.  As a result, it led to a

11  breakdown in our relationship, and I terminated his employment.

12       Then we had Mr. Silva.  Judge Stroud ruled on the

13  record during the preliminary hearing, I believe on September

14  11, 2009, that my rights were being violated by the jail because

15  I was being housed in Riverside; as a result, I had inadequate

16  time to meet with my attorney to prepare a defense.  He did not

17  want to discuss anything over the phone because he was too

18  paranoid.  So as a result, I was prejudiced during the

19  preliminary hearing in not being able to be adequately prepared.

20  The judge ordered Ms. DiMaria to contact Rod Pacheco, to have

21  him call Stanley Sniff personally to fix the problem.

22  Apparently, that didn't happen, and the problem didn't get fixed

23  until my mother intervened.  So as a result he got relieved of

24  it due to a breakdown in the attorney-client's communication.

25       Then Mr. Quinn comes along, and we get informed by the

26  jail, jail investigator comes to us and says, hey, we have

27  reason to believe that there's been threats against your

28  attorney's life supposedly because another codefendant heard

Exhibit 2, Page 123

117

JULIE GIMINEZ, CSR

1   calls, according to the jail.  And so, you know, I'm being

2   deprived of counsel of choice left and right, having breakdowns

3   in the relationships over and over and over again.  It's led to

4   my prolonged incarceration, it's led to trial delays, et cetera,

5   all because we can't just be guaranteed one simple thing: don't

6   listen to our calls.  Don't even ask for them unless you go

7   through the proper channels.

8           THE COURT:  Okay.

9           MR. GARCIA:  If the roles were reversed, and I was

10  to send someone into Ms. DiMaria's office to rummage through her

11  paperwork or to record one of their calls, I would be charged

12  with a new felony.

13          THE COURT:  Mr. Garcia, I know all that.  That's why

14  another reason that I would hope that the laptop issue was

15  solved, and I do think will solve many of the problems you bring

16  up, but -- I don't know if you've looked at the writ yet, but

17  county counsel disagrees with me.  So we'll see.  We'll see.  I

18  don't run the appellate courts either.  I don't know what

19  they'll do.  I know -- and my frustrations are because I've

20  tried to get you and Mr. Niroula to trial last September, and I

21  severed you all because I knew you weren't ready, truly were not

22  ready, and I know you were not, and so I severed you out, and

23  I'm -- I'm hoping to get you to trial in September of this year.

24          And I know you, Mr. Garcia, didn't agree to the

25  continuance, and Mr. Niroula asked for that date, and

26  Mr. Niroula even said he's not even sure he'll be ready then,

27  but I did set December -- September 7 as the drop-dead date --

28  September 6, I'm sorry, as a drop-dead date that we have to go

Exhibit 2, Page 124

118

JULIE GIMINEZ, CSR

1    on, on you, Mr. Garcia, and for sure, if you're ready.  I think

2    if you have your laptop, you will be ready.  I think if you

3    don't have your laptop, I'm not sure.  I know about all these

4    issues, but I can't run the jail.  I really can't.  So, you

5    know, I've done my part as much as I can, probably more than

6    some will do, but I don't know what else I can do.

7            I can only listen to the evidence and make my decision

8    based on what I've heard.  And what I've heard here is no

9    misconduct by the DA.  And so the other prosecution agency, I'm

10   not going to include them because there's no evidence that they

11   did anything wrong.  It's that simple.  You know, again, Medina,

12   the judge found the DA investigator listened and shouldn't have

13   and relieved him from the case.  That's the appropriate remedy

14   the appellate court said.

15           MR. GARCIA:  Your Honor --

16           THE COURT:  Among other things.  Remember, Medina is

17   not a published case, so I'm not --

18           MR. GARCIA:  I think --

19           MR. REILLY:  Your Honor --

20           THE COURT:  Mr. Reilly.  Let Mr. Reilly say something,

21   Mr. Garcia.

22           MR. REILLY:  Thank you, Your Honor.  I appreciate the

23   court's tentative, and I won't take much time.

24           THE COURT:  Take whatever you want.

25           MR. REILLY:  I just want to clear the record.

26           The court had said that -- had interspersed terms

27   "listened to" and "recorded," and I just want to make clear -- I

28   believe this is the understanding of the court -- is that that

1   perhaps calls were recorded by the jail between Mr. Garcia and

2   an attorney or more than one attorney, but there's been no

3   evidence that anyone has listened to those calls, either in the

4   District Attorney's Office or within the jail staff, as well.

5           THE COURT:  Yeah, correct.  My understanding is that --

6   you're right.  I don't know the name that listened to them,

7   you're right.

8           MR. REILLY:  Okay.

9           THE COURT:  Thank you, Mr. Reilly.

10          MR. REILLY:  Correct.

11          THE COURT:  But -- they may have been recorded, but for

12  sure nobody in the District Attorney's Office listened to, and I

13  haven't heard any in evidence that anyone in the sheriff's

14  department did.

15          MR. REILLY:  Correct.  And getting to the issue of

16  evidence I just wanted to clear up, Mr. Garcia has made

17  allegations regarding his discussions with Mr. Rodriguez, with

18  Mr. Quinn, with access to facilities in the jail to be able to

19  discuss with those people and those kind of things.  There's

20  been no testimony regarding that, so -- so I don't believe that

21  that that's been established in this hearing.  And in any event,

22  it's not relevant.  As the court has correctly narrowed the

23  issue is the -- has anybody from the District Attorney's Office,

24  Ms. DiMaria, or anyone else for that matter, listened to calls

25  between Mr. Garcia, and -- and anybody -- that may have been

26  privileged.  And the evidence -- all the evidence is actually to

27  the contrary.  Ms. DiMaria took affirmative steps to make sure

28  that she was not going to be exposed to those conversations once

1    it became an issue.

2         The other thing is -- things are I just wanted to

3    mention was as far as the -- Mr. Garcia mentioned issues as far

4    as confidentially -- confidentiality of his property at the

5    jail.  The testimony from the stand from -- from various

6    witnesses was that the jail, in fact, takes affirmative steps to

7    make sure that they are not exposed to legal mail, as well.  So

8    that was the state of the evidence.

9         THE COURT:  Sergeant Hughes testified that she would

10   not look at anything that had the word "legal mail" on it or

11   something that may not have the -- a legal mail or a letter from

12   a lawyer or, for example, a psychotherapist or something --

13        MR. REILLY:  Correct.

14        THE COURT:  -- something that she would recognize

15   immediately and something that she shouldn't look at and didn't,

16   yeah.

17        MR. REILLY:  Correct.  I think, again, that it's really

18   not relevant to whether or not there's been prosecutorial

19   misconduct, but I just wanted to make -- kind of clear the

20   record and make sure that we're clear on that, that there's been

21   no evidence that that -- any legal mail whatsoever has been

22   looked at.  In fact, the court had had an opportunity to look at

23   what was copied in Mr. Garcia's cell and made an independent

24   determination that none of that was privileged whatsoever.

25        THE COURT:  Correct.  I believe that.  I believe that.

26        Anything else?  Anything else you want to ask?

27        MR. REILLY:  I think that covers it.  I thank you, Your

28   Honor, for the time.

Exhibit 2, Page 127

121

JULIE GIMINEZ, CSR

1          THE COURT:  Mr. Garcia.

2          MR. GARCIA:  Yes.  In regards to the mail which Your

3   Honor reviewed, that is only the mail which was turned over to

4   us in discovery.  Again, we have a situation where the defense

5   is being asked to take the District Attorney's word at face

6   value and trust that when -- when they're accused of committing

7   a crime and they say they didn't do this, that they're telling

8   the truth, when --

9          THE COURT:  Mr. Garcia, no, no, you got it wrong.  I'm

10  the one who decides who tells the truth because I'm the finder

11  of fact.  And I have told you that in my opinion every witness

12  who testified here was truthful.  The hearing I had the last

13  eight days, you've seen on TV, one of those police witnesses I

14  don't think was truthful.  I'm not going to say which one.  I

15  just -- the way I dealt with that, I just didn't -- I discounted

16  it.  I just threw it out.  I ignored it.  Didn't consider it

17  because it was nonsense.  But -- but I'm not finding that here.

18  I weighed all the credibility of the witnesses, and I believe

19  all of them.  So when I do that, I don't find that there's any

20  misconduct by the District Attorney's Office.  I just don't.

21  They -- it isn't there.  It just isn't in my opinion.

22          So I know -- I know about your concerns, but I -- I

23  don't see at this point that you've met your burden.  I'm not

24  telling you, you can't tell me more if you want, but that's my

25  tentative opinion.  That's the way I see it.  I have to weigh

26  the credibility of the witnesses.

27          Jurors, at the end of the jury trial, tell us the

28  biggest, hardest thing for them, because you're going to have

Exhibit 2, Page 128

122

JULIE GIMINEZ, CSR

1  two stories usually, I mean multiple stories, they have to sit

2  down and weigh the credibility of the witnesses and find out

3  what is reasonable and what's not.  And that's -- that's a big

4  deal.  And I -- I -- I've weighed the credibility here, and I

5  don't find anybody that was anything but true.  I think all the

6  witnesses told the truth as they knew it, and I don't see

7  misconduct.  I just don't.  So --

8         MR. GARCIA:  And, Your Honor, I wasn't questioning the

9  court's ruling on -- on witnesses.  What I'm saying, and in the

10  context of Barber, it -- it goes to the state of mind of the

11  defendant.  In order to establish prejudice in that case, it was

12  the state of mind of the defendant in being paranoid essentially

13  that they could not participate in their defense, they could not

14  communicate confidentially with their attorneys, and that's

15  where the prejudice was.  This is completely analogous to that

16  case to where I have such a state of fear that it is hindering

17  the ability to prepare.  And we've heard time and time again,

18  every time we've been in this courtroom, that fear readdressed

19  with the court, where investigators, the lawyers, everyone,

20  myself, have all said that we're upset over these things.  That

21  it's impeding our ability to prepare, that we can't effectively

22  communicate.  That's the prejudice.  I understand, you know,

23  maybe the District Attorney's Office seems to be more

24  well-insulated, but the sheriff's department definitely isn't.

25  And in Barber --

26         THE COURT:  Mr. Garcia, then you can sue them.

27         MR. GARCIA:  And I have.

28         THE COURT:  Well, that's fine.  And see how things

Exhibit 2, Page 129

123

JULIE GIMINEZ, CSR

```
 1   shake out.
 2              MR. GARCIA:  But in Barber, it doesn't -- it wasn't the
 3   District Attorney's Office, Your Honor, it was a law enforcement
 4   officer who surreptitiously eavesdropped in on a conversation or
 5   participated in a joint conversation, and that's what happened
 6   in this case.  Law enforcement -- there's no question that
 7   Riverside County Sheriff's Department eavesdropped in and
 8   recorded calls.  Of course, GTL would be able to tell us if they
 9   actually listened to them.  GTL would be able to tell us how
10   they were able to record them in the first place.  But we
11   haven't had that evidence yet because they haven't provided it.
12   And so --
13              THE COURT:  Well -- okay.
14              MR. GARCIA:   -- so we keep forgetting the sheriff's
15   department misconduct in this case.  And I think that can't just
16   be ignored.  Yes, there's a jailer but --
17              THE COURT:  Okay, Mr. Garcia, tell me, just tell me,
18   let's say hypothetically -- and I'm not finding -- but let's say
19   hypothetically a court were to find the sheriff committed
20   misconduct on five cases by doing this, this and this.  How does
21   that affect the trial?  What would you expect that judge to do
22   in the trial, assuming the DA has done nothing wrong?  Then
23   what?  We never try you?  What -- what's the remedy?  What's the
24   remedy?
25              MR. GARCIA:  Well --
26              THE COURT:  You sue them civilly, but what remedy is
27   there in the criminal justice system?
28              MR. GARCIA:  Correct.  And --
```

Exhibit 2, Page 130

```
 1          THE COURT:  Dismissal isn't the answer, by the way, so
 2   don't hang your hat on that.
 3          MR. GARCIA:  Well, in Barber it was.  But I think --
 4          THE COURT:  That was extreme.
 5          MR. GARCIA:  I think this court has broad discretion to
 6   tailor the relief.  Your Honor could easily order that all the
 7   CD's be returned to the court and destroyed or placed under
 8   seal.  And with a ruling that if during the course of trial,
 9   Ms. DiMaria uses anything that -- that was gleaned from
10   listening to those calls, and we're able to make an offer of
11   proof, that she then would have to rebut it and show that it
12   came from an independent source.  Your Honor could issue that
13   ruling.
14          THE COURT:  Do those in 402 hearings.
15          MR. GARCIA:  And Your Honor could order a protective
16   order, not against the sheriff's department at this time, but
17   against the District Attorney's Office that if they wished to
18   search property or get calls or whatever that they have to come
19   to Your Honor and go through the proper channel, use a special
20   master to review the calls, or at least put me on notice so I
21   can say, wait a minute, before you start listening to my calls,
22   here's a list of phone numbers and people and please make sure
23   that those calls are not included.  But that's, you know, that
24   hasn't been done.  And so for them to just constantly --
25          THE COURT:  All right.  Let me ask the DA.
26          DA, it appears in this proceeding, DA, that
27   Mr. Garcia's concerned that inadvertently the DA may have
28   listened to calls, could have been privileged, but you
```

Exhibit 2, Page 131

125

JULIE GIMINEZ, CSR

```
 1    didn't know that and how would you know.  If Mr. Garcia was to

 2    provide a list of names and phone numbers of people who are

 3    privileged, would that assist.

 4           The only problem is, Mr. Garcia, then the DA knows who

 5    all your people who are -- you are talking to, who -- I don't

 6    know if that matters -- but that's what you'd have to do.

 7    You've already given me a list once in November of the phone

 8    numbers that I took to the jail.  But my -- my guess is that

 9    Ms. DiMaria is not going to listen to any more phone calls

10    anyway in this case.  And -- but if she wants to, it may not be

11    a bad idea to have a list of names and phone numbers.  But the

12    problem again, hypothetically, she's listened to them and nobody

13    identifies themselves, how is she to know who it is?

14           MR. GARCIA:  The program, when you open a call list,

15    the phone number, the dates and time, et cetera, so before you

16    even press play, the proper procedure would be to simply look at

17    the phone number.

18           THE COURT:  All right.  Then if you want to give me a

19    list of names and phone numbers that you feel are privileged,

20    and I will give them to the DA and tell them don't listen to

21    these.

22           MS. DiMARIA:  Your Honor, the only way I find that

23    acceptable, if we can, depending on who the people are, he's

24    deeming privileged his investigator, absolutely lawyers --

25           THE COURT:  Well, I --

26           MS. DiMARIA:  -- lawyers, absolutely.

27           THE COURT:  -- I would have to deem them privileged.

28           MS. DiMARIA:  Thank you, sir.  But other than that,
```

Exhibit 2, Page 132

126

JULIE GIMINEZ, CSR

| | |
|---|---|
| 1 | People have no problem with that.  We did it before when we knew |
| 2 | numbers were privileged. |
| 3 | THE COURT:  Well, okay.  Do it -- that's the best we |
| 4 | can do. |
| 5 | MR. GARCIA:  Well, but I -- I would ask for one step |
| 6 | further and that is if they wished -- because my point is quite |
| 7 | simple: the only people I'm calling at this point are people who |
| 8 | I believe are privileged and people whose numbers I've already |
| 9 | blocked.  So there shouldn't be any recordings, period, coming |
| 10 | from my pen because all those numbers should be blocked.  So I |
| 11 | would ask simply for an order that if the District Attorney's |
| 12 | Office wishes to -- to get calls, again, what -- that they |
| 13 | follow proper procedure.  The form from the sheriff's department |
| 14 | does not give them a sense of entitlement.  It's just a template |
| 15 | that was designed by the sheriff's department.  There's no legal |
| 16 | authority attached to that that says that -- that the District |
| 17 | Attorney's Office no longer has to abide by the Fourth Amendment |
| 18 | or utilize a subpoena or a warrant to obtain these things. |
| 19 | They're just taking them out the back door. |
| 20 | THE COURT:  They can do that then.  All calls from the |
| 21 | institution, correctional facility or the jail can be recorded |
| 22 | and are throughout California except those that are privileged. |
| 23 | So that's -- give me a list.  If I agree that everybody on there |
| 24 | is privileged, I will turn it over to the DA and tell them don't |
| 25 | listen to these calls ever, no matter what.  I don't know what |
| 26 | else I can do at the moment. |
| 27 | MR. GARCIA:  Could we also have an order, I believe |
| 28 | Ms. DiMaria said -- said they -- she didn't intend on using any |

1    of the calls as evidence of anyone.

2              THE COURT:  Which calls?

3              MR. GARCIA:  From any of the CD's pertaining to me.  I

4    believe she made that representation.  Correct me if I'm

5    wrong.

6              THE COURT:  Ms. DiMaria -- long before the trial

7    started, when we had Replogle and Bustamante, we spent a whole

8    week on 402's.  We'll do the same thing.  Given what Ms. DiMaria

9    has heard here, she well knows that if she's going to use a

10   phone call that I -- a hypothetical phone call, it had best not

11   even get near the word "privilege."  If she has a doubt about

12   it, I'm sure she'll bring it up, and I'll rule on it.  And if I

13   find it privileged, it won't be -- she can't use it.  That's how

14   we'll do it.  We'll do this at some point, not today, but, yeah,

15   I agree, the DA cannot use improperly obtained evidence, okay,

16   in any -- hypothetically in any case.  And sometimes just

17   because a DA has properly obtained evidence, it may not be

18   relevant.  So they're not going to use that either.  So --

19             MR. GARCIA:  Right.  I --

20             THE COURT:  -- we did that in 402 hearings, okay,

21   before the trial.

22             MR. GARCIA:  But my point is simply this: In order to

23   put my mind at ease and in order to insulate the prosecution

24   from any further allegations that they're currently still in

25   possession of privileged calls, any of the CD's that were

26   received already, which I very clearly laid out do have

27   privileged calls on them, should be placed in a sealed envelope

28   with the court.  If Ms. DiMaria wants them, I have no objection

Exhibit 2, Page 134

128

1   to having a hearing where I can assert the privilege.  I can

2   identify every single recording which I believe is privileged.

3   But otherwise, to allow her to be in continuous possession of

4   them doesn't exactly give me much comfort.

5          THE COURT:  Well, I -- Mr. Garcia, think this through a

6   minute.  If Ms. DiMaria wanted to be tricky, she could say,

7   okay, here's the -- here's my bag full of CD's, there are 10 of

8   them in there.  Meanwhile have copied them, keep the copies for

9   yourself, and who would be the wiser.  I don't believe she would

10  do that.  I also don't believe she would listen to the CD's that

11  she had because I told her not to, and she gets the drift of

12  this hearing, so she's not going to do it.  I'm not worried

13  about that.

14         Again, at any time in the trial if you think something

15  is improperly presented, bring it up, I rule on it.  If the

16  evidence is inadmissible, it's not coming in.  If it's not

17  relevant on under 352, it isn't coming in.  If it's more

18  prejudicial than probative, it's not coming in.  So I will make

19  all those rulings.  Not today.  This issue -- this case -- this

20  motion is narrow.  Is there misconduct by the DA.  Is this

21  prejudice to you to the point where I should recuse the District

22  Attorney's Office.  And I'm telling you I haven't heard anything

23  even close to that, that it was either of those, where there was

24  misconduct or they did anything wrong.  The DA did nothing

25  wrong, Mr. Garcia, nothing at all, not even close.  As a matter

26  of fact, they did everything right, as far as I can tell.

27         MR. GARCIA:  Well, the other half of it is whether or

28  not the sheriff's department, with regard to the case, did

1    anything wrong.

2        THE COURT:  Well, that's a separate finding -- a

3    separate way -- you can deal by suing civilly if you think you

4    need to.

5        MR. GARCIA:  But that doesn't address my concerns in

6    in the criminal case.

7        THE COURT:  Mr. Reilly, any comment about that part of

8    the equation?

9        MR. REILLY:  Well, I think the court has properly

10   separated the issues here.  Appreciate the comments that there's

11   been no misconduct whatever, whatsoever and, in fact, that

12   Ms. DiMaria's acted in an exemplary fashion in this case.

13       And as far as Mr. Garcia's claims regarding the jail,

14   as the court has noted and as Mr. Garcia has noted, he has filed

15   a civil action regarding those claims, and I'm not able to

16   address those, but I'm sure they'll be answered properly.

17       Yeah, Ms. DiMaria wanted to comment, as well.

18       MS. DiMARIA:  Your Honor, the other thing I'd like to

19   bring to the court's attention, as much as Mr. Garcia's already

20   met, his motion is vague, flawed and based on no evidence.

21   There's not been any evidence that any of his visits have been

22   eavesdropped on.  There's been no evidence that any of his legal

23   mail coming in or out has been read.  There's been no evidence

24   that any log or privileged mail from his box was copied.  And

25   the call issue we've addressed ad nauseam.  So all of his

26   concerns and inabilities to prepare and his paranoia, as he

27   himself mentioned, is nothing more than that.  So again, these

28   are blanket assertions with no evidence to support them

```
 1   whatsoever.
 2         THE COURT:  Okay.  Well, all right.  Mr. Garcia, you've
 3   heard the DA's.  Anything else by either side?
 4         MR. GARCIA:  Well, I -- I --
 5         THE COURT:  On this issue.
 6         MR. GARCIA:  I would disagree that there's no evidence.
 7   And Your Honor went to the jail personally.  You saw the
 8   inadequacies of the facilities.
 9         THE COURT:  Mr. Garcia, I don't have the money in my
10   pocket to rebuild the jail facility.  You know I can't do that.
11   You know, Corky Larson was the supervisor.  Only she wanted to
12   build the courthouse here and only she then wanted to refurbish
13   the jail.  Everybody else wanted to build a new jail and a new
14   court facility in Thousand Palms.  She won and named the
15   facility after herself.  So everybody knew that the jail was
16   inadequate 15 years ago when they talked about redoing it.  It
17   is what it is.  The facility is old.  It's built the way it's
18   built.  Nobody has the power to go in there and build better
19   attorney-client visiting rooms and all that.  I can't do that.
20   I can't do anything about it.  I went over there, and I agree
21   with you, for your investigator to bring a laptop in, sit across
22   from you through a glass and have you try to glean something off
23   that laptop doesn't work.  I know that already.  That's why I
24   ordered a laptop for you in the jail facility.  We'll see how
25   that shakes out.  I know that.  But that's -- a lot of the
26   problem is the way the place is built, and nobody can fix that
27   at the moment.  So we're stuck with it.  You have to work with
28   what we have.  And you got to understand that.  Now we can only
```

Exhibit 2, Page 137

JULIE GIMINEZ, CSR

```
 1    work with what we have.  Some things we can change, some things
 2    we can't so . . . okay.
 3              MR. GARCIA:  And one last thing I mentioned -- would
 4    mention is since the District Attorney's Office has brought it
 5    up repeatedly, the fact that I have, in fact, sued the county, I
 6    know it has definitely served the adversarial blood amongst us
 7    and --
 8              THE COURT:  That happens when people get sued,
 9    Mr. Garcia.  The old adage, "It's not personal, it's just
10    business" is nonsense because it always becomes personal.
11              MR. GARCIA:  Right.
12              THE COURT:  I mean just the way human nature is.
13              MR. GARCIA:  But I think that in itself creates issues
14    as well with the fact that, you know, I've filed a formal
15    complaint, a criminal complaint against Ms. DiMaria now both
16    with the state and with Department of Justice's offices,
17    Inspector General.  Ms. DiMaria repeatedly commented that she's
18    sick and tired of all these allegations being made against her.
19    She made comments that she's upset about being sued.
20              THE COURT:  Okay.  So what?
21              MR. GARCIA:  And I think in many respects it has
22    interfered with her ability to be able to dispense justice in an
23    evenhanded manner.  I've made repeated offers to meet with the
24    District Attorney's Office, and I've been turned down
25    repeatedly, yet they've met with the other codefendants and
26    interviewed each one of them.  I've made offers to sit down and
27    try and resolve many of the evidentiary issues in this case or
28    to reach stipulations.  Ms. DiMaria seemed to be unwilling to
```

Exhibit 2, Page 138

JULIE GIMINEZ, CSR

```
 1    even speak to me.  Most of the time she's insistent on having
 2    deputies and other witnesses around to even talk about a simple
 3    issue.  She's made snide remarks in the courtroom in the
 4    presence of others and derogatory comments under her breath
 5    constantly complaining about how much money is being spent on my
 6    defense and how it's, you know, it's unfair to her when she only
 7    has a $1500 laptop and when I've got a $3,000 one.  Clearly she
 8    is so personally vested in this case that it's hard for her to
 9    make the proper decisions.
10            We actually sent a letter to Mr. Zellerbach directly
11    just, I believe, a couple of weeks ago asking that much like
12    the Zapien case, the District Attorney Snead, I believe at the
13    time, voluntarily removed the prosecutor off the case and
14    resumed the role of prosecutor himself to insulate the rest of
15    his office.
16            THE COURT:  What did Mr. Zellerbach say about your
17    letter?
18            MR. GARCIA:  We haven't received a response.
19            THE COURT:  Okay.
20            MR. GARCIA:  But we made the offer to at least try and
21    resolve it that way rather than having to continuously pursue
22    this and ultimately pursue it to the appellate court and so on.
23    Your Honor has made the record before that it is -- this case is
24    not the prosecutor's, it's the District Attorney's Office, and
25    he can assign whoever he wants to prosecute.
26            THE COURT:  That's true.
27            MR. GARCIA:  And I would have no problem with any other
28    person in the District Attorney's Office.  And I'm quite
```

```
 1   confident that no other person -- no other prosecutor in the
 2   District Attorney's Office has had my calls or has even listened
 3   to my calls accidentally or otherwise.
 4           THE COURT:  Well, Mr. Garcia, you've made your record.
 5   And if Mr. -- you're correct in that if Mr. Zellerbach wants to
 6   replace Ms. DiMaria, he has the authority to do that.  But
 7   that's, you know, that's his call.  I don't know what he's going
 8   to do.  I can't talk to him about it.  And I do not know
 9   anything about the letter till you just said so.  So whatever
10   happens, happens.  But I'm not going to recuse Ms. DiMaria or
11   the District Attorney's Office for all the reasons indicated.
12   So that's . . .
13           Anything else, anybody?
14           MS. DiMARIA:  Sir, I apologize, I know you're ready to
15   rule, and I don't mean to drag this out.
16           THE COURT:  I thought I did already but go ahead.
17           MS. DiMARIA:  I just want to correct a couple of things
18   that Mr. Garcia said.
19           He comments that I have repeatedly said I'm upset about
20   being sued.  My comments to this court have been about limiting
21   the evidence to the issue at hand and not having it about being
22   sued for his civil case.  So I wanted to correct the record in
23   regard to the comments I have made.
24           In regard to any offer to meet with me, the repeated,
25   extensive offers to meet and come to stipulations, I have no
26   idea what he's talking about.  One time an investigator
27   approached me a long time ago -- I think it might have been
28   Mr. Bolanos -- if he wants to put any offer in writing, I'm
```

Exhibit 2, Page 140

134

JULIE GIMINEZ, CSR

```
 1   willing to review any offer.  I am not shutting him out or
 2   taking anything personally so . . . I'm a professional.  I will
 3   prosecute this case the way it needs to be prosecuted.  And if
 4   he wants to make any offers to me in writing, I'm willing to
 5   read them.
 6           In regard to his complaint with the United States
 7   Department of Justice, back on January 4th they rejected his
 8   invitation to investigate me.  Mr. Garcia represented at one of
 9   the hearings that they had, even asked for copies of his motion
10   in this case to assist their investigation, and it turns out
11   that that does not appear to be true in any way, shape or form.
12   They reviewed the information he submitted and concluded there
13   was no prosecutorial violation of federal criminal rights and
14   decided not to complete an investigation or to open an
15   investigation against me.  So there's nothing personal on my
16   part in this case, and I just wanted the record to be clear in
17   regard to those issues.
18           MR. GARCIA:  And that's also not entirely true.  It was
19   a division at the Department of Justice and now the complaint is
20   being handled by the Office of the Inspector General, and my
21   civil attorneys have been facilitating the exchange of
22   information with them.  So --
23           THE COURT:  Okay.
24           MR. GARCIA:  But anyway.
25           THE COURT:  Listen, folks, that's not before me.
26   Whatever happens in those cases or whatever happened, nothing to
27   do with me.  Okay.
28           All right.  For the reasons indicated, I find that the
```

Exhibit 2, Page 141

135

JULIE GIMINEZ, CSR

1  District Attorney's Office has not committed any wrongdoing

2  whatsoever in this issue.  And you have not made your burden

3  whatsoever.  I decline to recuse either Ms. DiMaria directly,

4  her investigator, or the District Attorney's Office at this

5  point.  So that ruling is without prejudice.

6       MR. GARCIA:  Do you make the finding of fact, though,

7  Your Honor, that Ms. DiMaria is in possession of CD's containing

8  privileged calls?

9       THE COURT:  I know she has one because I've heard it.

10  I don't know about the others.

11       MR. REILLY:  Just to clarify the record, when you --

12  when you indicate without prejudice, what I'm taking that to

13  mean is that these same grounds cannot be litigated again?

14       THE COURT:  Not these grounds.  But if you find new

15  evidence, Mr. Garcia, if something else comes up, it is not

16  ruled out, as of today, and feel may be grounds to recuse the

17  DA, then feel free to file whatever you need to file.  I've not

18  ever, in all the motions you filed, just arbitrarily not heard

19  them.  So that's what I'm basically telling you.  The allegation

20  you made so far, I agree, we're not going to relitigate.  If you

21  find new evidence, that is different.

22       Is that what you mean, Mr. Reilly?

23       MR. REILLY:  Yes.

24       THE COURT:  Okay.  All right.  So everybody knows.

25       MS. DiMARIA:  Your Honor, may I inquire when I can

26  expect that list of phone numbers from Mr. Garcia that he's to

27  provide to you to provide to me?

28       THE COURT:  Well, the names -- and, Mr. Garcia, I

Exhibit 2, Page 142

136

JULIE GIMINEZ, CSR

```
1    need -- I need a list to include name, why the person is
2    privileged in the center column and then the protected phone
3    number in the third column.  Three columns.  Names, you know,
4    Bill Schmuck; middle column, attorney at law; third column,
5    phone numbers.  Okay?
6              MR. GARCIA:  Yes, Your Honor.
7              THE COURT:  Okay.  You know, whatever.  And then --
8    then if I have any doubts, I'll have a hearing about it.  If
9    not, then I'll just hand it over to the DA as-is.  And that way
10   that gives you some -- as much as I can do on this subject.
11             Okay.  Anything else?
12             MR. GARCIA:  Yes, Your Honor.  We --
13             THE COURT:  On this issue.
14             MR. GARCIA:  Oh, on this issue, no, Your Honor.
15             THE COURT:  Okay.  All right.  Anything -- anything at
16   all from anybody about this issue?  Everybody understands it's
17   done, or do you need anything else?
18             MS. DiMARIA:  Are you going to have a date set by when
19   Mr. Garcia is to turn that list over?
20             THE COURT:  Well, when can you do it, Mr. Garcia?
21             MR. GARCIA:  Excuse me, Your Honor?
22             THE COURT:  When can you do it by?
23             MS. DiMARIA:  Is February 28th enough time?
24             MR. GARCIA:  That's more than adequate.
25             THE COURT:  All right.  On or before February 28, okay,
26   please.  All right.
27             Switching gears, please.  There were a couple of things
28   left over from many days ago.
```

Exhibit 2, Page 143

137

```
 1              THE CLERK:  (Inaudible.)

 2              THE COURT:  The return of property motion.  I'm taking

 3    it off calendar.  What I told Mr. Garcia -- I reiterate this --

 4    give me a list and I'll deal with it, I never got a list from

 5    him.

 6              MR. GARCIA:  Okay.  And again, I ran into some issues

 7    trying to --

 8              THE COURT:  Motion is off calendar.  Done.

 9              MR. GARCIA:  Well, if I could at least be heard on one

10    issue because it's rather important.  We've been doing

11    everything we can to interface with Detective Simon Min to help

12    facilitate our expert --

13              THE COURT:  That's a different issue.

14              MR. GARCIA:  Well --

15              THE COURT:  But that's okay, go ahead.

16              MR. GARCIA:  May I address that?

17              THE COURT:  All right.  Go ahead.

18              MR. GARCIA:  One of our concerns, as I brought to the

19    court's attention before, Mr. White has issued via his attorney

20    in a civil case in San Francisco, a subpoena to copy all of the

21    hard drives that were seized by Sacramento PD.  And it is our

22    understanding that on February 23rd that the city attorney, I

23    think Mr. Holland, has agreed to allow Mr. Min to provide copies

24    of all of those hard drives to Mr. White's attorney.

25              I have repeatedly brought up this concern with the

26    court because, first of all, Ms. DiMaria herself has asserted

27    this court has not made a ruling as to who owns the property.

28    And so my parents, for example, have expressed concern that one
```

Exhibit 2, Page 144

138

JULIE GIMINEZ, CSR

1    of the laptops belongs to my father.  That Ms. DiMaria has

2    expressed concerns that Mr. Shahbazian may have a stake in some

3    of the contents of some of these devices.  And just to simply

4    allow a third party access to evidence that is being held in a

5    criminal homocide case I think would be negligent.

6            THE COURT:  Let me ask Ms. DiMaria.  Refresh my

7    recollection on that, please.

8            MS. DiMARIA:  I don't really know, Your Honor.  Most of

9    what I've heard is from Mr. Garcia.  I asked Detective Min about

10   it, and he said that he, I believe, turned the subpoena over to

11   their city counsel -- county -- yes, I guess it would be city

12   counsel --

13           THE COURT:  City attorney.

14           MS. DiMARIA:  City attorney?  And I haven't heard more

15   from that.

16           THE COURT:  Their city counsel is busy on other issues

17   so --

18           MS. DiMARIA:  Yes, sir.

19           THE COURT:  All right.  Well, the -- more than anything

20   else, the downtown, the empty building downtown.

21           MS. DiMARIA:  What did you say?

22           THE COURT:  They've been dealing with the owner, and

23   they want to buy it for 18 million or whatever.  That is what

24   I'm referring to.  All right.

25           MS. DiMARIA:  Oh.

26           I believe Detective Min said that they gave over the

27   subpoena to his legal authorities, obviously the Palm Springs

28   Police Department, and that would be completely separate from

 1    the District Attorney's Office.  Having that --

 2             THE COURT:  Unless you want to go get the property and

 3    bring it down here and book it into your own evidence.

 4             MS. DiMARIA:  I'm sorry?

 5             THE COURT:  Unless you go get all the stuff --

 6             MS. DiMARIA:  Right.

 7             THE COURT:  -- and bring it down here and book it into

 8    your own evidence, then it's yours.  Till then this belongs to

 9    Palm Springs Police.

10             MS. DiMARIA:  Correct.  And we have no intention of

11    doing that.

12             THE COURT:  I don't know.

13             MS. DiMARIA:  So that's as far as I know about that.

14    I've spoken with Detective Min, and he hasn't said anything

15    about --

16             THE COURT:  When is the date?  February what?  28?

17             MR. GARCIA:  February 23rd I believe is the day they've

18    agreed to copy everything.  And there's no mention of how it

19    will be copied, who's going to be copying it --

20             MS. DiMARIA:  I'm sorry, excuse me, Mr. Garcia.  Just

21    so I can get clarification and track you.

22             MR. GARCIA:  Yes.

23             MS. DiMARIA:  Are you saying that February 23rd is the

24    date that Mr. White's team, I guess, is supposed to be copying

25    the drive?

26             MR. GARCIA:  Correct.

27             MS. DiMARIA:  I will check that with Detective Min.

28             MR. GARCIA:  From my understanding, I guess the city

Exhibit 2, Page 146

1    attorney -- is it Mr. Holland -- and he's agreed to have the

2    evidence available to be copied by Mr. White's team, but there's

3    no mention of who is going to be doing it, what is -- what is

4    it -- they're asking for blanket copies of everything.

5           THE COURT:  Mr. Garcia, I don't own that evidence.  The

6    evidence we have in the Replogle-Bustamante trial we own, and no

7    one is touching that.  But -- I have control over that.  But the

8    stuff that Palm Springs has in their evidence locker, it's not

9    mine.  I don't have control over it.

10          MS. DiMARIA:  No, sir.

11          THE COURT:  Belongs to the Palm Springs Police

12   Department.

13          MS. DiMARIA:  I agree, Your Honor.  I don't really

14   believe this court has jurisdiction.  But I will speak with

15   Detective Min because that would possibly impact us, as well.

16   So --

17          THE COURT:  Yeah, I --

18          MS. DiMARIA:  -- I will be speaking with Detective Min

19   about that issue.

20          THE COURT:  It may and you might want -- oh, yeah.

21          MS. DiMARIA:  Yes, sir.

22          MR. GARCIA:  I would also state for the record that

23   Palm Springs PD does not own the evidence.  They're simply

24   custodians of the property pending decision of this court as to

25   who owns it.  They don't have the authority to then turn around

26   and say, well, we're going to provide it to whoever comes and

27   asks for it.

28          THE COURT:  Well, they have this in their hand, so to

Exhibit 2, Page 147

141

JULIE GIMINEZ, CSR

1    speak.

2            MR. GARCIA:  Correct.  But the subpoena is asking for

3    business records of PSPD, not property belonging to Mr. Garcia,

4    or whoever.

5            THE COURT:  Well, okay.  My only concern is that I

6    don't want anything damaged so it would affect the trial one way

7    or the other.

8            MS. DiMARIA:  People agree with that notion.

9            THE COURT:  Yeah, I don't -- but, please, talk to

10   Detective Min.

11           MS. DiMARIA:  Yes, sir.

12           THE COURT:  But again, I can't do anything about it.  I

13   could control the evidence that we have here; it's been admitted

14   already in the Replogle-Bustamante trial.  That's how no one is

15   going to get to it, period.  But the other stuff I don't have

16   legal control over.  I'm worried about it, but I can't -- I

17   can't interfere legally.

18           MR. GARCIA:  Well, that's why I -- I -- I had hoped

19   that if we had at least reached an issue as to the return of

20   some of the property, it would alleviate the bulk of the

21   issue.

22           THE COURT:  I don't have the list, Mr. Garcia.  Months

23   ago I said give me a list and I'll deal with it.  I've not

24   gotten a list.  I can't deal with it --

25           MR. GARCIA:  I could give you a list in two seconds.

26   It's basically -- essentially, it's just the list of everything

27   they took minus whatever Ms. DiMaria intends to use, such as the

28   iPhone, the one Apple computer, and any --

```
 1              THE COURT:  Well --

 2              MR. GARCIA:  -- physical documents.  But otherwise I

 3    don't see how if the court has already made a binding ruling

 4    that they can't use any of the hard drives that were found in

 5    the silver suitcase, which Your Honor ruled on the 18th, why

 6    they need to continue to hold onto the hard drives and the

 7    suitcase.

 8              If the concern is releasing it to me personally,

 9    obviously I'm in jail, I can't take possession.  Your Honor

10    could easily order it released to Mr. Reed or Ms. Sax or someone

11    to keep it safe, and we'll stipulate that it won't be touched or

12    used without order of the court, but at least we don't have the

13    issues where I can't defend myself in the civil case in

14    San Francisco if I'm in custody down here.  So --

15              THE COURT:  Mr. Garcia, the civil case in San Francisco

16    is the least of your problems.

17              MR. GARCIA:  However --

18              THE COURT:  Even if you were to lose, you don't have

19    any assets for them to get.  So you need to concentrate on this

20    case, sir.  The civil case, in the scheme of things, you know,

21    it's not even on your radar screen.  What are they going to do

22    to you even if you lose it?  So what?  You're looking at life

23    without at the moment.

24              MR. GARCIA:  Your Honor --

25              THE COURT:  If you get convicted.

26              MR. GARCIA:  -- Mr. White is not using the civil case

27    to recover money as against.  He's using it as a means of

28    interfering in the criminal case.  I believe one of his
```

Exhibit 2, Page 149

143

JULIE GIMINEZ, CSR

```
 1    associates, Mr. Pomeroy, has been sitting through every
 2    proceeding, taking notes and contacting him in Mexico and
 3    letting him know what is going on.
 4            THE COURT:  So what?  It's a public courtroom.  He's
 5    welcome to be here, like anyone else.
 6            MR. GARCIA:  Correct.  But the point is that once they
 7    were to obtain copies of all of these drives, including my
 8    privileged materials, communications with my attorneys, that
 9    they would then be able to dump it on line.  He's got a lovely
10    web page, basically it's a smear campaign against myself.
11    They've made it abundantly clear they're trying to influence the
12    criminal case as much as they can.  Mr. Pomeroy, I believe there
13    was some mention in the minutes that may have been interfering
14    with jurors in the Replogle trial.  To give him access --
15            THE COURT:  Well, that's news to me.
16            MS. DiMARIA:  And me.
17            MR. GARCIA:  It was in the court minutes, Your Honor,
18    that there was an inquiry by the court after the corporal
19    brought to the attention possible jury misconduct, and the court
20    inquired as to who Ray Pomeroy was.
21            THE COURT:  There was no finding of misconduct at all.
22            MR. GARCIA:  I wasn't there.  I -- I'm just going off
23    what was in the minutes.
24            MS. DiMARIA:  Can you give me that date so I --
25            MR. REILLY:  I have no memory, either.
26            THE COURT:  I --
27            MR. GARCIA:  Maybe Ms. Hinos can pull the minutes.  I
28    don't --
```

Exhibit 2, Page 150

```
 1              THE COURT:  There was no finding anybody did anything
 2    wrong.
 3              MS. DiMARIA:  I'm sorry, Your Honor, can I inquire of
 4    Mr. Garcia the date of that, since there were four months' worth
 5    of minutes in this trial?
 6              MR. GARCIA:  I don't have it with me.  I'll see if I
 7    can find it.  But my point is this is simply this issue -- to
 8    ignore this issue could cause massive ramifications for the
 9    criminal case.
10              THE COURT:  Well, if it does, it does.  We'll see how
11    it goes.
12              All right.  Anything else before we knock off for the
13    day because it's 10 minutes to 3:00.
14              MR. GARCIA:  Your Honor --
15              THE COURT:  Wait, wait.
16                      (Discussion with the clerk.)
17              MR. GARCIA:  Yeah, the date, for the record, was
18    November 4th, 2010, in the 9:15 a.m. minutes.
19              THE COURT:  November 4?
20              MR. GARCIA:  Right.  Says that Corporal Casarez
21    informed the court of possible juror misconduct.  The court
22    inquired of Ray Pomeroy, audience member, regarding contact with
23    a juror.
24              THE COURT:  But there wasn't any contact with a juror,
25    as it turned out.
26              MR. GARCIA:  I don't know.  I was just reading the
27    minutes so --
28              THE COURT:  There wasn't any.
```

Exhibit 2, Page 151

JULIE GIMINEZ, CSR

```
 1              All right.  Okay, folks, we have to stop.  Anything
 2    else we need to do?
 3              Ms. Hinos, anything else we need to do?
 4              THE CLERK:  Mr. Niroula has further proceedings set for
 5    today.
 6              THE COURT:  There were --
 7              THE CLERK:  He's just been following along with.
 8              MR. NIROULA:  Yeah, I've just been brought to
 9    observe.
10              THE COURT:  Getting out of the jail for the day.
11              THE CLERK:  (Inaudible.)
12              THE COURT:  What?
13              THE CLERK:  Since the motion is now denied, I don't
14    know whether we should continue the further proceedings and just
15    set the TRC for the motion date?
16              THE COURT:  No, let's do this, everyone.  Next date
17    will be March 4.  If I hear anything from the appellate court
18    that makes any difference, I'll bring you both over here.  In
19    other words -- because I'll have to deal with it.  That's on the
20    laptop issue.  But I would guess a couple of weeks we'd hear
21    something or another.  Usually it's pretty quick.
22              Right, Mr. Reilly?  How long does it take for the court
23    of appeal to rule on these things?
24              MR. REILLY:  Are they asking for an immediate stay?
25              THE COURT:  They are.
26              MR. REILLY:  Those are usually pretty quick, within a
27    couple of weeks, if not sooner.
28              THE COURT:  And they'll stay it or not.
```

Exhibit 2, Page 152

146

JULIE GIMINEZ, CSR

```
 1            MR. REILLY:  Yes, and then the decision ultimately is
 2   usually within 60 days.
 3            MR. NIROULA:  Your Honor, if I may?  I've been briefly
 4   going through the writ that county counsel has filed --
 5            THE COURT:  I've not seen it yet, and I don't want to
 6   get my blood pressure up today, so I'm probably not going to
 7   read it --
 8            MR. NIROULA:  Yes.  In regards to that --
 9            THE COURT:  Would get my blood pressure up if I read
10   it, is that what you're saying?
11            MR. NIROULA:  Well, Your Honor, this stated that every
12   piece of evidence that is included in this writ is filed with
13   the court, and they've actually pulled an on-line article from a
14   tabloid newspaper in San Francisco and used that as an exhibit.
15   That's against Mr. Garcia.  How that is filed as evidence before
16   the court --
17            THE COURT:  Probably not and --
18            MR. NIROULA:  So we might need to go to hearing for
19   those things prior to that, Your Honor.
20            THE CLERK:  There were exhibits that were identified on
21   the record in the motion, exhibits from the defense, A, E and F.
22   Will they be admitted --
23            THE COURT:  Yes.
24            THE CLERK:  -- counsel?
25            MS. DiMARIA:  I'm not following.  I'm sorry.
26            THE WITNESS:  Exhibits, A, E and F that were identified
27   on the record.
28            THE COURT:  Yeah, they're admitted, folks.  We should
```

Exhibit 2, Page 153

147

JULIE GIMINEZ, CSR

```
 1    have admitted them before.

 2           MR. GARCIA:  Your Honor --

 3           MS. DiMARIA:  Your Honor, I have a couple of issues,

 4    please.

 5           Two questions.  Number 1, since you made your ruling

 6    today, last time Ms. Maker from GTL was present, you had ordered

 7    Mr. McNeil to come to testify on March 4th.  Since you've ruled

 8    today, and his testimony is now unnecessary, may I advise

 9    Ms. Maker that Mr. McNeil need not be present on

10    March 4th so no one has to pay for his flight for no reason?

11           THE COURT:  Yes.

12           MS. DiMARIA:  The other thing I would just mention is

13    Mr. Garcia has his laptop with him, and when he was -- when I

14    made the inquiry about the date of the minutes of the alleged

15    misconduct involving Mr. Pomeroy, P-O-M-E-R-O-Y, Mr. Garcia

16    started looking on his computer.  I can see his hands working

17    from here.  And it appears that he possibly pulled the minutes

18    up from his computer, which would indicate that his computer

19    does, in fact, have internet access.  And I bring that to this

20    court's attention because that was one of the issues about him

21    having the computer at the jail.

22           THE COURT:  I've already talked to Captain Taylor --

23           MR. GARCIA:  It's actually a saved PDF, Your Honor,

24    so --

25           THE COURT:  I already talked to Captain Taylor about

26    the laptop.  And what I told Captain Taylor today is that Apple

27    may be hardwired for WiFi.  If there's WiFi capability in the

28    jail, and the court of appeals rules you cannot have that, they
```

Exhibit 2, Page 154

1   need to disable that.  But I told him to keep that in mind

2   should the court of appeal rule for the defendant.  So he knows

3   about it.  And I don't know the answer yet, but we'll take care

4   of it.  Okay?

5        MS. DiMARIA:  Yes, sir.  Thank you.

6        MR. GARCIA:  Your Honor, there's one other issue in

7   regards to copying of property of.  I guess Detective Min --

8        THE COURT:  Detective what?

9        MR. GARCIA:  I guess Detective Min had some concerns

10  over what was allowed.  So we just wanted to clarify maybe the

11  minute order.

12       THE COURT:  In regard to what?

13       MR. GARCIA:  Chris Pavan, our expert --

14       THE COURT:  Uh-huh.

15       MR. GARCIA:  -- I guess there's -- the order didn't say

16  that he was allowed to copy the devices.  That he was allowed to

17  have physical access to review the devices.  So if we could get

18  a corrected minute order that says he actually be allowed to

19  forensically copy the devices and retain those copies for --

20       THE COURT:  When -- what was -- what -- the last I

21  thought was that your expert was going to come down, get with

22  Detective Min, they were going to look at all the evidence and

23  decide how to proceed from there.  Because you wanted me to give

24  it all to your expert, and I said absolutely not.  So at this

25  point what's --

26       Ms. DiMaria, do you know?

27       MS. DiMARIA:  When I've spoken with Detective Min, I

28  think he's under the impression that their expert wants to copy

1    the hard drive.  Of course, he wants to ensure it's done

2    forensically properly.

3            THE COURT:  Right.

4            MS. DiMARIA:  He's a little baffled at how it's going

5    to get done considering the quantity.  But Mr. Garcia brought up

6    a point that -- I apologize if I don't remember -- but I don't

7    recall you excluding the drives from the silver suitcase.

8            THE COURT:  I don't either but --

9            MS. DiMARIA:  I guess we can deal with that at a 402 if

10   that comes up.  But my understanding that Detective Min is ready

11   or aware that their expert wants to copy these devices.  He's

12   just going to ensure that it's done in a forensically

13   appropriate way.

14           THE COURT:  Well, do we need to do a minute order that

15   says that so that everybody is covered?  What was the date of

16   the last minute order so I can look at it?

17           MR. GARCIA:  You know, I don't know that one.

18           MS. DiMARIA:  Let me text Detective Min, Your Honor.  I

19   apologize for using the cell phone.

20           THE COURT:  That's all right.  Go, do it.  That's all

21   right.

22           MS. DiMARIA:  Thank you.

23           THE COURT:  If both sides agree, I'll do a minute order

24   now so that everybody will be covered on what he can and cannot

25   do.

26           MR. GARCIA:  Because Mr. Pomeroy has a standing

27   appointment with Detective Min on Monday.  So rather than having

28   him come back down --

Exhibit 2, Page 156

JULIE GIMINEZ, CSR

```
 1              THE COURT:  Yeah, no, I don't want him to come down
 2   twice.
 3              MS. DiMARIA:  I believe it's Monday the 14th.  I don't
 4   believe it's next Monday.
 5              MR. REED:  Me and Detective Min had communicated this
 6   Monday.
 7              MS. DiMARIA:  Well, Detective Min had told me the 14th.
 8   I'll check if it's been advanced because I believe Detective Min
 9   thinks it's Monday the 14th.
10              THE COURT:  Then do we need to do a minute order now
11   laying out what they can and cannot do?
12              MR. GARCIA:  Yes, Your Honor.
13              THE COURT:  So everybody is protected.  Right?  And
14   your proposal on a minute order languagewise is what?
15              MR. GARCIA:  Oh.  That Chris Pavan be --
16              THE CLERK:  I need a spelling, please.
17              THE COURT:  Do you have a spelling for that.
18              MR. GARCIA:  P-A-V-A-N, Pavan.
19              THE COURT:  And he's associated with what organization,
20   please?
21              MR. GARCIA:  A forensic consulting company called
22   42 LLC.
23              THE COURT:  Okay.  Go ahead.  Slowly.
24              MR. GARCIA:  That he be granted access to all of the
25   electronic devices in possession of PSPD that were seized by
26   Sacramento Police Department, that he be allowed to forensically
27   copy those devices.
28              THE CLERK:  Were seized by?
```

Exhibit 2, Page 157

151

JULIE GIMINEZ, CSR

1          THE COURT:  Seized by Sacramento PD?

2          MR. GARCIA:  Uh-huh.

3          MS. DiMARIA:  On March 9, to distinguish them from any

4     other electronic evidence that PSPD may have.

5          MR. GARCIA:  March 9, 2009, I believe.

6          MS. DiMARIA:  And I apologize, I know Mr. Reed has

7     given me his name before and I was writing something else down,

8     Mr. Garcia, can you again spell Chris -- his last name, too?

9          MR. GARCIA:  Yes, it's Pavan, P-A-V-A-N, Pavan.

10         THE COURT:  Okay.

11         THE CLERK:  And the company is 42 LLC, is that spelled

12    out "42"?

13         MR. GARCIA:  Just use numbers, yeah.

14         MS. DiMARIA:  Where are they located so I can look them

15    up.

16         MR. GARCIA:  Well, actually, I think Paul Mejias knows

17    him quite well.

18         MR. REED:  I can give you that information.

19         MS. DiMARIA:  Thanks, Jeff.

20         THE COURT:  So do the minute order now and then, okay,

21    everybody will have it, all right.

22         THE CLERK:  Can I do it in a half an hour?

23         THE COURT:  Half an hour.  The minute order will be

24    done soon.

25         MS. DiMARIA:  And I can work this out with Mr. Reed,

26    but I'm telling you Detective Min just clarified he believes

27    it's on the 14th so --

28         THE COURT:  That's why we need to do the minute order

Exhibit 2, Page 158

152

JULIE GIMINEZ, CSR

1   today.

2         MS. DiMARIA:  Okay.  Well, he's under the impression

3   it's the 14th.  And I know from another case that I have with

4   Detective Min that Detective Min is going to have scheduling

5   issues next week and that he is under the impression it's the

6   14th.

7         THE COURT:  That's not your impression, gentlemen?

8         MR. REED:  No.  It -- I've been speaking with Chris

9   Pavan.  Instead of me trying to get in the middle of this,

10   initially Mr. -- Detective Min and I set the 14th.  I then

11   introduced Mr. Pavan to Simon so the two of them could work it

12   out.  Chris Pavan has relayed to me that because this is going

13   to take more than one day that they put it over to the 7th so

14   they can comply with the -- the court's ruling of being it done

15   within the 30 days, but it's going to take couple of days to do

16   this.  Now, it could be a communication error.  I have no -- I

17   mean, I can call Mr. Pavan.  The -- it's set -- it's -- it

18   sounds like we have a -- just pick a day next up, but it will

19   get taken care.

20         THE COURT:  All right.  You'll work it out, I know,

21   between you.  I know.  It will be fine.

22         Anything else before we break?  It's three o'clock,

23   folks, I got to go in a minute.

24         MS. DiMARIA:  Nothing from the People, sir.

25         THE COURT:  Your next date is the 4th of March;

26   correct, everybody?

27         THE CLERK:  Yes, Your Honor.

28         THE COURT:  Again, if I hear anything on the writ that

Exhibit 2, Page 159

JULIE GIMINEZ, CSR

1    I think you all need to know about, I'll bring everyone back.

2          Ms. DiMaria, you have some other days you're not going

3    to be available; right?

4          MS. DiMARIA:  Yes, sir.

5          THE COURT:  The writ doesn't concern you anyway,

6    really.

7          MS. DiMARIA:  I am not available next two weeks.

8          THE COURT:  All right.  County counsel may have some.

9    But anyway, all right.  Okay.  I can always pull some DA in here

10   just so there's not an ex parte if I need to talk to Mr. Garcia

11   and Mr. Niroula about the writ.  I don't know.  Okay.

12         Mr. Niroula, really quick, please, I got to go.

13         MR. NIROULA:  Your Honor, without mentioning, because

14   of what Mr. Garcia said members in the audience, could we at

15   least make sure that that box does not get out of the hands of

16   the special master?

17         THE COURT:  It's not going anywhere.

18         MR. NIROULA:  Okay.  Thank you, Your Honor.

19         THE COURT:  It's been sitting here for long now.

20         MR. NIROULA:  Almost two years in San Francisco, close

21   to two years, and I think it came here during the trial.  So

22   thank you, Your Honor.

23         THE CLERK:  Ms. DiMaria, you have, too, a motion to

24   compel discovery on calendar.

25         MR. GARCIA:  I thought that was decided on a while

26   back.

27         THE CLERK:  Well, it's been trailing.

28         MS. DiMARIA:  I know.  I will move to take it off

Exhibit 2, Page 160

```
 1    calendar as this -- well, I don't know if I want to trail it or
 2    not, Your Honor.  This is the issue about Mr. Garcia providing
 3    me copies of the subpoenas, not the actual response to the
 4    subpoena.  Let's trail that to the 4th, please.  Is Your Honor
 5    okay --
 6              THE COURT:  Let's do -- I -- I got to --
 7              MS. DiMARIA:  No, I know.
 8              MR. GARCIA:  I thought it had been fully litigated, and
 9    we haven't issued any subpoenas, and if we do, we're more than
10    happy to inform Ms. DiMaria who the party is and what we're
11    requesting.
12              THE COURT:  Let's put it over on the 4th.  And
13    everything is okay.  We'll just deal with this then, okay.
14              All right, gentlemen.  I'll let you know on the writ if
15    I hear before you do.  Thank you everybody for your time and
16    attention.
17              MR. REILLY:  Thank you, Your Honor.
18              MS. DiMARIA:  Thank you, Your Honor.
19              THE COURT:  You're welcome.
20              MS. FITZPATRICK:  Thank you.
21                        (Proceedings concluded.)
22
23
24
25
26
27
28
```

Exhibit 2, Page 161

155

1

2

3                    REPORTER'S CERTIFICATE

4

5

6   PEOPLE OF THE STATE OF CALIFORNIA,  )
                                         )
7                       Plaintiff,       )
                                         )
8              vs.                       )  Case No. INF 064492
                                         )
9   DANIEL CARLOS GARCIA,                )
                                         )
10                      Defendant.       )
    _____ )

11

12

13          I, Julie Giminez, Certified Shorthand Reporter,

14   No. 8396, hereby certify:

15          On February 3, 2011, in the County of Riverside, State

16   of California, I took in stenotype a true and correct report of

17   the testimony given and proceedings had in the above-entitled

18   case, pages 1-155, and that the foregoing is a true and accurate

19   transcription of my stenotype notes and is the whole thereof.

20

21

22   DATED:  Indio, California, April 19, 2011.

23

24

25

26                       JULIE GIMINEZ, CSR No. 8396

27

28

Exhibit 2, Page 162